DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 173594
Chief Deputy City Attorney
WADE CHOW, SBN 168527
Chief Attorney
Neighborhood and Resident Safety Division
HUNTER W. SIMS III, SBN 266039
Deputy City Attorneys
Fox Plaza
1390 Market Street, Seventh Floor
San Francisco, California 94102-5406
Telephone:     (415) 554-4259 (Sims)
Facsimile:     (415) 437-4644
E-Mail:        hunter.sims@sfcityatty.org

Attorneys for Plaintiffs and Cross-Defendants
CITY AND COUNTY OF SAN FRANCISCO
(Erroneously sued as MAYOR'S OFFICE OF
HOUSING AND COMMUNITY DEVELOPMENT
[1]) and PEOPLE OF THE STATE OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, a Municipal Corporation; and the PEOPLE OF THE STATE OF CALIFORNIA, by and through Dennis J. Herrera, City Attorney for the City and County of San Francisco,<br><br>        Plaintiffs,<br><br>        vs.<br><br>KELLY ANN DOMINGUEZ JOHNSTON<br><br>        Defendants. | Case No. 3:25-cv-03518 SK<br><br>**DECLARATION OF HUNTER W. SIMS III IN SUPPORT OF PLAINTIFFS AND CROSS-DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**<br><br>Hearing Date:    October 6, 2025<br>Hearing Judge:  Hon. Sallie Kim<br>Time:        9:30 a.m.<br>Place:       450 Golden Gate Avenue<br>           Courtroom C, 15th Floor<br>           San Francisco, California<br><br>Date Action Filed:  September 20, 2018<br>Trial Date:      Not set |
| KELLY ANN DOMINGUEZ JOHNSTON, an individual, | |

[1] The Mayor's Office of Housing and Community Development is a department of the City and County of San Francisco.  This department is not a properly joined defendant because it does not have power to sue or be sued, and is not an independent public corporation.  (See *Bauer v. County of Ventura* (1955) 45 Cal.2d 276, 288-289; *compare* Gov. Code, §§ 23000, 23004, subd. (a).)

Cross-Complainant,

v.

MAYOR'S OFFICE OF HOUSING AND
COMMUNITY DEVELOPMENT, a City and
County of San Francisco organization, and
ROES ONE through ROES TEN,

Cross-Defendants.

I, Hunter W. Sims III, declare as follows:

1.    I am a Deputy City Attorney in the Office of the City Attorney for the City and County of San Francisco ("Defendant").  I am the Deputy City Attorney assigned to the above-captioned matter.  I have personal knowledge of the contents of this declaration, except where indicated otherwise, and I could and would testify competently thereto if called upon to do so.

2.    Attached as Exhibit A is a true and correct copies of Plaintiffs' complaint filed in San Francisco Superior Court.

3.    Attached as Exhibit B is a true and correct Defendant's cross-complaint filed in San Francisco Superior Court.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct, and that I executed this declaration on September 8, 2025, at San Francisco, California.


_____/s/ Hunter W. Sims III_____
HUNTER W. SIMS III

# EXHIBIT A

1  DAVID CHIU, State Bar #189542
   City Attorney
2  YVONNE R. MERÉ, State Bar #173594
   Chief Deputy City Attorney
3  WADE CHOW, State Bar #168527
   Chief Attorney
4  Neighborhood and Resident Safety Division
   HUNTER W. SIMS III, State Bar #266039
5  Deputy City Attorneys
   Fox Plaza
6  1390 Market Street, Seventh Floor
   San Francisco, California 94102-5406
7  Telephone:    (415) 554-4259 (Sims)
   Facsimile:     (415) 437-4644
8  E-Mail:        hunter.sims@sfcityatty.org

9
   Attorneys for Plaintiffs
10 CITY AND COUNTY OF SAN FRANCISCO and
   PEOPLE OF THE STATE OF CALIFORNIA

11

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                     COUNTY OF SAN FRANCISCO

14                       UNLIMITED JURISDICTION

15 CITY AND COUNTY OF SAN
   FRANCISCO, a Municipal Corporation; and
16 the PEOPLE OF THE STATE OF
   CALIFORNIA, by and through David Chiu,
17 City Attorney for the City and County of San
   Francisco,
18
             Plaintiffs,
19
        vs.
20
21 KELLY ANN DOMINGUEZ JOHNSTON, an
   individual, and DOE ONE through DOE TEN
22
         Defendants.
23

24

CGC-24-614712

Case No.

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

**(1) VIOLATION OF THE SAN FRANCISCO PLANNING CODE**
**(2) VIOLATION OF THE STATE UNFAIR COMPETITION LAW (CAL. BUSINESS AND PROFESSIONS CODE §§ 17200-17210)**

Type of Case:        (42) Other Complaint

ELECTRONICALLY
F I L E D
Superior Court of California,
County of San Francisco

05/16/2024
Clerk of the Court
BY: AUSTIN LAM
Deputy Clerk

25        The CITY AND COUNTY OF SAN FRANCISCO ("CITY") and PEOPLE OF THE STATE

26 OF CALIFORNIA, by and through San Francisco City Attorney DAVID CHIU ("PEOPLE"),

27 (collectively "PLAINTIFFS"), file their Complaint against Defendants KELLY ANN DOMINGUEZ

28

1

JOHNSTON and DOE ONE through DOE TEN ("DEFENDANTS"). PLAINTIFFS hereby allege as set forth below:

## INTRODUCTION

1.      This action arises out of DEFENDANTS' unlawful and unfair business practices in the ownership and use of a property intended for low-income households as part of the San Francisco Mayor's Office of Housing and Community Development's ("MOHCD") Residential Inclusionary Affordable Housing Program. This program requires developers of residential properties containing ten or more units to set aside a certain number of units to be sold to low-income households for below market rates. Low-income households who purchase a property through this program agree to abide by restrictions and conditions, including requirements that the owner live there as a primary residence and not rent out the property.

2.      DEFENDANTS purchased the property located at 400 Grove Street, Unit 100, Assessor's Block 0793, Lot 107, in the City and County of San Francisco, State of California 94102 ("PROPERTY"). as a below market rate condominium unit in October 2015. In 2022, MOHCD began investigating potential misuse of the PROPERTY. A subsequent investigation revealed that DEFENDANTS had, in contravention of the program's requirements, been illegally renting out the PROPERTY since at least 2018. DEFENDANTS have also failed to live at the PROPERTY and purchased a separate apartment for $865,000 in October of 2020.

3.      DEFENDANTS' deliberate and repeated flouting of the Residential Inclusionary Affordable Housing Program and City and County of San Francisco's Planning Code constitutes an unlawful, fraudulent, and unfair business practice under the Unfair Competition Law, as codified in California Business and Professions Code sections 17200-17210 ("UCL") and a violation of the San Francisco Planning Code. DEFENDANTS' violations of law have also prevented a law-abiding and deserving low-income household from purchasing and occupying the PROPERTY.

## PARTIES

4.      Plaintiff CITY AND COUNTY OF SAN FRANCISCO is a consolidated charter city and county under the laws of the State of California. Plaintiff CITY AND COUNTY OF SAN FRANCISCO brings this action under San Francisco Planning Code section 176.

5.      Plaintiff PEOPLE OF THE STATE OF CALIFORNIA, by and through David Chiu, City Attorney of the City and County of San Francisco, brings this action pursuant to California Business and Professions Code section 17204.

6.      Defendant KELLY ANN DOMINGUEZ JOHNSTON, an individual who owns and uses the PROPERTY, in violation of the law.

7.      Defendants DOE ONE through DOE TEN are sued herein under fictitious names. PLAINTIFFS do not at this time know the true names or capacities of said defendants but pray that the same may be alleged herein when ascertained.

8.      At all times herein mentioned, each Defendant was an agent, servant, employee, partner, franchisee and joint venturer of each other defendant and at all times was acting within the course and scope of said agency, service, employment, partnership, franchise and joint venture.

9.      At all times herein mentioned, all the acts and omissions described in this Complaint by any individual Defendant were aided and abetted by all other DEFENDANTS. DEFENDANTS were aware of the illegality of the acts and omissions described in this Complaint, and either directly participated in, or encouraged, these acts and omissions.

10.     Whenever reference is made in this Complaint to any act of "DEFENDANTS" each such allegation shall mean that each defendant acted both individually and jointly with the other defendants. Actions taken by or omissions made by DEFENDANTS' employees or agents in the course of their employment or agency are considered to be actions or omissions of DEFENDANTS for the purposes of this Complaint.

## JURISDICTION AND VENUE

11.     The Superior Court has jurisdiction over this action.

12.     Venue is proper because the PROPERTY is located in San Francisco and all the acts complained of, including those giving rise to penalties, occurred in this venue. (Code of Civ. Proc. §§ 392, 393 and 395.)

## GENERAL ALLEGATIONS

13.     The California Legislature has found the availability of housing to be "of vital statewide importance," and mandated that, "local and state governments have a responsibility to use

Complaint, CCSF v. Kelly Ann Dominguez Johnston                    n:\codenf\li2024\221101\01748979.docx

the powers invested in them to facilitate the improvement and development of housing to make adequate provision for the housing needs of all economic segments of the community." (Cal. Govt. Code, §65580.)

14.    In response to the shortage of low-income housing, MOHCD established the Inclusionary Affordable Housing Program, first codified in San Francisco Planning Code section 315 *et seq*. and later amended into Planning Code section 415. The purpose of the Inclusionary Affordable Housing Program is to increase the number of affordable housing units for low-income households. Accordingly, the Inclusionary Affordable Housing Program requires developers of new residential buildings containing ten or more units to set aside a certain number of units for low-income households.  These units are commonly referred to as Below Market Rate units ("BMR UNIT").

15.    Qualified low-income households who wish to purchase a BMR UNIT enter their names into a lottery. The lucky few whose names are chosen are afforded an opportunity to purchase a BMR UNIT for a below market price. In return, the households agree to abide by the restrictions and conditions placed on the use of the BMR UNIT, including the requirement that the household reside at and use the property as a primary residence and not rent out the property without the express permission of MOHCD. If a household no longer wishes to reside in a BMR UNIT, they must contact MOHCD to arrange for a sale of the BMR UNIT to another qualified low-income household.

## I.    THE PROPERTY AT ISSUE

16.    The PROPERTY at issue is a 485-square-foot one bedroom, one-bathroom condominium.

17.    On May 6, 2013, a "Notice of Special Restrictions under the Planning Code" ("NSR") was recorded against title to the PROPERTY.  The NSR required that 12% of the apartments, or 4 units, in the building serve as BMR UNITS. The NSR further stated, "[t]he use of said property contrary to these special restrictions shall constitute a violation of the Planning Code . . . ." A true and correct copy of the NSR is attached as **Exhibit 1** and incorporated as part of this Complaint.

## II.    DEFENDANTS' UNLAWFUL USE OF THE PROPERTY

18.    DEFENDANTS purchased the PROPERTY for $321,634, approximately $328,000 below then market value on October 26, 2015.

19.     To purchase the PROPERTY at below-market price, DEFENDANTS signed an "Acknowledgment of Special Use Restriction and Procedures Manual" on October 20, 2015 ("ACKNOWLEDGMENT"). A true and correct copy of the ACKNOWLEDGMENT is attached as **Exhibit 2** and incorporated as part of this Complaint.

20.     In the ACKNOWLEDGMENT, DEFENDANTS confirmed receipt of the NSR and the 2013 City and County of San Francisco Residential Inclusionary Affordable Housing Monitoring Procedures Manual ("2013 PROCEDURES MANUAL") and asserted, "Purchaser acknowledges and agrees that the BMR unit shall remain subject to the NSR and the Procedures Manual." San Francisco Planning Code section 415 mandates that the Procedures Manual in effect at the time of sale of each BMR UNIT governs its regulation. As of October 20 2015, the 2013 PROCEDURES MANUAL was in effect. A true and correct copy of the 2013 PROCEDURES MANUAL is attached as **Exhibit 3** and incorporated as part of this Complaint.

21.     Section F of Chapter II of the 2013 PROCEDURES MANUAL states that, "BMR units are to be owner-occupied and used as the owner's primary residence" and "[a]n owner of a BMR unit may not rent or sublease any part or the entire unit without prior written consent of MOH." (MOH was an earlier name for MOHCD.)

22.     On October 20, 2015, DEFENDANTS also signed a "Promissory Note Secured by Deed of Trust, Inclusionary Housing Program" ("PROMISSORY NOTE"). The PROMISSORY NOTE also makes clear that the PROPERTY was subject to various restrictions, including the NSR and 2013 PROCEDURES MANUAL. A true and correct copy of the PROMISSORY NOTE is attached as **Exhibit 4** and incorporated as part of this Complaint.

23.     The PROMISSORY NOTE was secured by a "Deed of Trust and Assignment of Rents" ("DEED OF TRUST"). In 2015, the DEED OF TRUST was recorded against title to the PROPERTY. A true and correct copy of the DEED OF TRUST is attached as **Exhibit 5** and incorporated as part of this Complaint.

24.     On December 12, 2016, DEFENDANTS signed an Occupancy Certification form declaring under penalty of perjury that she resided as the owner and occupant of the PROPERTY.

25.     In or around 2018, and in direct violation of Section F of Chapter II of the 2007

PROCEDURES MANUAL, DEFENDANTS began renting out the PROPERTY for approximately $2,000 per month. It was subsequently rented to at least one other tenant. From June 2023 to January 2024, DEFENDANTS rented the PROPERTY for $2,600 per month. Upon information and belief, DEFENDANTS failed to live at the PROPERTY from 2018 to the present.

26.     At no time did MOHCD give DEFENDANTS permission to rent the PROPERTY.

## FIRST CAUSE OF ACTION

**FOR VIOLATIONS OF THE SAN FRANCISCO PLANNING CODE BROUGHT BY PLAINTIFF CITY AND COUNTY OF SAN FRANCISCO AGAINST DEFENDANTS (S.F. PLANNING CODE SECTIONS 174, 176, 303, 415)**

27.     Plaintiff CITY AND COUNTY OF SAN FRANCISCO ("CITY") hereby incorporates by reference all of the foregoing paragraphs, as though fully set forth herein.

28.     The PROPERTY is part of a program intended to facilitate home ownership among low-income households.  As such, its use is restricted to, and conditioned upon, owner occupancy by a low-income household.  Using the PROPERTY as rental property is prohibited unless expressly permitted by MOHCD.

29.     The PROPERTY is also subject to a Notice of Special Restrictions.

30.     San Francisco Planning Code section 174 mandates that every "condition, stipulation, special restriction and other limitation imposed by administrative actions pursuant to this Code . . . shall be complied with in the development and use of land and structures."  Failure to comply with any such condition "shall constitute a violation of the provisions of this Code."

31.     San Francisco Planning Code section 303(d) states that the "violation of any condition shall constitute a violation of this Code and may constitute grounds for revocation of the Conditional Use authorization."

32.     San Francisco Planning Code section 415 directs that the San Francisco Planning Department and MOHCD, "periodically publish a Procedures Manual for monitoring and enforcement of the policies and procedures for implementation of this Program" and further states that the Procedures Manual in effect at the time of the initial purchase of the BMR UNIT, "shall govern the regulation of that unit."  The 2013 PROCEDURES MANUAL was in effect at the time of DEFENDANTS' purchase of the PROPERTY.

33. Section F of Chapter II of the of the 2013 PROCEDURES MANUAL explicitly states, "BMR Ownership Units are to owner-occupied and used as the owner's primary residence." Section F of Chapter II adds that, "BMR ownership are not to be used a rental property. An owner of a BMR unit may not rent or sublease any part or the entire unit without prior written consent of MOH." Even where an owner seeks consent to rent the property, MOHCD may allow rental of a BMR UNIT only under certain specific circumstances; the total time period of the rental does not exceed twelve months; the tenant "satisfies the income, household size and other qualifying household requirements placed on the BMR unit"; and, "[i]nitial rent does not exceed the maximum monthly rent," calculated using the 2013 PROCEDURES MANUAL'S formula.

34. By failing to live at the PROPERTY as their primary residence, DEFENDANTS failed to comply with the special restrictions, stipulations, limitations and conditional uses imposed on the PROPERTY, as well as the directives of the 2013 PROCEDURES MANUAL. Likewise, by renting out the PROPERTY, DEFENDANTS failed to comply with the special restrictions, stipulations, limitations and conditional uses imposed on the PROPERTY, as well as the directives of the 2013 PROCEDURES MANUAL. In doing so, DEFENDANTS violated San Francisco Planning Code sections 174, 176, 415, and 303.

35. At all times alleged herein, DEFENDANTS had notice and knowledge that they were maintaining the PROPERTY in violation of the 2013 PROCEDURES MANUAL and the San Francisco Planning Code, but failed and refused to abate the violations or to cease the illegal use of the PROPERTY.

36. The CITY has no adequate remedy at law in that damages are insufficient to protect the public from the harm caused by the conditions described herein.

37. Pursuant to San Francisco Planning Code section 176, DEFENDANTS are subject to civil penalties of not less than $200 and up to $1,000 for each day such violations were, and are, committed, or permitted to continue, and reasonable attorney's fees and costs, including expert witness fees, incurred by the CITY in enforcing the San Francisco Planning Code against DEFENDANTS through this Complaint. DEFENDANTS are also subject to injunctive relief, requiring that they comply with the San Francisco Planning Code.

**SECOND CAUSE OF ACTION**
**FOR UNLAWFUL, UNFAIR AND FRAUDULENT BUSINESS PRACTICES BROUGHT BY**
**PLAINTIFF PEOPLE OF THE STATE OF CALIFORNIA AGAINST DEFENDANTS**
**(California Business and Professions Code Sections 17200-17210)**

38.    Plaintiff PEOPLE hereby incorporates by reference all of the foregoing paragraphs, as though fully set forth herein.

39.    The PEOPLE bring this cause of action in the name of the People of the State of California, pursuant to Business and Professions Code section 17204 in order to protect the public and similarly-situated individuals from the unlawful, unfair and fraudulent business practices committed by DEFENDANT within the City and County of San Francisco, State of California.

40.    The violations of law described herein have been, and are being, carried out within the City and County of San Francisco. DEFENDANTS are in violation of the laws and public policies of the City and County of San Francisco and the State of California, and their conduct is inimical to the rights and interest of the general public.

41.    DEFENDANTS are now engaging in and, for a considerable period of time and at all times pertinent to the allegations of this Complaint, have engaged in unlawful business practices prohibited by California's Unfair Competition Law by operating in violation of the following laws:

- San Francisco Planning Code sections 174, 176 and 303 by failing to abide by the conditions, stipulations, special restrictions, and other limitations placed on the PROPERTY;

- San Francisco Planning Code section 415 by failing to comply with the Residential Inclusionary Affordable Housing Program, including the restrictions contained in the 2013 PROCEDURES MANUAL.

42.    DEFENDANTS are now engaging in and, for a considerable period of time and at all times pertinent to the allegations of this Complaint, have engaged in unfair business practices prohibited by the Unfair Competition Law as follows:

- By renting out the PROPERTY and failing to live there, DEFENDANTS have undermined the purpose of the Residential Inclusionary Affordable Housing Program and prevented the PROPERTY from housing a low-income household.

8

43.    DEFENDANTS are now engaging in and, for a considerable period of time and at all times pertinent to the allegations of this Complaint have engaged in, fraudulent business practices prohibited by California's Unfair Competition Law. MOHCD authorized DEFENDANTS to purchase the PROPERTY only after they represented that they would abide by the restrictions, stipulations, conditions, and limitations imposed on the PROPERTY, including the requirement that they occupy the PROPERTY and obtain permission from the MOHCD before renting out the PROPERTY. DEFENDANTS failed to comply. Instead, they moved out of the PROPERTY and rented it out without notifying MOHCD, depriving a low-income household of the chance to occupy the PROPERTY. By advertising rentals and renting out the PROPERTY, DEFENDANTS also engaged in conduct that was likely to deceive prospective and actual tenants into believing that they were renting a legal unit. DEFENDANTS' failure to disclose this fact was material; a reasonable consumer would assume the rental was lawful.

44.    The PEOPLE have no adequate remedy at law in that damages are insufficient to protect the public from the harm caused by the conditions described in this complaint.

45.    Unless injunctive relief is granted to enjoin the unfair, fraudulent, and unlawful business practices of DEFENDANTS, the PEOPLE will suffer irreparable injury and damage.

46.    By engaging in unfair, fraudulent, and unlawful business practices described herein, DEFENDANTS are subject to civil penalties in the amount of up to $2,500 per violation, pursuant to California Business and Professions Code section 17206.

## PRAYER

WHEREFORE, PLAINTIFFS pray that:

**Declaratory Relief**

1.    DEFENDANTS be declared to have engaged in unfair, fraudulent, and unlawful business acts and practices in violation of California Business and Professions Code sections 17200-17210;

2.    DEFENDANTS be declared to have violated San Francisco Planning Code sections 415, 174, and 303;

**Injunctive Relief**

3.     The public nuisance be abated;

4.     DEFENDANTS be enjoined and restrained from continuing to own and maintain the PROPERTY in violation of the law;

5.     DEFENDANTS be enjoined from committing unlawful, fraudulent, and unfair business practices in the use and maintenance of the PROPERTY;

6.     If DEFENDANTS are unable to own the PROPERTY in compliance with the law, DEFENDANTS be ordered to sell the PROPERTY to a qualified low-income household through MOHCD;

**Penalties**

7.     Pursuant to California Business and Professions Code section 17206, DEFENDANTS be ordered to pay a civil penalty of up to $2,500 for each violation. Therefore, penalties total $182,000 ($2,500 x 73 months) as of April 22, 2024, plus $2,500 per unit for each month thereafter that the violations continue to occur through entry of judgment, or a greater amount as may be shown by the evidence.

8.     Pursuant to San Francisco Planning Code sections 176(c)(2) and 176(f), DEFENDANTS be ordered to pay a civil penalty of up to $1,000 for each day that the Planning Code violations alleged in the Complaint existed or were permitted to occur, for a total of $610,000 ($1,000 x 610 days), plus $1,000 per day thereafter through the entry of judgment, or a greater amount as may be shown by the evidence for violations of Planning Code sections 174, 415, and 303;

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**Fees and Costs**

9.      PLAINTIFFS be awarded reasonable attorney's fees incurred in bringing this action, pursuant to San Francisco Planning Code section 176(c)(2);

10.     PLAINTIFFS be awarded their costs, including expert witness fees, incurred herein pursuant to Code of Civil Procedure section 1032 and San Francisco Planning Code section 176(c)(2); and

11.     Other and further relief as this Court should find just and proper.

Date:  May 16, 2024

DAVID CHIU
City Attorney
YVONNE R. MERÉ
Chief Deputy City Attorney
WADE CHOW
Chief Attorney
Neighborhood and Resident Safety Division
HUNTER W. SIMS III
Deputy City Attorneys


By:_____
        HUNTER W. SIMS III
        Attorneys for Plaintiffs
        CITY AND COUNTY OF SAN FRANCISCO and
        PEOPLE OF THE STATE OF CALIFORNIA

11

## INDEX TO EXHIBITS

| **Exhibit** | **Description** |
|---|---|
| 1 | NOTICE OF SPECIAL RESTRICTIONS |
| 2 | ACKNOWLEDGMENT |
| 3 | 2013 PROCEDURES MANUAL |
| 4 | PROMISSORY NOTE |
| 5 | DEED OF TRUST |

# EXHIBIT 1

## NOTICE OF SPECIAL RESTRICTIONS UNDER THE PLANNING CODE

RECORDING REQUESTED BY:               )
                                      )
And When Recorded Mail To:            )
                                      )
Name: GROVE STREET Hayes Valley LLC   ) CONFORMED COPY of document recorded
                                      )
                                      )   05/06/2013, 2013J652026
Address: 443 LINDEN ST.               )  ch._____ with document no._____
                                      )  This document has not been compared with the original
City: SAN FRANCISCO                   )  SAN FRANCISCO ASSESSOR-RECORDER
                                      )
California                            ) Space Above This Line For Recorder's Use

I (We) _____ Grove Street Hayes Valley LLC _____, the
owner(s) of that certain real property situated in the City and County of San Francisco, State of
California, more particularly described as follows (or see attached sheet marked Exhibit A on
which property is more fully described):

Being Assessor's Block 0793 Lot 103, commonly known as 400 Grove Street (AKA
Central Freeway Parcel "H"), hereby give notice that there are special restrictions on the use of
said property under Part II, Chapter II of the San Francisco Municipal Code (Planning Code).

Said restrictions consist of conditions attached to Conditional Use Application No.
2012.0083C, authorized by the Planning Commission of the City and County of San Francisco
on January 31,2013 as set forth in Planning Commission Motion No. 18795, TO CONSTRUCT
A NEW DEVELOPMENT REACHING A MAXIMUM HEIGHT OF FOUR TO FIVE
STORIES CONTAINING UP TO 34 DWELLING UNITS, APPROXIMATELY 2,025 SQUARE
FEET OF GROUND FLOOR COMMERCIAL USE, AND 17 OFF-STREET RESIDENTIAL
PARKING SPACES LOCATED AT 400 GROVE STREET (AKA CENTRAL FREEWAY
PARCEL "H") LOT 103 IN ASSESSOR'S BLOCK 0793, WITHIN THE MODERATE-SCALE
NEIGHBORHOOD COMMERCIAL TRANSIT DISTRICT (NCT-3), AND THE 40-X & 50-X
HEIGHT AND BULK DISTRICTS, AND ADOPTING FINDINGS UNDER THE
CALIFORNIA ENVIRONMENTAL QUALITY ACT.

Page 1 of 11

## NOTICE OF SPECIAL RESTRICTIONS UNDER THE PLANNING CODE

The restrictions and conditions of which notice is hereby given are:

### AUTHORIZATION

This authorization is for a Conditional Use to allow development of a lot exceeding 10,000 square feet to construct a new development reaching a maximum height of four to five stories containing up to 34 dwelling units, approximately 2,025 square feet of ground floor commercial uses, and 17 off-street residential parking spaces located at 400 Grove (AKA Central Freeway Parcel "H"), Lot 103 in Assessor's Block 0793, within the Moderate-Scale Neighborhood Commercial Transit District (NCT-3), and the 40-X & 50-X Height and Bulk Districts; in general conformance with plans, dated June 13, 2012, and stamped "EXHIBIT B" included in the docket for Case No. 2012.0083ECV and subject to conditions of approval reviewed and approved by the Commission on January 31, 2013 under Motion No. 18795. This authorization and the conditions contained herein run with the property and not with a particular Project Sponsor, business, or operator.

### RECORDATION OF CONDITIONS OF APPROVAL

Prior to the issuance of the building permit or commencement of use for the Project the Zoning Administrator shall approve and order the recordation of a Notice in the Official Records of the Recorder of the City and County of San Francisco for the subject property. This Notice shall state that the project is subject to the conditions of approval contained herein and reviewed and approved by the Planning Commission on January 31, 2013 under Motion No 18795.

### PRINTING OF CONDITIONS OF APPROVAL ON PLANS

The conditions of approval under the 'Exhibit A' of this Planning Commission Motion No. 18795 shall be reproduced on the Index Sheet of construction plans submitted with the Site or Building permit application for the Project. The Index Sheet of the construction plans shall reference to the Conditional Use Authorization and any subsequent amendments or modifications.

### SEVERABILITY

The Project shall comply with all applicable City codes and requirements. If any clause, sentence, section or any part of these conditions of approval is for any reason held to be invalid, such invalidity shall not affect or impair other remaining clauses, sentences, or sections of these conditions. This decision conveys no right to construct, or to receive a building permit. "Project Sponsor" shall include any subsequent responsible party.

### CHANGES AND MODIFICATIONS

Changes to the approved plans may be approved administratively by the Zoning Administrator. Significant changes and modifications of conditions shall require Planning Commission approval of a new Conditional Use Authorization.

## NOTICE OF SPECIAL RESTRICTIONS UNDER THE PLANNING CODE

### Conditions of approval, Compliance, Monitoring, and Reporting
#### PERFORMANCE

1. **Validity and Expiration.** The authorization and right vested by virtue of this action is valid for three years from the effective date of the Motion. A building permit from the Department of Building Inspection to construct the project and/or commence the approved use must be issued as this Conditional Use Authorization is only an approval of the proposed project and conveys no independent right to construct the project or to commence the approved use. The Planning Commission may, in a public hearing, consider the revocation of the approvals granted if a site or building permit has not been obtained within three (3) years of the date of the Motion approving the Project. Once a site or building permit has been issued, construction must commence within the timeframe required by the Department of Building Inspection and be continued diligently to completion. The Commission may also consider revoking the approvals if a permit for the Project has been issued but is allowed to expire and more than three (3) years have passed since the Motion was approved.

   *For information about compliance, contact Code Enforcement, Planning Department at 415-575-6863, www.sf-planning.org*

2. **Extension.** This authorization may be extended at the discretion of the Zoning Administrator only where failure to issue a permit by the Department of Building Inspection to construct the project and/or commence the approved use is caused by a delay by a local, State or Federal agency or by any appeal of the issuance of such permit(s).

   *For information about compliance, contact Code Enforcement, Planning Department at 415-575-6863, www.sf-planning.org*

3. **Mitigation Measures.** Mitigation measures described in the MMRP for the Market and Octavia Area Plan EIR (Case No. 2003.0347E) attached as Exhibit C are necessary to avoid potential significant effects of the proposed project and have been agreed to by the project sponsor.

   *For information about compliance, contact Code Enforcement, Planning Department at 415-575-6863, www.sf-planning.org*

#### DESIGN – COMPLIANCE AT PLAN STAGE

4. **Final Materials.** The Project Sponsor shall continue to work with Planning Department on the building design. Final materials, glazing, color, texture, landscaping, and detailing shall be subject to Department staff review and approval. The architectural addenda shall be reviewed and approved by the Planning Department prior to issuance.

   *For information about compliance, contact the Case Planner, Planning Department at 415-575-9078, www.sf-planning.org*

5. **Garbage, composting and recycling storage.** Space for the collection and storage of garbage, composting, and recycling shall be provided within enclosed areas on the property and clearly

## NOTICE OF SPECIAL RESTRICTIONS UNDER THE PLANNING CODE

labeled and illustrated on the building permit plans. Space for the collection and storage of recyclable and compostable materials that meets the size, location, accessibility and other standards specified by the San Francisco Recycling Program shall be provided at the ground level of the buildings.

*For information about compliance, contact the Case Planner, Planning Department at 415-575-9078, www.sf-planning.org*

6. **Rooftop Mechanical Equipment.** Pursuant to Planning Code 141, the Project Sponsor shall submit a roof plan to the Planning Department prior to Planning approval of the building permit application. Rooftop mechanical equipment, if any is proposed as part of the Project, is required to be screened so as not to be visible from any point at or below the roof level of the subject building.

*For information about compliance, contact the Case Planner, Planning Department at 415-575-9078, www.sf-planning.org*

7. **Signage.** The Project Sponsor shall develop a signage program for the Project which shall be subject to review and approval by Planning Department staff before submitting any building permits for construction of the Project. All subsequent sign permits shall conform to the approved signage program. Once approved by the Department, the signage program/plan information shall be submitted and approved as part of the site permit for the Project. All exterior signage shall be designed to compliment, not compete with, the existing architectural character and architectural features of the building.

*For information about compliance, contact the Case Planner, Planning Department at 415-575-9078, www.sf-planning.org*

8. **Transformer Vault.** The location of individual project PG&E Transformer Vault installations has significant effects to San Francisco streetscapes when improperly located. However, they may not have any impact if they are installed in preferred locations. Therefore, the Planning Department recommends the following preference schedule in locating new transformer vaults, in order of most to least desirable:

   1. On-site, in a basement area accessed via a garage or other access point without use of separate doors on a ground floor façade facing a public right-of-way;

   2. On-site, in a driveway, underground;

   3. On-site, above ground, screened from view, other than a ground floor façade facing a public right-of-way;

   4. Public right-of-way, underground, under sidewalks with a minimum width of 12 feet, avoiding effects on streetscape elements, such as street trees; and based on Better Streets Plan guidelines;

   5. Public right-of-way, underground; and based on Better Streets Plan guidelines;

   6. Public right-of-way, above ground, screened from view; and based on Better Streets Plan guidelines;

Page 4 of 11

## NOTICE OF SPECIAL RESTRICTIONS UNDER THE PLANNING CODE

7. On-site, in a ground floor façade (the least desirable location).

Unless otherwise specified by the Planning Department, Department of Public Work's Bureau of Street Use and Mapping (DPW BSM) should use this preference schedule for all new transformer vault installation requests.

*For information about compliance, contact Bureau of Street Use and Mapping, Department of Public Works at 415-554-5810, http://sfdpw.org*

9. **Overhead Wiring.** The Property owner will allow MUNI to install eyebolts in the building adjacent to its electric streetcar line to support its overhead wire system if requested by MUNI or MTA.

*For information about compliance, contact San Francisco Municipal Railway (Muni), San Francisco Municipal Transit Agency (SFMTA), at 415-701-4500, www.sfmta.org*

10. **Noise, Ambient.** Interior occupiable spaces shall be insulated from ambient noise levels. Specifically, in areas identified by the Environmental Protection Element, Map1, "Background Noise Levels," of the General Plan that exceed the thresholds of Article 29 in the Police Code, new developments shall install and maintain glazing rated to a level that insulate interior occupiable areas from Background Noise and comply with Title 24.

*For information about compliance, contact the Environmental Health Section, Department of Public Health at (415) 252-3800, www.sfdph.org*

11. **Streetscape Plan.** Pursuant to Planning Code Section 138.1, the Project Sponsor shall submit a pedestrian streetscape improvement plan to the Planning Department for review in consultation with the Department of Public Works and the Department of Parking and Traffic prior to Building Permit issuance.

*For information about compliance, contact the Case Planner, Planning Department at 415-575-9078, www.sf-planning.org*

12. **Street Trees.** Pursuant to Planning Code Section 138.1 (formerly 143), the Project Sponsor shall submit a site plan to the Planning Department prior to Planning approval of the building permit application indicating that street trees, at a ratio of one street tree of an approved species for every 20 feet of street frontage along public or private streets bounding the Project, with any remaining fraction of 10 feet or more of frontage requiring an extra tree, shall be provided. The street trees shall be evenly spaced along the street frontage except where proposed driveways or other street obstructions do not permit. The exact location, size and species of tree shall be as approved by the Department of Public Works (DPW). In any case in which DPW cannot grant approval for installation of a tree in the public right-of-way, on the basis of inadequate sidewalk width, interference with utilities or other reasons regarding the public welfare, and where installation of such tree on the lot itself is also impractical, the requirements of this Section 428 may be modified or waived by the Zoning Administrator to the extent necessary.

*For information about compliance, contact the Case Planner, Planning Department at 415-575-9078, www.sf-planning.org*

## NOTICE OF SPECIAL RESTRICTIONS UNDER THE PLANNING CODE

### PARKING AND TRAFFIC

13. **Bicycle Parking.** The Project shall provide no fewer than 17 Class 1 bicycle parking spaces as required by Planning Code Sections 155.1 and 155.5.

    *For information about compliance, contact Code Enforcement, Planning Department at 415-575-6863, www.sf-planning.org*

14. **Parking Maximum.** Pursuant to Planning Code Section 151.1, and as indicated on Exhibit B, the Project shall provide no more than 17 independently accessible off-street parking spaces, excluding car share spaces.

    *For information about compliance, contact Code Enforcement, Planning Department at 415-575-6863, www.sf-planning.org*

15. **Managing Traffic During Construction.** The Project Sponsor and construction contractor(s) shall coordinate with the Traffic Engineering and Transit Divisions of the San Francisco Municipal Transportation Agency (SFMTA), the Police Department, the Fire Department, the Planning Department, and other construction contractor(s) for any concurrent nearby Projects to manage traffic congestion and pedestrian circulation effects during construction of the Project.

    *For information about compliance, contact Code Enforcement, Planning Department at 415-575-6863, www.sf-planning.org*

### PROVISIONS

16. **First Source Hiring.** The Project shall adhere to the requirements of the First Source Hiring Construction and Employment Program approved by the First Source Hiring Administrator, pursuant to Section 83.4(m) of the Administrative Code. The Project Sponsor shall comply with the requirements of this Program regarding construction work and on-going employment required for the Project.

    *For information about compliance, contact the First Source Hiring Manager at 415-401-4960, www.onestopSF.org*

17. **Transit Impact Development Fee.** Pursuant to Planning Code Section 411 (formerly Chapter 38 of the Administrative Code), the Project Sponsor shall pay the Transit Impact Development Fee (TIDF) as required by and based on drawings submitted with the Building Permit Application. Prior to the issuance of a temporary certificate of occupancy, the Project Sponsor shall provide the Planning Director with certification that the fee has been paid.

    *For information about compliance, contact the Case Planner, Planning Department at 415-575-9078, www.sf-planning.org*

18. **Affordable Units. Requirement. Number of Required Units.** Pursuant to Planning Code Section 415.6, the Project is required to provide 12% of the proposed dwelling units as affordable to qualifying households. The Project contains 34 units; therefore, four (4) affordable units are

## NOTICE OF SPECIAL RESTRICTIONS UNDER THE PLANNING CODE

required. The Project Sponsor will fulfill this requirement by providing the four (4) affordable units on-site. If the number of market-rate units change, the number of required affordable units shall be modified accordingly with written approval from Planning Department staff in consultation with the Mayor's Office of Housing ("MOH").

*For information about compliance, contact the Case Planner, Planning Department at 415-575-9078, www.sf-planning.org or the Mayor's Office of Housing at 415-701-5500, www.sf-moh.org.*

19. **Unit Mix.** The Project contains nine (9) studios, eight (8) one-bedroom, and 17 two-bedroom units; therefore, the required affordable unit mix is one (1) studio, one (1) one-bedroom and two (2) two-bedrooms. If the market-rate unit mix changes, the affordable unit mix will be modified accordingly with written approval from Planning Department staff in consultation with MOH.

*For information about compliance, contact the Case Planner, Planning Department at 415-575-9078, www.sf-planning.org or the Mayor's Office of Housing at 415-701-5500, www.sf-moh.org.*

20. **Unit Location.** The affordable units shall be designated on a reduced set of plans recorded as a Notice of Special Restrictions on the property prior to the issuance of the first construction permit.

*For information about compliance, contact the Case Planner, Planning Department at 415-575-9078, www.sf-planning.org or the Mayor's Office of Housing at 415-701-5500, www.sf-moh.org.*

21. **Phasing.** If any building permit is issued for partial phasing of the Project, the Project Sponsor shall have designated not less than twelve percent (12%) of the each phase's total number of dwelling units as on-site affordable units.

*For information about compliance, contact the Case Planner, Planning Department at 415-575-9078, www.sf-planning.org or the Mayor's Office of Housing at 415-701-5500, www.sf-moh.org.*

22. **Duration.** Under Planning Code Section 415.8, all units constructed pursuant to Section 415.6, must remain affordable to qualifying households for the life of the project.

*For information about compliance, contact the Case Planner, Planning Department at 415-575-9078, www.sf-planning.org or the Mayor's Office of Housing at 415-701-5500, www.sf-moh.org.*

23. **Other Affordable Housing Conditions.** The Project is subject to the requirements of the Inclusionary Affordable Housing Program under Section 415 et seq. of the Planning Code and City and County of San Francisco Inclusionary Affordable Housing Program Monitoring and Procedures Manual ("Procedures Manual"). The Procedures Manual, as amended from time to time, is incorporated herein by reference, as published and adopted by the Planning Commission, and as required by Planning Code Section 415. Terms used in these conditions of approval and not otherwise defined shall have the meanings set forth in the Procedures Manual. A copy of the Procedures Manual can be obtained at the MOH at 1 South Van Ness Avenue or on the Planning Department or Mayor's Office of Housing's websites, including on the internet at:

http://sf-planning.org/Modules/ShowDocument.aspx?documentid=4451.
As provided in the Inclusionary Affordable Housing Program, the applicable Procedures Manual is the manual in effect at the time the subject units are made available for sale.

**Page 7 of 11**

## NOTICE OF SPECIAL RESTRICTIONS UNDER THE PLANNING CODE

*For information about compliance, contact the Case Planner, Planning Department at 415-558-6378, www.sf-planning.org or the Mayor's Office of Housing at 415-701-5500, www.sf-moh.org.*

a.  The affordable unit(s) shall be designated on the building plans prior to the issuance of the first construction permit by the Department of Building Inspection ("DBI"). The affordable unit(s) shall (1) reflect the unit size mix in number of bedrooms of the market rate units, (2) be constructed, completed, ready for occupancy and marketed no later than the market rate units, and (3) be evenly distributed throughout the building; and (4) be of comparable overall quality, construction and exterior appearance as the market rate units in the principal project. The interior features in affordable units should be generally the same as those of the market units in the principal project, but need not be the same make, model or type of such item as long they are of good and new quality and are consistent with then-current standards for new housing. Other specific standards for on-site units are outlined in the Procedures Manual:

b.  If the units in the building are offered for sale, the affordable unit(s) shall be sold to first time home buyer households, as defined in the Procedures Manual, whose gross annual income, adjusted for household size, does not exceed an average of ninety (90) percent of Area Median Income under the income table called "Maximum Income by Household Size derived from the Unadjusted Area Median Income for HUD Metro Fair Market Rent Area that contains San Francisco." The initial sales price of such units shall be calculated according to the Procedures Manual. Limitations on (i) reselling; (ii) renting; (iii) recouping capital improvements; (iv) refinancing; and (v) procedures for inheritance apply and are set forth in the Inclusionary Affordable Housing Program and the Procedures Manual.

c.  The Project Sponsor is responsible for following the marketing, reporting, and monitoring requirements and procedures as set forth in the Procedures Manual. MOH shall be responsible for overseeing and monitoring the marketing of affordable units. The Project Sponsor must contact MOH at least six months prior to the beginning of marketing for any unit in the building.

d.  Required parking spaces shall be made available to initial buyers or renters of affordable units according to the Procedures Manual.

e.  Prior to the issuance of the first construction permit by DBI for the Project, the Project Sponsor shall record a Notice of Special Restriction on the property that contains these conditions of approval and a reduced set of plans that identify the affordable units satisfying the requirements of this approval. The Project Sponsor shall promptly provide a copy of the recorded Notice of Special Restriction to the Department and to MOH or its successor

f.  The Project Sponsor has demonstrated that it is eligible for the On-site Affordable Housing Alternative under Planning Code Section 415.6 instead of payment of the Affordable Housing Fee, and has submitted the *Affidavit of Compliance with the Inclusionary Affordable Housing*

## NOTICE OF SPECIAL RESTRICTIONS UNDER THE PLANNING CODE

*Program: Planning Code Section 415* to the Planning Department stating that any affordable units designated as on-site units shall be sold as ownership units and will remain as ownership units for the life of the Project.

g. If the Project Sponsor fails to comply with the Inclusionary Affordable Housing Program requirement, the Director of DBI shall deny any and all site or building permits or certificates of occupancy for the development project until the Planning Department notifies the Director of compliance. A Project Sponsor's failure to comply with the requirements of Planning Code Section 415 et seq. shall constitute cause for the City to record a lien against the development project and to pursue any and all available remedies at law.

h. If the Project becomes ineligible at any time for the On-site Affordable Housing Alternative, the Project Sponsor or its successor shall pay the Affordable Housing Fee prior to issuance of the first construction permit or may seek a fee deferral as permitted under Ordinances 0107-10 and 0108-10. If the Project becomes ineligible after issuance of its first construction permit, the Project Sponsor shall notify the Department and MOH and pay interest on the Affordable Housing Fee at a rate equal to the Development Fee Deferral Surcharge Rate in Section 107A.13.3.2 of the San Francisco Building Code and penalties, if applicable.

21. **Market Octavia Affordable Housing Fee.** Pursuant to Planning Code Section 416 (formerly 315.4), the Project Sponsor shall comply with the Market Octavia Affordable Housing requirements through payment of the Market Octavia Affordable Housing Fee in full to the Treasurer, prior to the issuance by Department of Building Inspection of the first certificate of occupancy for the development project.

*For information about compliance, contact the Case Planner, Planning Department at 415-575-9078, www.sf-planning.org*

22. **Market Octavia Community Improvements Fund.** Pursuant to Planning Code Section 421 (formerly 326), the Project Sponsor shall comply with the Market Octavia Community Improvements Fund provisions through payment of an Impact Fee in full to the Treasurer, or the execution of a Waiver Agreement, or an In-Kind agreement approved as described per Planning Code Section 421 (formerly 326) prior to the issuance by Department of Building Inspection of the construction document for the development project.

*For information about compliance, contact the Case Planner, Planning Department at 415-575-9078, www.sf-planning.org*

## MONITORING - AFTER ENTITLEMENT

23. **Enforcement.** Violation of any of the Planning Department conditions of approval contained in this Motion or of any other provisions of Planning Code applicable to this Project shall be subject to the enforcement procedures and administrative penalties set forth under Planning Code Section 176 or Section 176.1. The Planning Department may also refer the violation complaints to other city departments and agencies for appropriate enforcement action under their jurisdiction.

## NOTICE OF SPECIAL RESTRICTIONS UNDER THE PLANNING CODE

*For information about compliance, contact Code Enforcement, Planning Department at 415-575-6863, www.sf-planning.org*

24. **Revocation due to Violation of Conditions.** Should implementation of this Project result in complaints from interested property owners, residents, or commercial lessees which are not resolved by the Project Sponsor and found to be in violation of the Planning Code and/or the specific conditions of approval for the Project as set forth in Exhibit A of this Motion, the Zoning Administrator shall refer such complaints to the Commission, after which it may hold a public hearing on the matter to consider revocation of this authorization.

    *For information about compliance, contact Code Enforcement, Planning Department at 415-575-6863, www.sf-planning.org*

## OPERATION

25. **Garbage, Recycling, and Composting Receptacles.** Garbage, recycling, and compost containers shall be kept within the premises and hidden from public view, and placed outside only when being serviced by the disposal company. Trash shall be contained and disposed of pursuant to garbage and recycling receptacles guidelines set forth by the Department of Public Works.

    *For information about compliance, contact Bureau of Street Use and Mapping, Department of Public Works at 415-554-.5810, http://sfdpw.org*

26. **Sidewalk Maintenance.** The Project Sponsor shall maintain the main entrance to the building and all sidewalks abutting the subject property in a clean and sanitary condition in compliance with the Department of Public Works Streets and Sidewalk Maintenance Standards.

    *For information about compliance, contact Bureau of Street Use and Mapping, Department of Public Works, 415-695-2017, http://sfdpw.org*

27. **Community Liaison.** Prior to issuance of a building permit to construct the project and implement the approved use, the Project Sponsor shall appoint a community liaison officer to deal with the issues of concern to owners and occupants of nearby properties. The Project Sponsor shall provide the Zoning Administrator with written notice of the name, business address, and telephone number of the community liaison. Should the contact information change, the Zoning Administrator shall be made aware of such change. The community liaison shall report to the Zoning Administrator what issues, if any, are of concern to the community and what issues have not been resolved by the Project Sponsor.

    *For information about compliance, contact Code Enforcement, Planning Department at 415-575-6863, www.sf-planning.org*

## NOTICE OF SPECIAL RESTRICTIONS UNDER THE PLANNING CODE

*Program: Planning Code Section 415* to the Planning Department stating that any affordable units designated as on-site units shall be sold as ownership units and will remain as ownership units for the life of the Project.

g.  If the Project Sponsor fails to comply with the Inclusionary Affordable Housing Program requirement, the Director of DBI shall deny any and all site or building permits or certificates of occupancy for the development project until the Planning Department notifies the Director of compliance.  A Project Sponsor's failure to comply with the requirements of Planning Code Section 415 et seq. shall constitute cause for the City to record a lien against the development project and to pursue any and all available remedies at law.

h.  If the Project becomes ineligible at any time for the On-site Affordable Housing Alternative, the Project Sponsor or its successor shall pay the Affordable Housing Fee prior to issuance of the first construction permit or may seek a fee deferral as permitted under Ordinances 0107-10 and 0108-10. If the Project becomes ineligible after issuance of its first construction permit, the Project Sponsor shall notify the Department and MOH and pay interest on the Affordable Housing Fee at a rate equal to the Development Fee Deferral Surcharge Rate in Section 107A.13.3.2 of the San Francisco Building Code and penalties, if applicable.

21. **Market Octavia Affordable Housing Fee.** Pursuant to Planning Code Section 416 (formerly 315.4), the Project Sponsor shall comply with the Market Octavia Affordable Housing requirements through payment of the Market Octavia Affordable Housing Fee in full to the Treasurer, prior to the issuance by Department of Building Inspection of the first certificate of occupancy for the development project.

*For information about compliance, contact the Case Planner, Planning Department at 415-575-9078, www.sf-planning.org*

22. **Market Octavia Community Improvements Fund.**  Pursuant to Planning Code Section 421 (formerly 326), the Project Sponsor shall comply with the Market Octavia Community Improvements Fund provisions through payment of an Impact Fee in full to the Treasurer, or the execution of a Waiver Agreement, or an In-Kind agreement approved as described per Planning Code Section 421 (formerly 326) prior to the issuance by Department of Building Inspection of the construction document for the development project.

*For information about compliance, contact the Case Planner, Planning Department at 415-575-9078, www.sf-planning.org*

### MONITORING - AFTER ENTITLEMENT

23. **Enforcement.**  Violation of any of the Planning Department conditions of approval contained in this Motion or of any other provisions of Planning Code applicable to this Project shall be subject to the enforcement procedures and administrative penalties set forth under Planning Code Section 176 or Section 176.1. The Planning Department may also refer the violation complaints to other city departments and agencies for appropriate enforcement action under their jurisdiction.

**Page 9 of 11**

## NOTICE OF SPECIAL RESTRICTIONS UNDER THE PLANNING CODE

*For information about compliance, contact Code Enforcement, Planning Department at 415-575-6863, www.sf-planning.org*

24. **Revocation due to Violation of Conditions.** Should implementation of this Project result in complaints from interested property owners, residents, or commercial lessees which are not resolved by the Project Sponsor and found to be in violation of the Planning Code and/or the specific conditions of approval for the Project as set forth in Exhibit A of this Motion, the Zoning Administrator shall refer such complaints to the Commission, after which it may hold a public hearing on the matter to consider revocation of this authorization.

*For information about compliance, contact Code Enforcement, Planning Department at 415-575-6863, www.sf-planning.org*

### OPERATION

25. **Garbage, Recycling, and Composting Receptacles.** Garbage, recycling, and compost containers shall be kept within the premises and hidden from public view, and placed outside only when being serviced by the disposal company. Trash shall be contained and disposed of pursuant to garbage and recycling receptacles guidelines set forth by the Department of Public Works.

*For information about compliance, contact Bureau of Street Use and Mapping, Department of Public Works at 415-554-.5810, http://sfdpw.org*

26. **Sidewalk Maintenance.** The Project Sponsor shall maintain the main entrance to the building and all sidewalks abutting the subject property in a clean and sanitary condition in compliance with the Department of Public Works Streets and Sidewalk Maintenance Standards.

*For information about compliance, contact Bureau of Street Use and Mapping, Department of Public Works, 415-695-2017, http://sfdpw.org*

27. **Community Liaison.** Prior to issuance of a building permit to construct the project and implement the approved use, the Project Sponsor shall appoint a community liaison officer to deal with the issues of concern to owners and occupants of nearby properties. The Project Sponsor shall provide the Zoning Administrator with written notice of the name, business address, and telephone number of the community liaison. Should the contact information change, the Zoning Administrator shall be made aware of such change. The community liaison shall report to the Zoning Administrator what issues, if any, are of concern to the community and what issues have not been resolved by the Project Sponsor.

*For information about compliance, contact Code Enforcement, Planning Department at 415-575-6863, www.sf-planning.org*

Page 10 of 11

## NOTICE OF SPECIAL RESTRICTIONS UNDER THE PLANNING CODE

The use of said property contrary to these special restrictions shall constitute a violation of the Planning Code, and no release, modification or elimination of these restrictions shall be valid unless notice thereof is recorded on the Land Records by the Zoning Administrator of the City and County of San Francisco; except that in the event that the zoning standards above are modified so as to be less restrictive and the uses therein restricted are thereby permitted and in conformity with the provisions of the Planning Code, this document would no longer be in effect and would be null and void.

Dated: _____May 1, 2013_____ at San Francisco, California

GROVE STREET HAYES VALLEY LLC

_____
(Owner's Signature)

_____
(Agent's Signature)

This signature(s) must be acknowledged by a notary public before recordation; add Notary Public Certification and Official Notarial Seal.

MS:gwf

Page 11 of 11

**CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT**                    CIVIL CODE § 1189

State of California

County of _San FRANCISCO_

On _5/1/2013_ before me, _John MINJIRAS_, _NOTARY PUBLIC_

personally appeared _DANIELLE DIGNAN_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

JOHN MINJIRAS
Commission # 1924632
Notary Public - California
San Francisco County
My Comm. Expires Mar 5, 2015

Signature: _John Minjiras_

Place Notary Seal Above

Signature of Notary Public

—————— **OPTIONAL** ——————
*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____

☐ Corporate Officer — Title(s): _____
☐ Individual
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer Is Representing: _____

Signer's Name: _____

☐ Corporate Officer — Title(s): _____
☐ Individual
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer Is Representing: _____

© 2010 National Notary Association • NationalNotary.org • 1-800-US NOTARY (1-800-876-6827)                    Item #5907

EXHIBIT A (Legal Description)

THE LANDS REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF SAN FRANCISCO, COUNTY OF SAN FRANCISCO, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE WESTERLY LINE OF GOUGH STREET (68.75 FEET WIDE) AND THE NORTHERLY LINE OF GROVE STREET (68.75 FEET WIDE); THENCE ALONG THE SAID NORTHERLY LINE OF GROVE STREET, SOUTH 80°55'00" WEST, 112.50 FEET; THENCE NORTH 9°05'00" WEST, 68.75 FEET; THENCE SOUTH 80°55'00" WEST, 25.00 FEET; THENCE NORTH 9°05'00" WEST, 25.75 FEET TO THE SOUTHERLY LINE OF THE REAL PROPERTY SHOWN ON THE CERTAIN MAP ENTITLED "MAP OF 515-521-525 GOUGH STREET", RECORDED ON MAY 11, 2005 IN BOOK 90 OF CONDOMINIUM MAPS AT PAGE 126, OFFICIAL RECORDS, OFFICE OF THE COUNTY RECORDER; THENCE ALONG SAID SOUTHERLY LINE NORTH 80°55'00" EAST, 137.50 FEET TO THE WESTERLY LINE OF GOUGH STREET; THENCE ALONG SAID WESTERLY LINE SOUTH 9°05'00" EAST, 94.50 FEET TO THE POINT OF BEGINNING.

BEING A PORTION OF WESTERN ADDITION BLOCK NO. 150.

BEING SHOWN AND DESCRIBED IN THE CERTIFICATE OF COMPLIANCE RECORDED MARCH 23, 2010, SERIES NO. 2010-I941800 OFFICIAL RECORDS.

**EXHIBIT C**

**City and County of San Francisco**
**Inclusionary Affordable Housing Program**

**BMR AFFIDAVIT**

I, the undersigned, am purchasing the property at <u>400 Grove Street, Unit 101, San Francisco, CA 94102</u>. I understand that this unit is restricted by the City and County of San Francisco for the purpose of assisting low- to moderate-income first-time homebuyers.

I affirm the following:

1.  I am a first time homebuyer in that I have not held title to any property in the past three (3) years.

2.  The number of people who will occupy the property is <u>1</u>.

3.  I will occupy and remain in the home as my principal place of residence within sixty (60) days of the close of escrow.

4.  I understand that I cannot change or amend the title to my unit without permission from the Mayor's Office of Housing and Community Development or its successor.

5.  I understand that any first parking space purchased with my unit must be resold with my unit upon resale as a part of the maximum below-market-rate price that is set by the Mayor's Office of Housing and Community Development or its successor and that any first parking space purchased after the closing of my unit must also be sold with my unit upon       resale  within  the  maximum  below-market-rate price that is set by the Mayor's       Office    of    Housing    and Community Development or its successor.

6.  Upon resale, I understand that my unit will be repriced based on the change in Median Income from the date on which I purchased my unit to the date on which I will sell my unit.

7.  I understand that only approved and eligible capital improvements made after the unit is 10 years old may be added on to the resale price of my unit.

8.  I understand that I cannot rent my property in part or whole without written approval from the Mayor's Office of Housing and Community Development or its successor and that I must remain in compliance with the guidelines set forth in the City and County of San Francisco Inclusionary Affordable Housing Program Monitoring and Procedures Manual.

Date: ___October 20_____ , 2015

Buyer(s)
Signature: _____Kelly AD Johnston_____
          Kelly AD Johnston

(Please add additional lines if necessary)

# EXHIBIT 2

☞ **Free Recording Requested**
**Pursuant to Government**
**Code Section 27383**

**RECORDING REQUESTED BY:**
City and County of San Francisco
Mayor's Office of Housing and Community Development

**WHEN RECORDED MAIL TO:**
Mayor's Office of Housing and Community Development
of the City and County of San Francisco
1 South Van Ness Avenue, Fifth Floor
San Francisco, California 94103
Attention: Inclusionary Program

---

*Block 0793 Lot 107*     *Space Above This Line for Recorder's Use*

400 Grove #101

## ACKNOWLEDGEMENT OF SPECIAL USE RESTRICTION
### AND PROCEDURES MANUAL

**Kelly AD Johnston** (Purchaser") intend to purchase **400 Grove Street, Unit 101, San Francisco, CA 94102** ("the BMR Unit") of that certain real property situated in the City and County of San Francisco, State of California, more particularly described as follows ("the property").

[See Attached Legal Description Exhibit A]

Purchaser acknowledges the receipt of the Notice of Special Restrictions under the City Planning Code ("NSR") recorded in the Official Records of San Francisco County against said property on **May 06, 2013 as Document #2013-J652026**.

The NSR includes San Francisco **Planning Commission Motion 18795** (the "Motion") adopted **January 31, 2013**. A copy of the NSR is attached hereto as Exhibit B.

Purchaser acknowledges receipt of the City and County of San Francisco Inclusionary Affordable Housing Program Monitoring and Procedures Manual 2013 ("Procedures Manual"), effective May 10, 2013.

Purchaser acknowledges and agrees that the BMR unit shall remain subject to the NSR and the Procedures Manual. In the event of any inconsistency between the NSR and the Procedures Manual, the NSR shall control.

A copy of the BMR Affidavit is attached hereto as Exhibit C.
A copy of the Conflict of Interest Affidavit is attached hereto as Exhibit D.

Dated: ___October 20_____ , 2015

    **Buyer(s)**
    Signature: _Kelly AD Johnston_____
         **Kelly AD Johnston**

(Please add additional lines if necessary)
**THIS DOCUMENT MUST BE NOTARIZED**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of San Francisco

On October 20, 2015, before me, _____ DAVID  LAU _____, Notary Public,
(here insert name and title of the officer)

personally appeared Kelly AD Johnston _____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature                                    (Seal)

DAVID LAU
Commission # 2098616
Notary Public - California
San Francisco County
My Comm. Expires Feb 1, 2019

# EXHIBIT 3

*CITY AND COUNTY OF SAN FRANCISCO*

*INCLUSIONARY AFFORDABLE HOUSING PROGRAM*
*MONITORING AND PROCEDURES MANUAL*

*Effective May 10, 2013*

Preface

The Inclusionary Affordable Housing Program ("Program") requires developers to sell or rent a certain percentage of units in new developments at a "below market rate" price that is affordable to Low-income, Median-income and Moderate-income Households.  The Program is governed by San Francisco Planning Code Section 415 *et seq.*, and is administered by the San Francisco Mayor's Office of Housing ("MOH").  Planning Code Section 415 requires that MOH and the San Francisco Planning Department publish a Procedures Manual containing procedures for monitoring and enforcement of the policies and procedures for implementation of the Program.  This Monitoring and Procedures Manual ("Manual") contains information regarding the Program for potential buyers and renters of below market rate units ("BMR Units"), as well as for information for Projects Sponsors, owners and property managers of BMR Units developed under the Program.  Updates to the Manual occur as needed.

The purpose of the Program is to provide housing options to Low-income, Median-income and Moderate-income Households in San Francisco in order to maintain income and cultural diversity in San Francisco.  The findings set forth in Section 415.1 of the San Francisco Planning Code further explain the need for such housing in San Francisco.

This Manual should be read in conjunction with the applicable requirements of the Program, found in San Francisco Planning Code Section 415 *et seq.*, including prior versions of that section.  Previous versions of Planning Code section 415 *et seq.* can be found on the MOH website at www.sf-moh.org.  While every effort has been made to harmonize the information in this Manual with the requirements of the Planning Code and previous versions of the Code, should there be any conflict with the Manual and the Planning Code or previous versions of Section 415 *et seq.* (whichever is applicable to a particular development), the terms of the Planning Code or those previous versions shall prevail over this Manual.  The provisions of a Notice of Special Restrictions recorded on a Project or BMR Unit developed under the Program shall prevail over any general requirements in the Manual or the Planning Code.

Users of this Manual are encouraged to seek their own legal counsel to aid in understanding of the requirements of the Program.  If there are general questions regarding the Manual, users may call the Mayor's Office of Housing at (415) 701-5500, or visit its website at www.sf-moh.org.

Any request for the interpretation and applicability of the provisions of the Planning Code may be sought by contacting the Zoning Administrator, pursuant to Planning Code Section 307(a).

The Procedures Manual in effect at the time of initial purchase or initial rental of a BMR Unit shall govern the regulation of that unit until it is sold or re-rented unless a BMR Owner or current BMR Renter chooses to be governed by all of the more up-to-date provisions of the then-current Procedures Manual.  In that case, the BMR Owner or current BM Renter must agree to be governed by the totality of the new regulations; a BMR Owner or BMR Renter may not pick some provisions from the Procedures Manual in effect at the time of initial purchase or initial rental and some in effect in the then-current Procedures Manual. If the owner or tenant chooses to be governed by the then-current Procedures Manual, he or she shall sign an agreement with the City to that effect, and the Planning Department and MOH shall apply all of the rules and regulations in the then-current Procedures Manual to the BMR Unit.

The effective date of this Manual is May 10, 2013. Prior versions of this Manual were adopted on September 10, 1992 and June 28, 2007.

Table of Contents

I.      DEFINITIONS…………………Pages 8-15

II.     OWNERSHIP PROGRAM …………………Pages 16 - 42

        A.   QUALIFIED BUYER
                        First-time Homebuyer Requirement
                        Income and Asset Requirement
                        Household Definition and Requirements
                        Household Size Determination
                        Minimum Household Size
                        Occupancy Requirement
                        Title and Loan Requirements
                        First-time Homebuyer Education Workshop Requirement
                        Loan Preapproval Requirement


        B.   PROCESS
                        Application Process
                        Application Requirements
                        Changing an Application after Submission
                        Application Review Period
                        Request for Application Reconsideration
                        Realtor Representation
                        Maximum Occupancy Standard
                        Selection of BMR Buyers upon Initial Sale and Resale of BMR Units
                                Lottery Preferences
                                Verification of Preference Qualification
                                Lottery Process
                                Post-Lottery Process
                        Financing
                        Escrow
                        Transaction Fees for BMR Ownership Units


        C.   ESTABLISHMENT OF INITIAL SALE AND RESALE PRICING
                        Pricing Process
                        Income Table
                        Methodology for Pricing Initial Sale Units
                        Parking Space Policy for BMR Ownership Units
                                Bundled Parking Policy for BMR Ownership Units
                                Unbundled Parking Policy for BMR Ownership Units
                        Pricing Methodology for BMR Units upon Resale


        D.   FINANCING REQUIREMENTS
                        Loan Requirement
                        Loan Originator
                        Loan Term

Loan Payment Plan
Loan to Value Ratio
Downpayment Requirement
Debt Ratios
Interest Rates
Documentation of Income
FICO Score
Co-signing
Fees
Seller Credits
Named Borrowers
Appraisals
BMR Note
Government-insured Loans
Securitizing Loans
Refinancing
Home Equity Lines of Credit and Home Equity Loans
Default and Foreclosure
Short Sales
Financing Additional Items upon Purchase
Exception for BMR Units Unable to Obtain Financing

E.   TITLE AND ESCROW REQUIREMENTS
        Named Titleholders
        Vesting

F.   RESTRICTIONS ON BMR OWNERSHIP UNITS AND OWNERS
        Term of Restriction
        Occupancy Requirements
        Rental Prohibition
        Maintenance and Insurance
        Transfer Procedures
                Transfer to Spouse of Domestic Partner
                Transfer upon Owner's Death
                Removing a Person from Title
                Resale Restrictions and Process
        Inheritance
        Resale Restrictions and Procedures
        Units Unable to Resell
        Capital Improvements and Special Assessments
        Procedure for Submitting Capital Improvements
        Special Assessments
        Capital Improvements Cap
        List of Approved Capital Improvements
        Estate Planning

G.  DOCUMENTATION AND ENFORCEMENT OF SALES RESTRICTIONS FOR BMR OWNERSHIP
    UNITS
            Promissory Note
            Deed of Trust
            Declaration of Restrictions and Options to Purchase Agreement
            Buyer Acknowledgment of Special Restrictions
            Function of Documents
                    Termination of Note and Reconveyance of Deed of Trust upon Resale
                    Term of Note and Deed
                    Order of Liens
                    Recordation of Restrictions


H.  Monitoring of BMR Ownership Units

III.    RENTAL PROGRAM.....................Pages 43 - 55

A.  QUALIFIED RENTER
            Non-homeowner Requirement
            Income and Asset Requirement
            Household Definition and Requirements
            Household Size Determination
            Minimum Household Size
            Occupancy Requirement
            Lease Holder Requirements

B.  PROCESS
            Application Process
            Application Requirements
            Changing an Application after Submission
            Application Review Period
            Request for Application Reconsideration
            Fees for Applying
            Selection of BMR Buyers at Initial Rental and Rerental of BMR Units
                    Lottery Preferences
                    Verification of Preference Qualification
                    Lottery Process
                    Post-Lottery Process

C.  ESTABLISHMENT OF INITIAL RENTAL AND RERENTAL PRICING
            Pricing Process
            Income Table
            Methodology for Establishing Initial Maximum Monthly Rent for BMR Rental Units
            Parking Space Policy for BMR Rental Units
            Methodology for Establishing Rental Rate upon Rerental of BMR Rental Units
            Permissible Rent Increases for BMR Rental Units
            Source of Annual Rent Levels for BMR Rental Units
            Rent Subsidies

       Additional Fees Required of Renters

  D.  PERMISSIBLE REASONS FOR PROJECT OWNERS TO DENY BMR RENTER HOUSEHOLDS
       Inability to Pay Rent
       Credit
       Eviction History
       Criminal History
       Maximum Occupancy Standard

  E.  PERMISSIBLE REASONS FOR PROJECT OWNERS TO EVICT OR FAIL TO RENEW THE LEASE OF A BMR RENTER HOUSEHOLD
       Non-payment of Rent
       Illegal Use of Unit
       Nuisance
       Breach of Lease
       Conversion of Rental BMR Unit to Ownership BMR Unit
       Nonconformance with Program Rules

  F.  LEASE AGREEMENT PROCESS

  G.  RESTRICTIONS ON BMR RENTAL UNITS AND RENTERS
       Term of Restriction
       Occupancy Requirement
       Rental Prohibition
       Maintenance
       Lease Changes
       Transferring Units
       Annual Recertification
       Permissible Increase in Income

  H.  DOCUMENTATION AND ENFORCEMENT OF RESTRICTIONS FOR BMR RENTAL UNITS

  I.  MONITORING OF BMR RENTAL UNITS

  J.  CONVERSION OF RENTAL UNIT TO OWNERSHIP UNIT

IV.    INCOME REVIEW PROCEDURES FOR BMR OWNERSHIP AND RENTAL UNITS .......Pages 56-58

  A.  Sources of Income

  B.  Determining Baseline Household Income
       Calculating Income from Paystubs
       Calculating Income from Government Income
       Calculating Income from Self-employed Income
       Calculating Income from Cash Income
       Unemployed Applicants
       Verification of Employment

Income from Commercial Property or Land Owned

    C.   Asset Test

    D.   Asset Test Exemption for Seniors

V.     PROCEDURES FOR PROJECT SPONSORS AND PROPERTY MANAGERS: GENERAL COMPLIANCE
PROCEDURES ......................Pages 59-79

    A.   APPROVAL PROCESS

    B.   COMPLIANCE THROUGH PAYMENT OF THE AFFORDABLE HOUSING FEE

    C.   COMPLIANCE THROUGH NEW CONSTRUCTION ON-SITE
          Number of Units Required
          Pricing and Income Requirements
          Term of Restriction
          Timing of Construction and Delivery of On-site Units
          Design, Size and Location of Units
          Development Subsidies
          Marketing
          Monitoring
          Requirement to Record Restrictions

    D.   COMPLIANCE THROUGH NEW CONSTRUCTION OFF-SITE
          Approval Process
          Number of Units Required
          Pricing and Income Requirements
          Term of Restriction
          Timing of Construction and Delivery of Off-site Units
          Geographic Location of Off-site BMR Units
          Quality Standards for Off-Site BMR Units
               Individual Unit Sizes
               Design of Off-site BMR Units
               Room sizes
               Interior Heights
               Kitchen and Bathroom Amenities
               Closets
               Laundry facilities
               Finish qualities
               Parking
               Zoning Administrator Discretion
          Development Subsidies
          Marketing
          Monitoring
          Requirement to Record Restrictions

E.   COMPLIANCE THROUGH LAND DEDICATION IN EASTERN NEIGHBORHOODS
        Initial Planning Department Review of Project
        MOH Review and Recommendation
        Required Materials
        Approval Letter and Conditions

F.   COMPLIANCE THROUGH MIDDLE INCOME ALTERNATIVE IN EASTERN NEIGHBORHOODS

G.   MARKETING PROCEDURES FOR INITIAL SALE AND RENTAL OF BMR UNITS
        General Requirements for Marketing of all Initial Sales and Rentals of BMR Units
        Contents of Marketing Plan
        Conduct of Marketing Plan
        Application Review Process
        Inability to Find a Buyer or Renter for an Initial Sale or Initial Rental BMR Unit

H.   MARKETING PROCEDURES FOR RESALE AND RERENTAL OF BMR UNITS
        Marketing Procedures for Resale of BMR Units
        Marketing Procedures for BMR Rental Units upon Rerental
                Maximum Monthly Rent of BMR Rental Units upon Re-rental
                Marketing Procedures for BMR Rental Units upon Re-rental

I.   CONVERSION OF BMR RENTAL UNITS TO OWNERSHIP UNITS

J.   MONITORING AND REPORTING PROCEDURE
        Monitoring and Reporting Procedures for BMR Ownership Units
        Monitoring and Reporting Procedures for BMR Rental Units

K.   STATISTICAL INFORMATION FOR BMR UNITS

L.   DOCUMENT RETENTION POLICY

M.   CONFLICT OF INTEREST

N.   PENALTIES

O.   PUBLIC RECORDS

**I. DEFINITIONS**

The definitions contained in Section 401 of the San Francisco Planning Code shall apply to this Manual. Defined terms are capitalized throughout this Manual.

| | |
|---|---|
| AMI OR AREA MEDIAN INCOME | As defined in Planning Code Section 401. |
| AFFORDABLE HOUSING FEE OR FEE | The fee paid to the City under Section 415.5 of the Planning Code. |
| AFFORDABLE TO QUALIFYING HOUSEHOLDS | As defined in Section 401 of the Planning Code. |
| ANNUAL GROSS INCOME | As defined in Section 401 of the Planning Code. |
| BMR | Below Market Rate |
| BMR BUYER | Below Market Rate Unit Buyer, including all members of the applicant Household. |
| BMR NOTE | As defined in Section II (G) of this Manual. |
| BMR OWNER | Owner of a Below Market Rate Unit, including all members of the Household. |
| BMR OWNERSHIP UNIT | A Below Market Rate Unit that is owned. |
| BMR RENTER | Below Market Rate Unit renter or current tenant of a BMR Rental Unit, including all members of the applicant Household |
| BMR RENTAL UNIT | A Below Market Rate Unit that is rented. |
| BMR UNIT | A Below Market Rate Unit as defined in Planning Code Section 401 as an "Affordable unit" or "affordable housing unit." |
| BACK END RATIO | As defined in Section II (D) of this Manual. |
| BASE PRICE | As defined in Section II (G) of this Manual. |
| CERTIFICATE OF FINAL COMPLETION AND OCCUPANCY | A certificate issued to a Project Sponsor by the San Francisco Department of Building Inspection (DBI) that certifies that all Building Code provisions and building specifications for the development project have been satisfied. |

| | |
|---|---|
| CERTIFICATE OF PREFERENCE | As defined in Section II (B) and III (B) of this Manual. |
| CERTIFIED REALTOR | A realtor certified with the California Association of Realtors. |
| CHANGE IN AMI FORMULA | As defined in Section II (F) of this Manual. |
| CITY | The City and County of San Francisco. |
| CITY DEED OF TRUST | As defined in Section II (G) of this Manual. |
| CLOSE OF ESCROW | The closing of the sale of Housing Unit. |
| COMBINED LOAN TO VALUE | The percentage of a property's value plus any outstanding debt on the property that a lender can or may loan to a borrower. |
| CONDITIONS OF APPROVAL | As defined in Planning Code Section 401. |
| CONDOMINIUM | As defined in Planning Code Section 401. |
| CONVERSION | Change in use of a property. |
| DBI OR DEPARTMENT OF BUILDING INSPECTIONS | As defined in Planning Code Section 401. |
| DEBT TO LOAN RATIO | The percentage of gross monthly income that goes toward paying for your monthly housing expense, alimony, child support, car payments and other installment debts, and payments on revolving or open-ended accounts, such as credit cards. |
| DEDICATED SITE | As defined in Planning Code Section 401. |
| DEED IN LIEU OF FORECLOSURE | A deed to real property accepted by a lender from a defaulting borrower to avoid the necessity of foreclosure proceedings by the lender. |
| DOMESTIC PARTNER | As defined in California Family Code, commencing with Section 297, whose definition does not include San Francisco Domestic Partnership. |
| EQUAL OPPORTUNITY HOUSING SYMBOL | The federal fair housing symbol used to identify the adherence to federal fair housing rules. |
| FICO | Fair Isaac Corporation. The best-known and most widely used credit score model in the United States. |
| FAIR MARKET APPRAISAL | The value of a BMR Unit determined without regard to sales or rental restrictions on that unit pursuant to an independent appraisal conducted |

| | by an appraiser acceptable to MOH. |
|---|---|
| FAIR HOUSING | State or federal laws that govern the fair and unbiased treatment of buyers and renters when selling or renting a housing unit. |
| FANNIE MAE OR FNMA | A New York stock exchange company. It is a public company that operates under a federal charter and is the nation's largest source of financing for home mortgages. Fannie Mae does not lend money directly to consumers, but instead works to ensure that mortgage funds are available and affordable, by purchasing mortgage loans from institutions that lend directly to consumers. |
| FIRST CERTIFICATE OF OCCUPANCY | As defined in Section 401 of the Planning Code. |
| FIRST CONSTRUCTION DOCUMENT | As defined in Section 401 of the Planning Code. |
| FIRST-TIME HOMEBUYER | As defined in Section 401 of the Planning Code and further defined in Section II of this Manual. |
| FIRST-TIME HOMEBUYER EDUCATION WORKSHOP | A course designed to provide basic education to first time homebuyers offered by a counseling agency certified by MOH as listed at www.sf-moh.org. |
| FREDDIE MAC | Federal Home Loan Mortgage Association.  An independent stock company which creates a secondary market in conventional residential loans and in FHA and VA loans by purchasing mortgages. |
| FRONT END RATIO | As defined in Section II of this Manual. |
| GROSS INCOME | As defined in Section 401 of the Planning Code. |
| HOA OR HOMEOWNERS ASSOCIATION | A nonprofit association that manages the common areas of a condominium or planned unit development (PUD).  Unit owners pay to the association a fee to maintain areas owned jointly. |
| HOA OR HOME OWNERS ASSOCIATION OR "HOA"DUES | Monthly payments due to a Homeowners Association for the upkeep, maintenance and improvement of common areas in a residential building. |
| HEAD OF HOUSEHOLD | Head of Household is defined as one who pays more than half the cost of maintaining a Household for the year and there cannot appear more than one Head of Household on a given application. |

| HOUSEHOLD | As defined in Planning Code Section 401. |
|---|---|
| HOUSEHOLD OF LOW INCOME | As defined in Planning Code Section 401 |
| HOUSEHOLD OF MEDIAN INCOME | As defined in Planning Code Section 401. |
| HOUSEHOLD OF MODERATE INCOME | As defined in Planning Code Section 401. |
| HOUSING UNIT | As defined in Planning Code Section 401. |
| INCLUSIONARY HOUSING PROGRAM ORDINANCE | Sections 415-415.9 inclusive of the San Francisco Planning Code, as amended from time to time. |
| LIFE OF THE PROJECT | As defined in Planning Code Section 401. |
| LOAN TO VALUE RATIO | The percentage of a property's value that a lender can or may loan to a borrower. |
| MOH | As defined in Planning Code Section 401. |
| MANUAL OR PROCEDURES MANUAL | As defined in Planning Code Section 401. |
| MARKETING CONSULTANT | A person representing a development of BMR units who markets and sells the BMR units in accordance with the procedures set forth in this Manual and by MOH. |
| MARKETING PLAN | A compliance procedure, described in Section V of this Manual, which requires the Project Sponsor that has a BMR Unit requirement to undertake certain measures that are directed to advertise and sell available affordable Housing Units to qualified Households. |
| MAXIMUM HOUSEHOLD INCOME | The maximum income allowed for a Household applying for a BMR Unit as determined by household size through the income table named Maximum Income by Household Size Derived from the Unadjusted Area Median Income (AMI) for HUD Metro Fair Market Rent Area (HMFA) that Contains San Francisco. |
| MAXIMUM INCOME BY HOUSEHOLD SIZE DERIVED FROM THE UNADJUSTED AREA MEDIAN INCOME (AMI) FOR HUD METRO FAIR MARKET | The table produced by MOH annually to announce AMI levels for that calendar year as published on the MOH website at www.sf-moh.org. |

| | |
|---|---|
| RENT AREA (HMFA) THAT CONTAINS SAN FRANCISCO | |
| MAXIMUM PURCHASE PRICE | As defined in Planning Code Section 401. |
| MAXIMUM MONTHLY RENT | The monthly monetary consideration determined per Section II (C) paid by a BMR Renter Household for use of the designated BMR rental unit as the Household's principal residence. |
| MAXIMUM RESALE PRICE | The purchase price to be paid by a buyer of a BMR unit previously purchased by a Qualified Household, as calculated according to Section II (C) of this Manual. |
| MAYOR'S OFFICE OF HOUSING, OR MOH | As defined in Planning Code Section 401. |
| MINORITY COMMUNITIES | Minority communities or minority Households shall include, as a guideline, members of the following racial, ethnic, gender or otherwise specially disadvantaged groups:<br><br>African-American - defined as persons of African origin.<br><br>Latino - defined as persons of Mexican, Caribbean, Central American or South American origin.<br><br>Asian - defined as persons of Chinese, Japanese, Korean, Pacific Islander, Samoan, Filipino, Southeast Asian or Asian Indian origin.<br><br>Native American - defined as persons whose origins are of indigenous peoples of North America.<br><br>Women<br><br>Gay and Lesbian Individuals<br><br>Families with dependents - defined as a Household with two or more persons in which the head of Household is an adult and at least one other Household member is an elderly or handicapped person who is financially dependent on the head of Household or a person under the age of 18 years who is related to the head of the Household by blood, marriage or adoption or related to the domestic partner by blood or adoption.<br><br>Person with a disability - defined as a person who satisfied the definition of "handicapped" under Federal Fair Housing Law on the basis of presence of a long-term physical or mental impairment which substantially limits |

| | one or more of such person's major life activities including mobility, visual or hearing impairment, terminal illness or AIDS diagnosis.<br><br>Elderly - defined as persons over the age of 65 years. |
|---|---|
| MOH-APPROVED FIRST-TIME HOMEBUYER EDUCATION PROVIDER | A housing counseling agency certified by MOH and listed at www.sf-moh.org. |
| MOH-APPROVED LENDER | A lender certified by MOH and listed at www.sf-moh.org.   Approved MOH lenders must attend annual trainings for all MOH homeownership programs and be a part of an approved lending institution that pays an annual participation fee to MOH. |
| MOH-APPROVED REALTOR | A realtor certified by MOH and listed at www.sf-moh.org.   Approved MOH realtors must attend annual trainings for the BMR Ownership Program. |
| MORTGAGE | A loan using a Housing Unit as collateral. |
| MULITPLE LISTING SERVICE OR MLS | An association of real estate agents providing for a pooling of listings and the sharing of commissions on a specified basis. |
| NOTICE OF SPECIAL RESTICTIONS (NSR) | As defined in Planning Code Section 401. |
| PLANNER | A staff member of the San Francisco Planning Department. |
| PLANNING APPROVAL | A general term for the Conditions of Approval, Planning Permits, Zoning Administrator determinations or other planning approvals issued for a specific housing development. |
| PLANNING CODE | The City and County of San Francisco Planning Code. |
| PLANNNG COMMISSION | As defined in Planning Code Section 401. |
| PLANNING DEPARTMENT | As defined in Section 401 of the Planning Code. |
| PRIMARY RESIDENCE | As defined in Section II (A) and III (A) of this Manual. |
| PRINCIPAL PROJECT | As defined in Planning Code Section 401. |
| PRINCIPALLY PERMITTED PROJECT | Development projects that do not require Planning Commission review in the form of a Conditional Use Permit or PUD. |

| | |
|---|---|
| PROCEDURES MANUAL OR MANUAL | As defined in Planning Code Section 401. |
| PROGRAM OR INCLUSIONARY HOUSING PROGRAM | As defined in Planning Code Section 401. |
| PROJECT | As defined in Planning Code Section 401. |
| PROJECT OWNER | The owner of a Project on which is subject to Planning Code Section 415 *et seq*. |
| PROJECT SPONSOR OR SPONSOR | As defined in Planning Code Section 401. |
| QUALIFYING HOUSEHOLD | As defined in Planning Code Section 401. |
| REDEVELOPMENT AGENCY | San Francisco Redevelopment Agency or its successor. |
| SRO | As defined in the Planning Code Section 890.88. |
| SECTION 8 OR SECTION 8 HOUSING CHOICE VOUCHER PROGRAM | A federal housing program as administered locally by public housing agencies in which a subsidy is paid to the landlord directly by the public housing agencies on behalf of the participating family. |
| SHORT SALE | A sale of real estate in which the proceeds from selling the property will fall short of the balance of debts secured by liens against the property and the property owner cannot afford to repay the liens' full amounts, whereby the lien holders agree to release their lien on the real estate and accept less than the amount owed on the debt.  Any unpaid balance owed to the creditors is known as a deficiency. |
| SPECIAL ASSESSMENT | A proportional fee charged to the owner by the Homeowner's Association (HOA) to cover the cost of physical improvement to the entire building. |
| SPOUSE | A partner in a marriage. |
| TRANSFER | Any voluntary or involuntary sale, assignment or transfer of any interest in a BMR Unit |
| TRANSFER TAX | Tax on the passing of title to property from one person (or entity) to another. |
| UNBUNDLED PARKING | As defined in Planning Code Section 167. |

| UPGRADES | Any improvement made to a Housing Unit that is purchased either through the seller of the unit or purchased by the BMR Buyer upon purchase of a Housing Unit. |
| --- | --- |
| USE RESTRICTION | Any restrictions imposed by the Program or the City on the use or conveyance of a Housing Unit, as set forth in the NSR, Conditions of Approval, and/or other recorded documents or associated Planning Code provisions in effect at the time of Project Approval. |
| UTILITY ALLOWANCE | A dollar amount established periodically by the San Francisco Housing Authority based on U.S. Department of Housing and Urban Development (HUD) standards for cost of basic utilities for Households. |
| ZONING ADMINISTRATOR | The Zoning Administrator for the City and County of San Francisco. |

II.    **OWNERSHIP PROGRAM**

Buying, owning, and selling a BMR Ownership Unit differs in many ways from buying, owning, and selling a market rate unit.  It is important that the buyers and sellers of BMR Ownership Units understand the rules and procedures of the Program fully.   Among other items, this section sets forth the requirements for BMR Ownership Units including the qualifications for Qualified BMR Buyers, the application process, the establishment of the initial BMR Unit sales price and resale pricing, mortgage loan requirements, title and escrow requirements, restrictions on BMR Ownership Units and BMR Owners, and documentation and enforcement of sales restrictions for BMR Ownership Units.

A.    **QUALIFIED BUYER**

Upon initial sale and resale of a BMR Unit, a BMR Buyer must meet the qualifications set forth below and MOH will use the procedures set forth below to determine Households that qualify as BMR Buyers.

**First-time Homebuyer**

No member of the applicant Household may have owned any interest in a Housing Unit for a three (3) year period prior to applying to qualify for purchase of a BMR Unit restricted under the Inclusionary Housing Program.  The period shall be counted backwards from the application date for the BMR Unit.

An applicant shall be deemed to have owned an interest in a Housing Unit regardless of whether or not that interest results in a financial gain, is in another state or country, or if the applicant has ever used the property as a primary residence.

Notwithstanding the forgoing, the following interests shall not, by themselves, disqualify an applicant from falling within the definition of first time homebuyer:  (1) ownership of timeshares; (2) loan co-signers from previous real estate transactions; (3) appearing on title solely in the capacity as a trustee for a trust, where the trust is the legal owner of the dwelling unit; (4) being a named beneficiary of a trust that includes a Housing Unit amongst the trust assets, but only if the trustor is living at the time; and (5) ownership of shares in a limited equity co-op.

MOH may verify first-time homebuyer status by (1) reviewing mortgage deductions on the three most recent years of federal tax returns for each applicant; (2) a signed statement on the application stating homeownership status; (3) a title search; or (4) other means reasonably calculated to determine First-time Homebuyer status.

**Income and Asset Requirement**

Per Planning Code Section 415.6 (c), initial sale BMR Ownership Units that are provided on the site of the Principal Project will be priced to be Affordable to Qualifying Households 90% of AMI on average, unless stated otherwise in Use Restrictions for the Project.  Per Planning Code Section 415.7 (d), initial sale BMR Ownership Units that are provided off-site of the Principal Project will be priced to be Affordable to Qualifying Households with a Maximum Household Income that does not exceed  70% of AMI.  In the case of the initial sale BMR Ownership Units only, the Maximum Household Income shall be set 10% above the Maximum Household Income level stated in Use Restrictions for the Project, not to

exceed 120% of AMI.  Maximum Household Income amounts are adjusted on an annual basis by MOH.

 These Maximum Income Levels apply except in the case of BMR Units that convert from rental to ownership as described in Section V (I) of this Manual.

MOH shall calculate Household income, including an asset test, based on the methodology contained in Section IV of this Manual.

BMR Ownership Units currently being marketed may adjust their Maximum Household Income used for qualifying applicants, but not for establishing the Maximum Purchase Price, as new Maximum Household Income levels are published by MOH at the beginning of each calendar year.  Should a Project Sponsor or BMR Owner wish to update the Maximum Purchase Price levels as new Maximum Household Income levels are published by MOH at the beginning of each calendar year, the BMR Unit(s) must be removed from marketing and a new pricing and marketing process must be established.

**Household Definition and Requirements**

As defined in Planning Code Section 401, and for the purpose of qualifying for the Program, a Household is defined as any person or persons who reside or intend to reside in the same Housing Unit.

All Spouses or Domestic Partners must be included in the Household and must appear on the application, title and loan for the BMR Unit.

100% student Households as defined under the California Tax Credit Allocation Committee Compliance Manual 2012 Chapter 17 Category 11I are not eligible for the Program except under the exceptions contained in the IRS Section 42 (i) (3) (D).

All Household members who are under 18 years of age must be the legal dependent of an adult Household member, except in the case of emancipated minors, as claimed on the most recent federal income tax return, or legal minor children of titleholders.

**Household Size Determination**

The size of the Household is determined by counting together every person who intends to live in the BMR Unit, regardless of age or dependency status.

All adult Household members exempted from title and loan in Section II (A) below will be counted toward Household size and must appear on the application for the BMR Unit.

Pregnant applicants will be counted as two members of a Household with verifiable medical documentation.

Verified live-in assistants and foster children may be counted toward Household size in order to determine unit size and must appear on the application for the BMR Unit but will not be counted in income determinations and may not appear on title and loan for the BMR Unit.

Temporarily absent Household members who intend to live in the BMR Unit upon return must appear on the application for the BMR Unit.  Such Household members include, but are not limited to,

P a g e **17**

Household members serving temporarily in the armed forces, or who are temporarily institutionalized.

**Minimum Household Size**

The size of a Household must be compatible with the size of the BMR Unit being purchased. A minimum of one person per bedroom is required. There is no restriction on purchasing a BMR Unit that has fewer bedrooms than the Household size; however, the Project may impose maximum Household size rules under the restrictions contained in Section II (B) of this Manual.

**Occupancy Requirement**

All members of the Household must occupy the BMR Ownership Unit as their primary residence, as defined by living in the BMR Unit at least 10 out of 12 months of the calendar year, and must occupy the BMR Unit within 60 days of the completion of the purchase.

**Title and Loan Requirements**

All adult Household members must appear as an owner or co-owner on the BMR Unit title and must co-sign for any purchase loan for the BMR Unit with the following exceptions:

(1) Legal dependents of titleholders as claimed on the most recent federal income tax return or legal minor children of titleholders. Spouses or Domestic Partners are not considered dependents;

(2) Household members younger than age 24 who are the child of a titleholder who will reside in the BMR Unit as their primary residence, regardless of being named as a dependent on the federal tax form of a titleholder; and,

(3) Recent immigrants with insufficient credit history as defined as a person who has been in the United States for 2 years or less as supported by entrance documentation or a sworn statement and lender documentation of the reason for loan denial, including a copy of the applicant's credit report.

**First-time Homebuyer Education Workshop Requirement**

All adult applicants age 18 and older must attend and complete a first-time homebuyer education workshop and receive a certificate of completion of such from a MOH-approved First-time Home Buyer Education Provider before applying for a BMR Unit. Applicants must provide a certificate of completion with the BMR application package. The certificate of completion from the workshop will be valid for two years from the date of issuance for the purpose of the Program. Applicants not required to complete the workshop include those adults who are not required to appear on the loan and title for the BMR Unit per the rules contained above in Section II (A) of this Manual.

**Loan Preapproval Requirement**

The applicant Household must obtain a loan preapproval from a MOH-approved Lender within the lending guidelines explained in Section II (D) in order to apply for a BMR Unit. The loan preapproval must refer to the building and/or the BMR Unit for which the applicant Household is applying and must include all adults age 18 and older as potential borrowers unless exempted from the requirement to

appear on the loan per Section II (A) of this Manual.

**B.  PROCESS**

The following describes the process for applying for and purchasing a BMR Ownership Unit.

**Application Process**

New BMR Ownership Units shall be marketed for at least 45 days and resale BMR Ownership Units upon resale shall be marketed for at least 21 days, including a listing on the MOH website and local venues. Specific rules for marketing new BMR Ownership Units are contained in Section V (G) of this Manual. Specific rules for marketing resale BMR Ownership Units are contained in Section II (F) of this Manual. Applicants must submit a BMR application form and supporting documentation by a specific deadline for each BMR Ownership Unit by a specified deadline for that unit.  All applications for BMR Ownership Units shall be entered into a lottery for the unit as described in Section II (B) of this Manual for initial sale and resale BMR Ownership Units.

**Application Requirements**

Applicants for all BMR Ownership Units must supply the following documentation to the Project Sponsor for the BMR Unit or, in the case of resale BMR Ownership Units, to the BMR Owner in order to apply for a BMR Ownership Unit:

An application from the proposed purchaser on a form specified by MOH;
Supporting documentation from all members 18 years or older of the purchaser Household, including:

Past three (3) years IRS returns;
Past three (3) years W-2 forms;
Three (3) current and consecutive pay stubs or equivalent;
Three (3) current and consecutive statements from every liquid asset account or personal cash holdings, including all custodial accounts held for minors;
Federal Tax Form T4506;
California Driver's License or State ID;
Certificate of completion of a first-time homebuyer workshop from a MOH-approved First-time Home Buyer Education Provider;
Loan preapproval for the specific BMR Unit or building from a MOH-approved Lender;
Verification of San Francisco residency or employment (only if applicable);
Copy of Certificate of Preference (only if applicable);
CalHome Citizenship Form (only if applicable).

If the application is approved, and to proceed with a BMR Unit purchase, the applicant's lender must supply the following documentation to MOH:

Lender Checklist;
Sales agreement;
Loan agreement (1003 and 1008);
Final Fair Market Appraisal;

Preliminary Title Report;
Mortgage loan commitment letter;
Good Faith Estimate (GFE);
Copy of Buyer's purchase approval letter from MOH;
City downpayment application (only if applicable).

Before proceeding with closing, the Title Company must send to MOH:

Original borrower's signed BMR Note;
Copy of signed City Deed of Trust;
Copy of signed City Declaration of Restrictions & Option to Purchase Agreement;
Copy of signed Acknowledgement of Declaration of Restrictions, Procedures Manual and Planning Code
Ordinance;
Estimated Settlement Statement;
Copy of 1st lender note & deed;
Copy of 1st lender escrow instructions;
Request for Notice of Default.

After closing, the Title Company must send to MOH:

Executed BMR Note & Recorded City Deed of Trust;
Recorded City Declaration of Restrictions & Option to Purchase Agreement;
Recorded Acknowledgement of Declaration of Restrictions, Procedures Manual and Planning Code
Ordinance;
Recorded Request for Notice of Default;
Final HUD-1 Statement;
ALTA Policy;
Completed sales agreement.

**Changing an Application after Submission**

No application changes shall be allowed after an application is submitted and after an application
deadline has passed unless the change is (1) the removal of an applicant, (2) the addition of an
applicant's Spouse or Domestic Partner or a new Household member in the case of an adoption or new
guardianship; (3) an update of income qualification, such as a new job or a job that has ended; or (4)
correction of technical errors, such as current phone number or other non-qualifying information.

**Application Review Period**

An application for a BMR Unit must be reviewed and approved for income qualification within the one
hundred and twenty (120) days prior to the Close of Escrow of a BMR Unit.

**Request for Application Reconsideration**

An applicant requesting reconsideration of a disqualified application shall submit new information or
documentation contesting the disqualification to MOH within 3 business days from the date of the
disqualification letter and MOH shall respond by the end of a 7 business day period from the date of the

disqualification letter.  In the case of such request, and when such a unit is available, the Project Sponsor shall maintain one appropriately sized BMR Unit for the disqualified Household for seven (7) business days from the date of the issuance of a disqualification letter but need not hold the applicant's preferred BMR Unit.

**Realtor Representation**

In the case where commission is being paid to the realtor of any buyer in a Project, commission shall be paid to the realtors of all BMR Buyers.  The amount paid to realtors for BMR Buyers must be comparable to fees being paid for non-BMR Buyer representation in the Project.

In the case where no buyer's realtor in a Project is provided commission for realtor representation and the Project Sponsor's realtor serves as the agent for all buyers in the Project, the Project Sponsor's agent may represent the BMR Buyer as long as that agent is a Certified Realtor and agrees to legally represent the BMR Buyer in all aspects of the transaction.

**Maximum Occupancy Standard**

MOH does not establish a maximum household size for BMR Units.  However, the Project Sponsor may apply a maximum occupancy standard to a Household occupying a BMR Unit as long as that standard is derived from the San Francisco Housing Code Section 503(b) and as long as that review is normal and customary and applied evenly to all tenants in the building.

**Selection of BMR Buyers upon Initial Sale and Resale of BMR Units**

*Lottery Preferences*

All Households may enter the lottery for a BMR Unit.  However, those Households in which one member holds a Certificate of Preference (COP) from the former Redevelopment Agency or who lives or works in San Francisco will be given preference in the lottery ranking process, with COP holders being given the highest preference.

COP holders are primarily Households previously displaced by former Redevelopment Agency action in Redevelopment Project Areas per the San Francisco Redevelopment Agency's Property Owner and Occupant Preference Program, as reprinted September 11, 2008 and effective October 1, 2008 and on file with the Clerk of the Board in File No. 080521.

If the number of BMR Units available exceeds the number of qualified applicants who hold a COP or who live or work in San Francisco, the BMR Units will become available to other qualified applicants.

*Verification of Preference Qualification*

To be considered a COP holder, a Household must submit a copy of the Certificate of Preference with the application.  COP inquiries should be addressed to the Mayor's Office of Housing at (415) 701-5613.

To be considered a Household that lives or works in San Francisco, at least one member of the applicant Household must provide the following proof of residency or employment with the submitted

application:

Verification that the applicant lives in San Francisco:
(1) One utility bill with a San Francisco address dated within the 45 days preceding the application date for the BMR Unit.  Utility bills can include gas, electric, garbage or water; or
(2) Current paystubs with a San Francisco address; or
(3) A current, formal lease with a San Francisco address.

OR

Verification that the applicant works in San Francisco:
MOH shall verify that a person works in San Francisco by reviewing an applicant's paystubs.  If an applicant's employer is not based in San Francisco, or if a person's paystubs do not reflect a San Francisco work address, the applicant must supply a letter from the employer stating that the person works primarily in San Francisco and demonstrate that at least 75% of their working hours are in San Francisco.

*Lottery Process*

The following guidelines shall be applicable to the lottery process for all BMR Ownership Units:

A non-prioritized list of interested buyers will be kept by MOH.  At least twenty-one (21) days prior to a lottery for initial sale BMR Units and at least fourteen (14) days prior to a lottery for resale BMR Units, all those signed up on the list will be notified of the availability of BMR Units and invited to participate in the lottery by MOH.  The general public will be invited to participate in the lottery, as well;

Applicants who submit a complete application by the application deadline for the BMR Unit(s) will receive a numbered lottery ticket whose twin ticket shall be entered into the lottery.  Applications missing a complete cover application, tax forms for all adults (or other applicable tax documents), all required certificates from a MOH-approved First-time Homebuyer Education Provider, and a loan preapproval will not be entered in to the lottery;

Lotteries for BMR Units shall be held in a public, accessible location that is arranged and paid for by the Project Sponsor;

A representative of MOH shall conduct the lottery in tandem with the Project Sponsor and record the order of lottery numbers drawn;

To conduct the lottery, MOH shall pull application tickets from a vessel in rank order and record the lottery results by application ticket number.  COP holders will be drawn and ranked first, followed by applicants who live or work in San Francisco.  MOH shall pull at least 10 ticket numbers for each BMR Unit available, should there be enough total applicants to do so;

Applications shall not be reviewed for eligibility before the lottery but only after the lottery ranking has been finalized;

The final lottery list shall be produced by MOH after the lottery once the lottery preferences have been clearly identified and applied;

Applicants shall be invited to attend lotteries, but attendance is not mandatory;

Lottery results shall be posted on either the MOH or Project Sponsor website but shall not include the names of applicants but only the application ticket numbers.  The results of resale lotteries with 10 or fewer applicants may be announced by the Project Sponsor to each applicant rather than posting to a website.

*Post-Lottery Process*

Project Sponsors, MOH and BMR applicants shall adhere to the following process following the lottery for a BMR Unit:

MOH shall transmit a final lottery list to the Project Sponsor who shall notify all applicants of their position in the lottery and inform MOH of the lottery winners' intent to purchase the BMR Unit;

The Project Sponsor shall adhere to the rank order of the lottery list when offering BMR Units to lottery winners;

Applicants shall be reviewed post-lottery for Program qualifications and issued an approval or disqualification letter;

Per Section II (B) of this Manual, in the case of an request for reconsideration of a BMR application, and when such a BMR Unit is available, the Project Sponsor shall maintain one appropriately sized BMR Unit for the disqualified applicant for a seven (7) day period from the date of the issuance of a disqualification letter but need not hold the applicant's preferred BMR Unit;

To maintain the live or work lottery preference, the applicant must maintain the status of the preference from the time of the application to the time the BMR Unit is purchased.

**Financing**

A BMR Buyer must be granted ten (10) calendar days from date of the Program approval letter to enter into a sales contract for an available BMR Unit and must be offered at least a sixty-day (60) closing period with at least a forty-five day (45) financing contingency period within the sixty-day (60) closing period in the contract.  This period can be extended if requested by the Project Sponsor or if needed to provide time for special products available to First-time Homebuyers.

**Escrow**

As is typical with market rate sale transactions, BMR Buyers may be required by the Project Sponsor or BMR Owner reselling a BMR Unit to work with a Title Company chosen by the Project Sponsor or BMR Owner when establishing an escrow account and finalizing the sale of the BMR Unit.

**Transaction Fees for BMR Ownership Units**

The Project Sponsor shall pay all usual, customary and reasonable transaction costs normally borne by the seller in a residential real estate transaction, with the following requirements:

Seller Transfer Tax shall be paid by the Project Sponsor in the case of all initial sales of BMR Units;

Seller realtor fees shall be paid by the Project Sponsor in all cases;

Buyer realtor fees shall be paid by the Project Sponsor in all cases in an amount commensurate with fees being paid for non-BMR Buyer representation in the Project per Section II (B) of this Manual.

### C.   ESTABLISHMENT OF INITIAL SALE AND RESALE PRICING

**Pricing Process**

Prior to marketing a BMR Ownership Unit for initial sale, the Project Sponsor shall transmit a copy of the Notice of Special Restrictions ("NSR"), final planning approval, approved floor plans indicating the location of the BMR Units in the building, and final HOA dues for each BMR Unit to MOH, together with a request for determination of initial sales pricing on a form provided by MOH. The pricing shall be valid for sixty (60) days and shall serve as the final pricing for the BMR Units only upon approval of the Marketing Plan for the BMR Units.  However, no BMR Units shall begin marketing in one calendar year with Maximum Purchase Prices that were established in the previous calendar year.

MOH shall require the completion of a standard form in order to request BMR Unit pricing.

**Income Table**

The income table used to calculate the income level of a BMR Household and thereby price BMR Units shall be the table named "Maximum Income by Household Size derived from the Unadjusted Area Median Income (AMI) for HUD Metro Fair Market Rent Area (HMFA) that contains San Francisco" unless the Project Sponsor, with permission from MOH, offers the BMR Units at a lower income level than that required by Use Restrictions and chooses to abide by an alternate income table in doing so.

**Methodology for Pricing Initial Sale Units**

MOH shall calculate the initial sales price of the BMR Unit according to the following assumptions:

(1) the income limits specified in Use Restrictions;
(2) total payments of no more than thirty-three (33) percent of the gross monthly income, including payments for taxes, insurance, homeowner or association's fees and related costs;
(3) a mortgage interest rate that is the ten (10) year rolling average of 30-year interest rate data provided by Freddie Mac; and
(4) a ten percent (10%) down payment assumption.

MOH shall price initial sale BMR Units based on the income level for a Household that is one person larger than the total number of bedrooms in the BMR Unit in all cases except for studio BMR Units, which assume a one-person Household, and SRO Units, which shall be priced based on three-fourths

(3/4) of the price for studio BMR Ownership Unit.

MOH shall transmit pricing information to the Project Sponsor within fifteen (15) business days of receiving a complete request for determination.

**Parking Space Policy for BMR Ownership Units**

*Bundled Parking Policy for BMR Ownership Units*

In Projects in which parking for the non-BMR units is sold or leased as a part of the sales price for any non-BMR Housing Unit, parking spaces shall be granted to BMR Buyers within the Maximum Purchase Price as established by MOH and at the same ratio of parking spaces to Housing Units in the Project overall. This policy shall apply in developments where even one parking space is included in the sales price for a non-BMR unit.  All parking spaces granted to BMR Buyer Households shall be resold or re-leased with the BMR Unit upon resale.

*Unbundled Parking Policy for BMR Ownership Units*

In Projects in which parking is "unbundled," or sold or leased separately from every Housing Unit in a Project, parking spaces shall be made available to BMR Buyers at the same ratio of parking spaces to Housing Units the project overall.  If the Project Sponsor qualifies for the option, the Maximum Purchase Price of each BMR Unit, as determined by MOH, shall be reduced by the cost of constructing a parking space (as determined and published annually by MOH) multiplied by the ratio of parking spaces to Housing Units in the Project overall. The Project Sponsor is then allowed to charge the BMR Buyer the market rate price for the parking space as long as that price is the lowest price available for a parking space to any buyer in the Project.

In Projects in which parking for non-BMR residential units is "unbundled," or sold or leased separately from every Housing Unit in a Project, the Project Sponsor may still choose to sell or rent the parking spaces for BMR Units within the Maximum Sales Price of the BMR Unit as established by MOH if the Project Sponsor so chooses or if the Project Sponsor is unable to provide sufficient documentation that 100% of the parking spaces in the Project are sold or rented separate from Housing Units.

The details of the unbundled parking policy for BMR Units are as follows:

Project Sponsors must offer BMR Buyers the opportunity to purchase or lease parking spaces according to the overall ratio of parking spaces to Housing Units in the Project;

In Projects in which 1:1 parking is available, the price of each BMR Unit will be lowered by a standardized amount equivalent to the cost of constructing either a structured, above-ground parking space or a below-grade parking space, exact amount to be established by MOH through cost analysis and adjusted annually;

In Projects with less than 1:1 parking availability, MOH will lower the price of each BMR Unit by an amount equivalent to the cost of constructing either a structured, above-ground parking space or a below-grade parking space multiplied by the ratio of parking spaces to Housing Units in the Project overall;

The price of each BMR Unit will be reduced regardless of the BMR Buyer's choice to purchase or lease a parking space;

BMR Buyers must be offered the opportunity to purchase or lease parking at the lowest market rate price offered to any buyer in the Project;

This policy applies only to Projects in which the parking is 100% unbundled, or sold or leased separately, from the all Housing Units in the Project. Project Sponsors choosing this option must provide proof that they have affirmatively marketed their non-BMR residential units as having unbundled parking and must alert all buyers to the fact that all Housing Units in the Project are sold or leased both with and without parking and at two respective sales prices. At a minimum, such Projects must provide non-BMR buyers with pricing materials that provide two prices for every Housing Unit, one price with parking and one price without parking, and must prove that all advertising for the non-BMR residential units either states that parking is sold separately from Housing Units or, at the very least, does not state that Housing Units in the Project are sold with a parking space included in one price;

Project Sponsors shall not charge special fees for parking to BMR Buyers that are not charged to all buyers;

The price of a parking space for a BMR Buyer must never exceed the maximum established during the initial marketing of the BMR Units, but may fall below this price for both non-BMR and BMR Buyers as long as the reduction is applied evenly to all buyers;

In buildings with less than 1:1 parking, the opportunity to purchase or lease a space will be allocated by lottery rank. All BMR Buyers must be offered the option of purchasing or leasing a parking space until all required parking spaces to be allocated to BMR Buyers are purchased or leased. Should any spaces remain after every BMR Buyer has been offered the option to purchase or lease a space, those spaces may be sold or leased to non-BMR Buyers;

A first parking space that is purchased either (1) at the same time that the BMR Unit is initially purchased or (2) purchased by a BMR Owner any time after the initial purchase of the BMR Unit shall be re-sold with the BMR Unit upon resale of the unit. The parking space shall be resold within the overall resale price as outlined in Section II (C);

BMR Buyers or BMR Owners may purchase or lease a second parking space at any time without any restrictions placed on the Project Sponsor or the BMR Buyer BMR Owner. However, this second parking space becomes the responsibility of the BMR Owner upon resale of the BMR unit.

**Pricing Methodology for BMR Units upon Resale**

Except for transfers pursuant to Section II (F) of this Manual, the BMR Owner shall transfer the BMR Unit at a sales price no greater than the following amount (the "Maximum Resale Price"):

(1) The price that the BMR Owner paid for the BMR Unit upon Close of Escrow ("Base Price") adjusted only by the percentage change in AMI (up or down) from the year of purchase to the year of the BMR Unit resale pricing (the "Change in AMI Formula");

(2) The cost of eligible capital improvements completed in compliance with Section II (F) of this

Manual;

(3) The cost of Special Assessments paid by the BMR Owner; plus
(4) The cost of using a Certified Realtor and Multiple Listing Service, up to 5% of the Base Price, which is before the addition of capital improvements, special assessments and realtor commission.

The current BMR Owner's purchase year is the calendar year in which the BMR Unit closed escrow. This rule applies regardless of when the BMR Unit was purchased within that calendar year. The resale pricing year is the calendar year in which the BMR Unit is being repriced.

The AMI percentage change will be based on 100% of AMI for a 4-person Household in both index years. This 4-person proxy will be applied regardless of BMR Unit size or income designation of the BMR Unit.

*Example of Change in AMI Formula Pricing:*

Household purchases BMR Unit in February 2008 for $300,000 and resells in July 2012. BMR Unit is a one-bedroom unit.

2008 4-person AMI = $94,300
2012 4-person AMI = $103,000
AMI change from 2008 – 2012 = 9.23%, or $27,678
New Base Price = $327,678
5% realtor commission = $16,384
Final Maximum Resale Price = $344,062

No other costs shall be recouped in the resale of a BMR Ownership Unit than those described under the Maximum Resale Price above.

A BMR Owner is not guaranteed that a buyer will purchase a BMR Unit at the Maximum Resale Price upon resale and may have to lower the resale price in order to attract a buyer. The Maximum Resale Price is simply the maximum amount that a BMR Owner may charge a BMR Buyer in a resale transaction.

The price of a BMR Unit at resale is not guaranteed to exceed the initial purchase price of the BMR Unit. However, any appreciation gained from the sale of a BMR Unit belongs to the BMR Owner upon resale unless the BMR Owner has an additional loan from the City or other entity that requires repayment and/or an appreciation share.

If the resale price as calculated above and before the addition of capital improvements and realtor commission is lower than the original purchase price for the BMR Unit, the BMR Owner may choose to resell the BMR Unit at the resale price as calculated, or at the original purchase price plus capital improvements and special assessments and realtor commission. The BMR Owner is not guaranteed that the BMR Unit will resell at the original purchase price, however.

**D.  FINANCING REQUIREMENTS**

The purpose of the following financing requirements for BMR Ownership Units is to ensure that BMR

Buyers can afford to become homeowners within commonly accepted standards and to protect the BMR Unit from foreclosure.  MOH will review loans factors important to sound lending, including but not limited to the following items.

**Loan Requirement**

All BMR Buyers must secure a loan to finance the purchase of a BMR Unit.  All loans must be secured through a MOH-approved lender.

**Loan Originator**

All MOH BMR Buyers must work with a MOH-approved lender to secure a first or a subsequent loan.  Such lenders are listed on the MOH website at www.sf-moh.org.  Approved MOH lenders must attend annual trainings for all MOH homeownership programs and be a part of an approved lending institution that pays an annual participation fee to MOH.

**Loan Term**

Buyers must use 30-year loans at all times, except in the case of refinance.

**Loan Payment Plan**

Buyers must use fixed rate loans only.  Buyers cannot use negative amortizing loans, adjustable rate mortgages, "balloon payment" loans, or interest-only loans.  MOH reserves the right to identify additionally prohibited loan characteristics.

**Loan to Value Ratio**

The maximum allowable Loan to Value Ratio is 95%.

**Downpayment Requirement**

Buyers must make a minimum 5% down payment, which will vary based on the sales price of the home.  Of the total 5%, 3% must be the BMR Buyer's own funds (held in a financial institution) and 2% can be from gift funds (not yet received).

**Debt Ratios**

The Buyer's front-end ratio or debt-to-income ratio (i.e. monthly housing payment) must be no lower than 28% and no higher than 38% of the BMR Buyer's income.  Such ratios will be determined by a BMR Buyer's lender.

The front-end ratio may include:
Principal and interest payments on the first mortgage;
Principal and interest payments, if any, on subordinate, non-deferred loans;
Real estate taxes;
Hazard insurance premium;

Flood insurance premium, is applicable;
Private mortgage insurance premium, if applicable;
Monthly Homeowners' Association Dues for condominiums.

The Buyer's back-end ratio or total debt-to-income ratio (i.e. total debt monthly payment) should not exceed 45% of the Buyer Household's income.

The back-end ratio may include:
The monthly housing payment as defined above;
Long-term installment debt beyond 10 months remaining to be paid;
Revolving accounts and lines of credit;
Alimony, child support or maintenance, if applicable.

**Interest Rates**

MOH will review loans for reasonable interest rates that are reflective of current trends.

**Documentation of Income**

Buyers must supply full income and other documentation to a lender when applying for a loan for a BMR Unit.

**FICO Score**

MOH does not establish a minimum FICO score for BMR Buyers. Lenders determine the minimum FICO score according to their own guidelines and loan products.

**Co-signing**

Co-signing for a loan for a BMR Unit by a non-BMR Household member is not allowed.

**Fees**

All fees must be usual, customary and reasonable transaction fees normally incurred in a residential real estate transaction. Fees should be charged at Close of Escrow, if possible.

**Seller Credits**

Seller Credits are allowed as long as the sales price remains at or under the stated sales price and if there is no dowpayment assistance money from the City and no cash back to the BMR Buyer. Seller credit funds must be used in escrow.

**Named Borrowers**

All adult Household members must appear as an owner or co-owner on the BMR Unit title and must co-sign for any purchase loan for the BMR Unit with the following exceptions:

(1) Legal dependents of titleholders as claimed on the most recent federal income tax return or legal minor children of titleholders.  Spouses or Domestic Partners are not considered dependents;

(2)  Household members younger than age 24 who are the child of a titleholder who will reside in the BMR Unit as their primary residence, regardless of being named as a dependent on the federal tax form of a titleholder; and,

(3) Recent immigrants with insufficient credit history as defined as a person who has been in the United States for 2 years or less as supported by entrance documentation or a sworn statement and lender documentation of the reason for loan denial, including a copy of the applicant's credit report.

**Appraisals**

MOH requires a Fair Market Appraisal as a part of the lending and closing process.  Lenders desiring to order an additional appraisal that compares BMR Units to other BMR Units may do for their lending purposes but such appraisal should compare BMR Units with similar characteristics, including similar AMI pricing targets.

**BMR Note**

Lenders should be aware of the placement of the BMR Note as defined in Section II (G) of this Manual.

**Government-insured Loans**

BMR Buyers may not be allowed to use government-insured loans such as FHA, Veteran's Administration loans, and other such loans at the current time as such loan programs have not agreed to accept loans that are restricted under the Program.  MOH allows the use of such loans; however, such programs have not approved MOH's BMR program and therefore, have not lent to BMR Buyers under the Program.

**Securitizing Loans**

As securitized loans under the Program tend to be sold to the Federal National Mortgage Association ("FNMA"), BMR Buyers should ensure that lenders are either able to sell their loan to FNMA or manage the loan within the lending institution itself.

**Refinancing**

MOH must approve all refinancing agreements for BMR Ownership Units, including any new loans placed on the BMR Unit in any lien priority position.  Owners may be permitted to refinance up to the original value of their first mortgage plus closing costs in order to obtain lower interest rates or lower monthly payments.  Owners may refinance their BMR Units to withdraw cash only in an amount equal to the principal paid on the BMR Unit. MOH will not review the Household income for Program qualification upon refinancing.  Owners must use a MOH-approved Lender to conduct the refinance and the new loan must be approved under the guidelines set out in Section II (D) of this Manual, including but not limited to a 95% loan to value ratio.

**Home Equity Lines of Credit and Home Equity Loans**

MOH does not allow BMR Owners to open Home Equity Lines of Credit but may approve a Home Equity Loan if that loan falls within the guidelines of Sections II (D) of this Manual.  BMR Owners who use such programs without approval from MOH may be in violation of their Program restrictions and/or may not be allowed by MOH to refinance their BMR Unit.

**Default and Foreclosure**

In the event of loan default or risk of foreclosure on first mortgage, a BMR Owner must contact MOH to alert MOH of the default within 30 days of the default.

BMR Units that fall into foreclosure must be resold under their current restrictions.  The Baseline Price used to resell a BMR Unit that was purchased by the primary lender at auction shall be the price paid at auction or the balance of the outstanding debt of the primary mortgage, whichever is higher.

In the event of a foreclosure, only a Qualified Buyer can purchase the BMR Unit at the foreclosure sale, with the exception of the first mortgage lender, who must then resell the BMR Unit to a Qualified Buyer.

See Section G of this Manual for information on the order of liens for a BMR Ownership Unit.

**Short Sales**

In the case of BMR Units that have not received loan assistance from the City, MOH will consent to a short sale request, provided that the short sale price does not exceed the Maximum Purchase Price allowed under the Program.  The BMR Owner has the discretion to lower the purchase price to any chosen amount below the maximum purchase price allowed under the Program.

In the case of Units that have received loan assistance from the City, MOH will only consent to a short sale request if allowed under the specific regulations governing the source of the City loan assistance. BMR Owners should refer to the specific guidelines associated with such sources outside of this Manual.

**Financing Additional Items upon Purchase**

A loan for a BMR Unit shall not include storage units, other additional spaces for sale, or second parking spaces that were not provided with the BMR Unit as a part of the purchase of the BMR Unit.  Such items and spaces will not be included in a BMR Unit resale and are the sole responsibility of a BMR Owner.

BMR Unit upgrades may not be financed as a part of a BMR Unit purchase and can never be added to the resale price of a BMR Ownership Unit that was purchased upon initial sale of the unit or within the first 10 years of the initial sale of the BMR Unit, as explained in Section II (F) of this Manual.

**Exception for BMR Units Unable to Obtain Financing**

When a BMR Unit is unable to secure financing upon resale due to pending litigation in the Project or due to a ratio of rental to ownership Housing Units in the Project that is unacceptable to lenders, and whose BMR Owners must sell their BMR Unit due to financial hardship or job relocation out of the Bay

Area, such BMR Unit may be eligible for an allowance to sell the BMR Unit to a Buyer who will pay cash for the unit rather than by obtaining a mortgage. This allowance differs from MOH's standard policy which requires that all BMR Buyers carry a mortgage on a BMR Unit.

Under this option, a BMR Buyer would be allowed to purchase the BMR Unit in cash and not carry a mortgage under the following rules.  However, financing is allowed and encouraged in the case of these Projects, should it be obtained.  All such financing must be secured through a MOH-approved Lender.

The process of selling a BMR unit to an all-cash buyer shall follow the ensuing requirements and process:

    (1)  After purchasing the BMR Unit in all cash, the Buyer's remaining monthly housing costs must equal no more than 38% of the Household monthly income. These costs include HOA dues, real estate taxes and home insurance as well as those set forth in Section II ( ) of this Manual. Settlement or trust funds may be used to determine the BMR Buyer's ability to meet monthly housing costs.  BMR Buyers shall provide a credit report to verify any debt liabilities as well as other documents requested by MOH to confirm debt to loan ratios;

    (2)  The Buyer must be at or below the Maximum Income Level for the BMR Unit;

    (3)  In the case of cash purchases only, to gather a more comprehensive picture of a Household's true earnings, and to avoid selling a BMR Unit to a Household that is only temporarily low-income, MOH will average the past three years of federal tax income (in addition to the standard income test) to determine Household income.  This method will present a more realistic picture of a Household's income.  In the case that a Household has become recently retired or disabled, MOH may seek documentation of such and revert back to the current income review standard;

    (4)  MOH will exempt the cash assets that are used to purchase a BMR Unit from the standard asset test for the Household;

    (5)  BMR Buyers applying gift funds toward the purchase of the BMR Unit must supply a Gift Letter and verification of funds with the application for the BMR Unit.

Realtors should inform all potential BMR Buyers of the one-time nature of these policies and that the BMR Unit must be sold through the regular procedures of this Manual upon resale and inform potential BMR Buyers of the lawsuit pending against the Project or to the current rental to ownership unit ratio that is disallowing financing on the BMR Unit.

In the absence of a lender, the realtor for a BMR owner selling under this allowance shall coordinate all processes and deliver all forms typically provided by a Lender, including but not limited to a Fair Market Appraisal, credits reports and a Preliminary Title Report.

BMR Owners intending to obtain one of these allowances must submit a form provided by MOH and receive permission from MOH before selling to a cash BMR Buyer.

**E.   TITLE AND ESCROW REQUIREMENTS**

**Named Titleholders**

All adult Household members must appear as an owner or co-owner on the BMR Unit title and must co-sign for any purchase loan for the BMR Unit with the following exceptions:

(1)  Legal dependents of titleholders as claimed on the most recent federal income tax return or legal minor children of titleholders.  Spouses or Domestic Partners are not considered dependents;

(2)  Household members younger than age 24 who are the child of a titleholder who will reside in the BMR Unit as their primary residence, regardless of being named as a dependent on the federal tax form of a titleholder; and

(3)  Recent immigrants with insufficient credit history as defined as a person who has been in the United States for 2 years or less as supported by entrance documentation or a sworn statement and lender documentation of the reason for loan denial, including a copy of the applicant's credit report.

**Vesting**

BMR Units may be vested in any form as long as all titleholders also appear on title as a fee owner for the BMR Unit.

**F.    RESTRICTIONS ON BMR OWNERSHIP UNITS AND OWNERS**

**Term of Restriction**

All BMR Ownership Units are restricted in their resale price and other applicable restrictions for the Life of the Project unless otherwise noted in Use Restrictions for the Project.

**Occupancy Requirements**

BMR Ownership Units are to be owner-occupied and used as the owner's primary residence as defined by living in the BMR Unit at least 10 out of 12 months of the calendar year.  The BMR Household must occupy the BMR Unit within 60 days of the completion of the purchase.

**Rental Prohibition**

BMR Units are not to be used as rental property.  An owner of a BMR Unit may not rent or sublease any part or the entire BMR Unit without prior written consent of MOH.

MOH may grant consent to a BMR Owner to rent in circumstances where the Household is forced to temporarily relocate due to employment requirements; where the BMR Owner is unable to sell a BMR Unit at the original purchase price or at the original purchase price plus the Change in AMI repricing methodology per Section II (C) of this Manual; or for other reason deemed acceptable by MOH in its sole discretion, provided that:

(1)  The total period for which the BMR Unit may be leased does not exceed twelve (12) months;

(2) The tenant satisfies the income requirements placed on the BMR Unit by Use Restrictions and of this Manual for the Unit as a BMR Ownership Unit and other qualifying Household requirements placed on the BMR Unit by Use Restrictions and of this Manual for the Unit as a BMR Rental Unit;

(3) Initial rent does not exceed the Maximum Monthly Rent, calculated according to the Maximum Household Income stated in the Use Restrictions for the Unit as a BMR Ownership Unit, or the BMR Owner's total housing expenses, as defined in Section I of this Manual, whichever is the lesser amount.

**Maintenance and Insurance**

The BMR Owner shall not destroy or damage the BMR Unit, allow the BMR Unit to deteriorate, or commit waste on the BMR Unit.  Owners shall maintain the BMR Unit in compliance with all applicable laws, ordinances and regulations and in a good and clean condition and all appliances shall be in good and working order.

**Transfer Procedures**

A BMR Owner may Transfer the BMR Unit only to a Qualified Buyer.  In connection with a proposed Transfer, Owner shall comply with the marketing and procedural requirements set forth in Section II (F) of this Manual.  Excepting Transfers by foreclosure or an Acquisition Lender's acceptance of a Deed in Lieu of Foreclosure, or other circumstances approved by MOH, all Transfers shall take place through an escrow account with a mutually acceptable Title Company.  No Transfer shall be permitted unless such title company complies with any and all escrow instructions provided by MOH.

*Transfer to Spouse or Domestic Partner*

If a BMR Owner marries or becomes a Domestic Partner after purchasing the BMR Unit, the Spouse or Domestic Partner may become a co-Owner.   An Owner intending to add a Spouse or Domestic Partner as a co-Owner must present his or her marriage certificate or Domestic Partnership registration to MOH for review, and the proposed co-Owner shall execute an addendum to City documents related to the BMR Unit by which the co-Owner shall assume the same rights and responsibilities with respect to those documents as the Owner.

*Transfer upon Owner's Death*

Upon a BMR Owner's death, the Property may be Transferred to any co-Owner previously approved by MOH without further MOH approval, but such co-Owner shall notify MOH within thirty (30) days of the Transfer and MOH may require such co-Owner to execute an addendum to City documents related to the Property by which the co-Owner shall assume the same rights and responsibilities with respect to those documents as the Owner.  If at the time of Owner's death, a co-Owner has not been previously approved by the City, such co-Owner must first present his or her marriage certificate or Domestic Partnership registration to the City for review, and if the documentation is approved by the City, the Property may be Transferred to such co-Owner in accordance with the preceding sentence.

Upon the death of a BMR Owner and all MOH-approved co-Owners, the Property may be Transferred by inheritance, will, or any other function of law to a child of the BMR Owner, provided however that such child otherwise qualifies under as a Qualified Buyer Household. The proposed transferee shall submit any financial and other information reasonably requested by MOH to verify that the proposed transferee meets the requirements of a Qualified Buyer Household. If MOH determines that the proposed transferee is a Qualified Buyer Household, the BMR Unit may be Transferred to the proposed transferee for no consideration (except to the extent necessary to pay off any existing lien secured by the BMR Unit). The proposed transferee shall execute a BMR Note, City Deed of Trust, and any other City documents related to the BMR Unit by which the proposed transferee shall assume the same rights and responsibilities with respect to those documents as the BMR Owner.

Upon the death of a BMR Owner and all MOH-approved co-Owners, if the Owner's child is not the entitled beneficiary of the BMR Unit, or if MOH determines that the proposed child transferee is not an Qualified Buyer Household, then the BMR Unit shall be Transferred pursuant to the requirements set forth in Section II (F) of this Manual, and the beneficiary of the BMR Unit shall only be entitled to receive the BMR Owner's proceeds from said Transfer.

In the case of an heir who is a current Household member at the time of the death of a titleholder, that heir shall be allowed one (1) year to live in the BMR Unit before either qualifying to inherit the BMR Unit as an Qualified Buyer Household or resell the BMR Unit under the procedures outlined in Section II (F) of this Manual.

**Removing a Person from Title**

Removal of a titleholder is allowed only in the case of death or dissolution of marriage or Domestic Partnership. MOH must approve such removals.

**Resale Restrictions and Procedures**

Upon the resale of BMR Ownership Units, a BMR Owner must adhere to the following procedures:

A BMR Owner must contract with a MOH-approved realtor to resell a BMR Ownership Unit. As described in Section II (C) of this Manual, the Maximum Resale Price of the resale BMR Unit will include commission for the realtor;

MOH shall calculate the Maximum Resale Price for the BMR Unit. The BMR Owner must, at least thirty (30) days prior to marketing the BMR Unit, advise MOH of his/her intent to sell the BMR Unit and shall work through a MOH-approved Realtor to request a determination of a Maximum Resale Price from MOH. MOH shall price the BMR Unit only upon receipt of a signed intent to resell the BMR Unit and request for pricing; a statement of all approved capital improvements made to the Unit; and a signed listing agreement with a MOH-approved certified realtor. MOH may require the completion of a standard form in the submission of such request. See Section II (C) of this Manual for an explanation of how BMR Ownership Units are priced upon resale;

Within the 30-day period, MOH shall inform the BMR Owner of the Maximum Resale Price of the BMR Unit and any other conditions of sale;

The BMR Unit must be marketed for at least 21 calendar days preceding an application deadline and lottery for the BMR Unit. Among other requirements, the BMR Owner's realtor must hold at least 3 open houses, including one week night and one weekend day open house; advertise the BMR Unit on the MLS to promote public awareness; accept applications; field all questions regarding BMR Units; provide applicants with lottery ticket or number; enter applicant information into a MOH-approved applicant tracking sheet within 24 hours of application deadline; and, ensure completeness of all applications;

All potential BMR Buyers who are on the general BMR interest list shall be notified by MOH of Units available for resale and invited to participate in the lottery, as well the general public;

A public lottery will be held by MOH for all BMR Units upon resale in accordance with Section II (B) of this Manual. MOH will conduct the lottery and record the results and the BMR Owner's realtor will make the results available to all interested applicants or members of the public;

To enter the lottery for resale, a BMR Buyer shall submit to the BMR Owner's realtor for approval the documentation outlined in Section II (B) plus a completed San Francisco Purchase Agreement. To proceed with a BMR Unit purchase post-lottery, the BMR Buyer's lender and Title Company must supply MOH with the documents outlined in Section II (B) of this Manual;

No sale may proceed without the written approval of MOH;

Broker fees paid by the BMR Owner must be shared in a commission agreement with the BMR Buyer's realtor. Such fees will be based on the MOH-calculated resale price before the addition of capital improvement amounts or realtor commission;

Sales agreements with terms requiring the payment of realtor fees by the BMR Buyer will not be approved;

No separate terms can be required within a sales agreement that requires the BMR Buyer to purchase appliances, furnishings, or other disallowed capital improvements;

All amenities and parking spaces that were purchased with the BMR Unit must be sold with the BMR Unit upon resale;

BMR Owners, BMR Buyers and realtors shall comply with the documentation and enforcement procedures set forth in Section II (G) of this Manual;

All new BMR Owners shall adhere to the requirements of this Manual;

Marketing of the resale of individual BMR Ownership Units shall be in compliance with all applicable federal, state and local laws related to Fair Housing. BMR Owners and their agents may be asked to certify that the BMR Unit has not been marketed in such a manner as to be discriminatory.

**Units Unable to Resell**

In the case of BMR Units that are unable to attract a buyer for a BMR Unit that has been repriced under

the Change in AMI Formula within a six (6) month period where the BMR Owner has made a good faith effort to sell the BMR Unit, or in cases where market rate comparisons reveal that the BMR Owner's purchase price for the BMR Unit is at or below current comparable market rate units, the BMR Owner may seek permission to rent the BMR Unit to a Qualified Renter Household for one year at a rent level that equals either the Maximum Monthly Rent levels allowed at the ownership AMI level of the BMR Unit as stated in Use Restrictions or the BMR Owner's total housing costs (whichever is lesser) with the option of entering into one additional year of rental if the current market rate comparisons continue exceed the original purchase price.

Furthermore, MOH may, upon application by the BMR Owner, consider granting the following exceptions on a one-time basis:

    (1) a one-time waiver of the First-time Homebuyer rule for the purchasing Household;
    (2) a one-time waiver of the minimum Household size rule for the purchasing Household;
    (3) a one-time waiver of the asset test for the purchasing Household; and,
    (4) a one-time allowance to exceed the maximum qualifying income level of the next BMR Buyer to be increased by 20% of that stated in Use Restrictions for the Project but not to exceed 120% of AMI at any time.

Owners of BMR Units that are repriced using a repricing formula other than the Change in AMI Formula must sign into this Manual in order for their BMR Unit to repriced under the Change in AMI Formula and adhere to all provisions within this Manual thereof.  These allowances will not be provided to BMR Owners who are reselling their BMR Unit at a price established by any other formula than the Change in AMI Formula.

**Capital Improvements and Special Assessments**

BMR Units may begin claiming capital improvements toward their Maximum Resale Price that are made no sooner than 10 years after the BMR Unit was first occupied.  Once the BMR Unit becomes eligible for capital improvements credit, BMR Owners may begin submitting documentation of completed work.

MOH will review all capital improvements claims and categorize them into three distinct categories: Eligible Capital Improvements, Eligible Replacement and Repair and Ineligible Costs.  Each category is defined as follows:

    (1) Eligible Capital Improvements include major structural system upgrades, new additions to the BMR Unit and improvements related to increasing the health, safety and energy efficiency of the property. Improvements that meet these criteria will be given 100% credit;

    (2) Eligible Replacement and Repair includes in-kind replacement of existing amenities, repairs and general maintenance that keeps the property in good working condition.  Costs that meet these criteria will be given 50% credit for repairs; and

    (3) Ineligible costs include cosmetic enhancements, installations with limited useful life spans and non-permanent fixtures.  Homeowners may undertake these projects at their discretion, however they will not be given capital improvements credit.

**Procedure for Submitting Capital Improvements**

BMR Owners must submit capital improvements to MOH for review within 6-months of the completion of the project.  In order to document the improvements, each BMR Owner must submit the following documentation:

    (1)  A list of the capital improvements with a description on a form provided by MOH:
    (2)  The receipt and invoice for each eligible improvement;
    (3)  Proof of payment, such as a cancelled check, bank account statement or credit card bill;
    (4)  A copy of site or building permits, if required; and
    (5)  Contractor's license number for Projects exceeding $500.

Upon receipt of a complete capital improvements claim, MOH staff may arrange a site visit to inspect the completed Project.  Once the improvements have been verified, MOH will send a written response to approve or deny the submitted capital improvements within 60 days of original receipt.  This information will be placed in the property file at MOH for use when the property is being sold.

**Special Assessments**

Homeowner's Association initiated special assessments are considered capital improvements and will be added to the resale price of the home at the full amount of the special assessment paid by the BMR Owner.  In order to receive credit for special assessments, homeowners must submit the following documentation within 6-months of payment:

    (1)  An invoice for the special assessment; and
    (2)  Proof of payment, such as a cancelled check, bank account statement or credit card bill.

**Capital Improvements Cap**

In order to maintain the affordability of the BMR Unit for subsequent buyers, MOH will approve all eligible capital improvements, eligible replacement and repair, and special assessments when submitted.  At the time of sale, MOH will cap all eligible capital improvements and eligible replacement and repair at 10% of the resale price.   MOH will not cap special assessments.

**List of Approved Capital Improvements**

*Eligible Capital Improvements*

Major Electrical Wiring System Upgrade
Major Plumbing System Upgrade
Room Additions
Installation of Additional Closets and Walls
Alarm System
Smoke Detectors
Removal of Toxic Substances, such as:
Asbestos
Lead

Mold/Mildew
Insulation
Upgrade to Double Paned Windows
Fireplace Glass Screen
Upgrade to Energy Star Built-In Appliances, as follows:
Furnace
Water Heater
Stove/Range
Dishwasher
Microwave Hood

*Eligible Replacement and Repair*

Electrical Maintenance and Repair, such as:
Switches
Outlets
Plumbing Maintenance and Repair, such as:
Faucets
Supply Line
Sinks
Flooring
Countertops
Cabinets
Bathroom Tile
Bathroom Vanity
Replacement of Built-In Appliances, as follows:
Furnace
Water Heater
Stove/Range
Dishwasher
Microwave Hood
Garbage Disposal
Window Sash
Fireplace Maintenance or In-kind Replacement (Gas)
Heating System
Lighting System (Recessed)

*Ineligible Costs*

Cosmetic Enhancements, such as:
Fireplace Tile and Mantel
Decorative Wall Coverings or Hangings
Window Treatments (Blinds, Shutters, Curtains, etc.)
Installed Mirrors
Shelving
Refinishing of Existing Surfaces

Non-Permanent Fixtures, such as:
Track Lighting
Door Knobs, Handles and Locks
Portable Appliances (Refrigerator, Microwave, Stove/Oven, etc.)

Installations with Limited Useful Life Spans, such as:
Carpet
Painting of Existing Surfaces
Window Glass
Light Bulbs

**Estate Planning**

New purchasers of BMR Units may not purchase the BM Unit through a trust of any kind, including but not limited to living trusts.  Existing BMR Owners may not transfer ownership of their BMR Units to trusts of any kind, including living trusts.

**G.   DOCUMENTATION AND ENFORCEMENT OF SALES RESTRICTIONS FOR BMR OWNERSHIP UNITS**

At the request of MOH, and at the time of the initial or any subsequent sale of a BMR Unit, the BMR Buyer shall enter into such agreements or other documents as MOH may require ensuring that the BMR Unit will be subject to the Program requirements.

These documents include the following:

**Promissory Note**

A BMR Buyer shall execute and deliver to the City a promissory note in a form prepared by MOH (a "BMR Note") in an original principal amount equal to the difference between (i) the appraised fair market value of the BMR Unit as determined without regard to the sales and rental restrictions on such unit at the time of resale or default, and (ii) the Maximum Purchase Price of that unit at the time of the resale or default pursuant to the Use Restrictions.  All such BMR Notes shall contain the above restrictions on resale and rental of a BMR Unit.  The BMR Note shall provide for a stated rate of interest.

The BMR Note shall be due and payable, in full, on either: (1) the date of a Transfer of the Unit that is not performed in compliance with this Manual and the Use Restrictions; or (2) the date of an event of a default of any of the conditions, obligations or covenants contained in the BMR Note (including without limitation the covenant to sell the applicable BMR Unit in compliance with Use Restrictions).  As further described below, the BMR Note shall be terminated, and no amount shall be due, upon a resale of the BMR Unit performed in compliance with this Manual and the Use Restrictions.  Any funds received by the City from the repayment of BMR Notes shall be placed in the Citywide Affordable Housing Fund.

**Deed of Trust**

Repayment of the BMR Note shall be secured by a deed of trust encumbering the applicable BMR Unit in a form prepared by MOH (the "City Deed of Trust").

**Declaration of Restrictions & Option to Purchase Agreement**

BMR Buyers shall execute and deliver to the City a Declaration of Restrictions and Option to Purchase Agreement, a document that, among other requirements, requires the BMR Owner to comply with the Use Restrictions and grants the City an option to purchase the BMR Unit in the event that the BMR Owner defaults under the terms therein.

**Buyer Acknowledgment of Special Restrictions**

BMR Buyers shall execute and deliver to the City an acknowledgement that they have thoroughly reviewed this Manual and the recorded Declaration of Restrictions and Option to Purchase Agreement on the BMR Unit ("the Buyer Acknowledgment of Special Restrictions").

**Function of Documents**

*Termination of Note and Reconveyance of Deed of Trust upon Resale*

Upon any resale of a BMR Unit, assuming (1) that there has been no event of default that is continuing under the existing BMR Note, and (2) that the resale of the BMR Unit complies with this Manual and Use Restrictions, MOH shall accept a replacement BMR Note made to the order of the City by the new purchaser of the BMR Unit, in form and substance acceptable to MOH, as full satisfaction of the existing BMR Note.  At the closing of the sale transaction, the deed of trust securing the existing BMR Note shall be reconveyed by the City, and the new purchaser of the BMR Unit shall deliver to the City a new Declaration of Restrictions and Option to Purchase Agreement, a new BMR Note, and a new City Deed of Trust securing the new BMR Note, which deed of trust shall be recorded against the applicable BMR Unit.

*Term of Note and Deed*

For all BMR Units, the BMR Note shall have a term commencing on the date of purchase and ending on the earlier of: (1) the sale of the BMR Unit to which it pertains, or (2) a default of any of the conditions, obligations or covenants contained in the BMR Note (including without limitation the covenant to sell the applicable BMR Unit in compliance with Use Restrictions).

*Order of Liens*

The BMR Note shall not be subordinated to any other liens or restrictions affecting the Project or a BMR Unit to which Use Restrictions apply except for the Buyer's primary mortgage loan.  The BMR Note can only be subordinated to the primary mortgage and must be in second lien priority position in all circumstances.

The restrictions imposed by Use Restrictions, and any liens recorded pursuant thereto (including but not limited to the Declaration of Restrictions and Option to Purchase Agreement), shall not be subordinated to any liens or restrictions affecting the Project or a BMR Unit to which Use Restrictions apply, including but not limited to Buyer's primary mortgage loan.  In no event shall the Program restrictions applicable to a BMR Unit be subordinated to any lien against such BMR Unit, unless specifically allowed in the Use Restrictions applicable to the Unit.

*Recordation of Restrictions*

Before the issuance of the First Construction Document by the Department of Building Inspection, a Notice of Special Restrictions and other appropriate documentation shall be recorded with the Office of the Recorder of the City and County of San Francisco for the BMR Units in order to implement the Use Restrictions.  Such restrictions and other recorded documents shall include language restricting the sale or rental of the BMR Units in accordance with Use Restrictions.

At the Close of Escrow for an individual BMR Unit, the Acknowledgement, Declaration of Restrictions and Option to Purchase Agreement, and the City Deed of Trust shall all be recorded against the BMR Unit with the Office of the Recorder of the City and County of San Francisco.

**H.   Monitoring of BMR Ownership Units**

MOH shall monitor and require occupancy certification for BMR Ownership Units on an annual or bi-annual basis.  Owner(s) of a BMR Unit will be required to submit an annual monitoring and enforcement report on a form provided by MOH and submitted on a date and at a location determined by MOH.  The report shall provide information regarding occupancy status, changes in title and any other information MOH may reasonably require in order monitor compliance with the BMR Unit's specific Use Restrictions.

**III. RENTAL PROGRAM**

Renting a BMR Rental Unit differs in many ways from renting a market rate unit.  It is important that the Project Owners and renters of BMR Rental Units understand the rules and procedures of the Program fully.   Among other items, this Section sets forth the requirements for BMR Rental Units including the qualifications for BMR Renters, the application process, the establishment of the Maximum Monthly Rent; permissible reasons for Project Owners to deny a BMR Unit to a potential BMR Renter Households; permissible reasons for Project Owners to evict or fail to renew the lease of a BMR Renter Household, the lease agreement process, restrictions on BMR Rental Units and Renters, Documentation and Enforcement of Restrictions for BMR Rental Units, monitoring of BMR Rental Units, and conversion of a BMR Rental Unit to a BMR Ownership Unit.

**A.   QUALIFIED RENTER**

The following section addresses the necessary qualifications to rent a BMR Rental Unit.

**Non-homeowner Requirement**

Each member of an applicant Household must establish that he/she does not own an interest in a Housing Unit as of the date of application for a BMR Rental Unit.

An applicant shall be deemed to have owned an interest in a Housing Unit regardless of whether or not that interest results in a financial gain, is in another state or country, or if they have ever used the property as a Primary Residence.

Notwithstanding the forgoing, the following interests shall not, by themselves, disqualify an applicant from falling within the definition of non-homeowner:  (1) ownership of timeshares; (2) loan co-signers from previous real estate transactions; and (3) appearing on title solely in the capacity as a trustee for a trust, where the trust is the legal owner of the dwelling unit.

MOH may verify non-homeowner status by (1) reviewing mortgage deductions on the three most recent years of federal tax returns for each applicant; (2) a signed statement on the application stating homeownership status; (3) a title search; or (4) other means reasonably calculated to determine first-time homebuyer status.

**Income and Asset Requirement**

Per Planning Code Sections 415.6 (c) and 415.7 (d), initial rental BMR Rental Units will be priced to be Affordable to Qualifying Households at 55% of AMI, unless stated otherwise in the Use Restrictions for the Project.  Maximum Household Income levels are adjusted on an annual basis.

BMR Rental Units currently being marketed may adjust their Maximum Household Income used for qualifying applicants, but not for establishing the Maximum Monthly Rent, as new Maximum Household Income levels are published by MOH at the beginning of each calendar year.  Should a Project Sponsor or Project Owner wish to update the Maximum Monthly Rent levels as new Maximum Household Income levels are published by MOH at the beginning of each calendar year, the BMR Rental Units must be removed from marketing and a new pricing and marketing process must be established.

**Household Definition and Requirements**

As defined in Planning Code Section 401, and for the purpose of qualifying for the Program, a Household is defined as any person or persons who reside or intend to reside in the same Housing Unit.

All Spouses or Domestic Partners must be included in the Household and must appear on the application and lease for the BMR Unit.

100% student Households as defined under the California Tax Credit Allocation Committee Compliance Manual 2012 Chapter 17 Category 11l are not eligible for the Program except under the exceptions contained in the IRS Section 42 (i) (3) (D).

All Household members who are under 18 years of age must be the legal dependent of an adult Household member, except in the case of emancipated minors, as claimed on the most recent income tax return, or legal minor children of titleholders.

**Household Size Determination**

The size of the Household is determined by counting together every person who intends to live in the BMR Unit, regardless of age or dependency status.

Pregnant applicants will be counted as two Household members with verifiable medical documentation.

Verified live-in assistants and foster children may be counted toward Household size in order to determine unit size and must appear on the application for the BMR Unit but will not be counted in income determinations and may not appear on the lease for the BMR Unit.

Temporarily absent Household members who intend to live in the BMR Unit upon return must appear on the application for the BMR Unit.  Such Household members include, but are not limited to, Household members serving temporarily in the armed forces, or who are temporarily institutionalized.

**Minimum Household Size**

The size of a Household must be compatible with the size of the BMR Unit being rented.  A minimum of one person per bedroom is required.  There is no restriction on renting a BMR Unit that has fewer bedrooms than the Household size; however, the Project may impose maximum Household size rules under the restrictions contained in Section III (D) of this Manual.

**Occupancy Requirement**

All members of the BMR Household must occupy the BMR Rental Unit as their Primary Residence, as defined by living in the BMR Unit at least 10 out of 12 months of the calendar year, and must occupy the BMR Unit within 60 days of the completion of the lease commencement date.

**Leaseholder Requirements**

All adult Household members must appear on the lease for the BMR Unit with following exceptions:

(1) Legal dependents of leaseholders as claimed on the most recent federal income tax return or legal minor children of leaseholders.  Spouses or Domestic Partners are not considered dependents; or

(2) Household members younger than age 24 who are the child of a leaseholder who will reside in the BMR Unit as their primary residence, regardless of being named as a dependent on the federal tax form of a leaseholder.

Should the Project require all adults to be on the lease for the BMR Rental Unit, these exceptions will not apply.

**B.  PROCESS**

**Application Process**

New BMR Rental Units shall be marketed for at least a 28-day period, including a listing on the MOH website and local venues.  Applicants must submit a MOH BMR rental lottery application by a specific deadline for each new BMR Rental Unit and submit a complete BMR rental application in order to qualify for a BMR Unit after the lottery.  For more details on the marketing requirements for new BMR Rental Units, see Section V (G) of this Manual.

BMR Rental Units upon re-rental shall be marketed for at least 7 days, including a listing on the MOH website and local venues.  All applications for BMR Rental Units upon re-rental shall be entered into a lottery as described in section II (B) of this Manual unless the Project is specifically permitted by MOH to maintain a wait list of applicants.  Applicants must submit a BMR application form and supporting documentation by a specific deadline for each BMR Rental Unit**.**  For more details on the marketing requirements for BMR Rental Units upon re-rental, see Section V (H) of this Manual.

**Application Requirements**

Households applying for new and re-rental BMR Rental Units must supply the following documentation in order to qualify for the unit:

An application from the proposed renter Household on a form specified by MOH;
Supporting documentation from all members 18 years or older of the renter Household, including:
Past one (1) year IRS returns;
Past one (1) year W-2 forms;
Three (3) current and consecutive pay stubs or equivalent;
Three (3) current and consecutive statements from every liquid asset account or personal cash holdings, including all custodial accounts held for minors;
Verification of San Francisco residency or employment (only if applicable);
Copy of Certificate of Preference (only if applicable).

In the case of new BMR Rental Units, applicants shall submit an abridged application form only and supply full income and other documentation if selected in the lottery process to proceed with a rental.  In the case of re-rental BMR Rental Units, applicants shall submit a complete application within 7 days of the posting of the unit on the MOH website in order to be entered into a lottery for the unit.

To proceed with renting new and re-rental BMR Rental Units post-lottery, the Project Owner must supply a reviewed and approved application, also approved by MOH, as well as a draft lease agreement to MOH before MOH will approve the rental.

**Changing an Application after Submission**

No application changes shall be allowed after an application is submitted and after an application deadline has passed unless the change is (1) the removal of an applicant; (2) the addition of an applicant's Spouse or Domestic Partner or a new Household member in the case of an adoption or new guardianship; (3) an update of income qualification, such as a new job or a job that has ended; or (4) correction of technical errors, such as current phone number or other non-qualifying information.

**Application Review Period**

An application for a BMR Unit must be reviewed and approved for income qualification within the one hundred and twenty (120) days prior to the signing of the lease.

**Request for Application Reconsideration**

An applicant requesting reconsideration of a disqualified application shall submit new information or documentation contesting the disqualification to MOH within 3 business days from the date of the disqualification letter and MOH shall respond by the end of a 7 business day period from the date of the disqualification letter.  In the case of such request, and when such a unit is available, the Project Sponsor shall maintain one appropriately sized BMR Unit for the disqualified Household for seven (7) business days from the date of the issuance of a disqualification letter but need not hold the applicant's preferred BMR Unit.

**Fees for Applying**

Project Owners shall not charge BMR Rental Unit applicants any fees for applying for a BMR Unit that (1) are not applied evenly to all tenants in the building; or (2) that are beyond actual cost.

**Selection of BMR Renters upon Initial Rental and Rerental of BMR Units**

*Lottery Preferences*

All individuals and Households may enter the lottery for a BMR Unit.  However, those Households in which one member holds a Certificate of Preference (COP) from the former Redevelopment Agency or who lives or works in San Francisco will be given preference in the lottery ranking process, with COP holders being given the highest preference.

COP holders are primarily Households previously displaced by former Redevelopment Agency action in Redevelopment Project Areas per the San Francisco Redevelopment Agency's Property Owner and Occupant Preference Program, as reprinted September 11, 2008 and effective October 1, 2008 and on file with the Clerk of the Board in File No. 080521.

If the number of BMR Rental Units available exceeds the number of qualified applicants who hold a COP or who live or work in San Francisco, the BMR Units will become available to other qualified applicants.

*Verification of Preference Qualification*

To be considered a COP holder, a Household must submit a copy of the Certificate of Preference with the application.  COP inquiries should be addressed to the Mayor's Office of Housing at (415) 701-5613.

To be considered a Household that lives or works in San Francisco, at least one applicant must provide the following proof of residency or employment with the submitted application:

Verification that the applicant lives in San Francisco:
(1)  One utility bill with a San Francisco address dated within the 45 days preceding the application date for the BMR Unit.  Utility bills can include gas, electric, garbage or water; or
(2) Current paystubs with a San Francisco address; or
(3) A current, formal lease with a San Francisco address.

OR

Verification that the applicant works in San Francisco:
MOH shall verify that a person works in San Francisco by reviewing an applicant's paystubs.  If an applicant's employer is not based in San Francisco, or if a person's paystubs do not reflect a San Francisco work address, the applicant must supply a letter from the employer stating that the person works primarily in San Francisco and demonstrate that at least 75% of their working hours are in San Francisco.

*Lottery Process*

MOH shall work in collaboration with the Project Sponsor to utilize a public lottery to select BMR Renters upon initial rental and rerental of BMR Rental Units.  The following guidelines shall be applicable to the lottery process for new BMR Rental Units:

A non-prioritized list of interested applicants will be kept by MOH.  At least twenty-one (21) days prior to a lottery for initial rental BMR Rental Units and at least seven (7) days prior to a lottery for rerental BMR Rental Units, all those signed up on the list will be notified of the availability of BMR Units and invited to participate in the lottery by MOH.  The general public will be invited to participate in the lottery, as well;

Applicants who submit a complete application by the application deadline for the BMR Unit(s) will receive a numbered lottery ticket whose twin ticket shall be entered into the lottery.  Applications missing a complete cover application will not be entered in to the lottery;

Lotteries for BMR Rental Units shall be held in a public, accessible location that is arranged and paid for by the Project Sponsor;

A representative of MOH shall conduct the lottery in tandem with the Project Sponsor and record the order of lottery numbers drawn;

To conduct the lottery, MOH shall pull application tickets from a vessel in rank order and record the lottery results by application ticket number.  COP holders will be drawn and ranked first, followed by applicants who live or work in San Francisco.  MOH shall pull at least 10 ticket numbers for each BMR Unit available, should there be enough total applicants to do so;

Applications shall not be reviewed for eligibility before the lottery but only after the lottery ranking has been finalized;

The final lottery list shall be produced by MOH after the lottery once the lottery preferences have been clearly identified and applied;

Applicants shall be invited to attend lotteries, but attendance is not mandatory;

Lottery results shall be posted on either the MOH or Project Sponsor website but shall not include the names of applicants but only the application ticket numbers.  The results of rerental lotteries with 10 or fewer applicants may be announced by the Project Sponsor to each applicant rather than posting to a website.

*Post-Lottery Process*

Following the lottery, MOH shall transmit a final lottery list to the Project Sponsor who shall notify all applicants of their position in the lottery and inform MOH of the lottery winners' intent to rent the BMR Unit;

The Project Sponsor shall adhere to the rank order of the lottery list when offering BMR Rental Units to lottery winners;

Applicants shall be reviewed by the Project Sponsor or Project Owner with MOH's approval post-lottery for Program qualifications and issued an approval or disqualification letter;

Per this section,  in the case of an request for reconsideration, and when such a BMR Unit is available, the Project Sponsor shall maintain one appropriately sized BMR Unit for the disqualified Household for a seven (7) business day period from the date of the issuance of a disqualification letter but need not hold the Household's preferred BMR Unit;

To maintain the live or work lottery preference, the applicant must maintain the status of the preference from the time of the application to the time of purchasing the BMR Unit.

**Annual Recertification**

BMR Renters must provide annual Household income documentation to the Project Owner upon request and other information MOH may reasonably require to monitor compliance with the BMR Unit's Use Restrictions to certify continued qualification under the Program.  Failure to provide such information could result in a Project Owner's inability to renew the lease of a BMR Renter.  The recertification process is explained in more detail in Section III (I) of this Manual.

**C.   ESTABLISHMENT OF INITIAL RENTAL AND RERENTAL PRICING**

**Pricing Process**

Prior to marketing a BMR Unit for initial rental, the Project Sponsor shall transmit a copy of the Notice of Special Restrictions ("NSR"), final planning approval and approved floor plans indicating the location of the BMR Units in the building to MOH, together with a request for determination of initial Maximum Monthly Rent on a form provided by MOH. The pricing shall be valid for sixty (60) days and shall serve as the final pricing for the BMR Rental Units only upon approval of the Marketing Plan for the BMR Units. However, no BMR Units shall begin marketing in one calendar year with rental rates that were established in the previous calendar year.

Prior to marketing a BMR Units upon rerental, the Project Owner shall contact MOH to confirm the Maximum Rent Level of the vacant BMR Rental Unit.

MOH shall require the completion of a standard form in order to request BMR Unit Maximum Monthly Rent levels.

**Income Table**

The income table used to calculate the income level of a BMR Household and thereby price BMR Units shall be the table named "Maximum Income by Household Size derived from the Unadjusted Area Median Income (AMI) for HUD Metro Fair Market Rent Area (HMFA) that contains San Francisco" as published at www.sf-moh.org unless the Project Sponsor, with permission from MOH, offers the BMR Units at a lower income level than that required by Use Restrictions and chooses to abide by an alternate income table in doing so.

**Methodology for Establishing Maximum Monthly Rent Levels for BMR Rental Units**

MOH shall calculate initial rent levels of the BMR Rental Unit according to the following assumptions: (1) the income limits specified in Use Restrictions; (2) total payments of no more than thirty (30) percent of gross monthly income, based on the income limits required by Use Restrictions (and not based on an individual Household's income); and (3) a Utility Allowance reduction where applicable.  MOH shall assume a one-person larger Household than the number of bedrooms in the BMR Unit when establishing the rent levels of all BMR Units except for studio units, which assume a one person Household, and SRO Units, which shall be priced based on three-fourths (3/4ths) of the Maximum Monthly Rent for a studio BMR Rental Unit.

In the case of renters using a Section 8 Voucher, Project Owners may collect the fully allowed rental reimbursement amount from the Housing Authority but shall not charge the tenant a rent higher than the Maximum Monthly Rent established by MOH.

**Parking Space Policy for BMR Rental Units**

*Bundled Parking Policy for BMR Rental Units*

In Projects in which parking for the non-BMR residential units is leased as a part of the rental rate for

such units, parking spaces shall be granted to BMR Renters within the Maximum Monthly Rent as established by MOH and at the same ratio of parking spaces to Housing Units for the Project overall. All parking spaces granted to BMR Renters shall be re-leased with the BMR Unit upon re-rental.  This policy shall apply in cases where even one parking space is included in the rental rate for a non-BMR Unit.

*Unbundled Parking Policy for BMR Rental Units*

In Projects in which parking is "unbundled," or leased separately from every Housing Unit, parking spaces shall be made available to BMR Renters at the same ratio of parking spaces to Housing Units for the Project overall and the Project Owner must charge the BMR Renter a maximum monthly lease rate for parking spaces that is equivalent to either (1) a percentage of the lowest parking rate available in the Project that is determined by the average difference between Maximum Monthly Rent for BMR Units and non-BMR unit rental levels over the previous three (3) years as published annually by MOH on January 1 or (2) $100, whichever is higher.  Should MOH fail to publish the average difference between Maximum Monthly Rent levels for BRM Units and non-BMR unit rental levels over the previous three (3) years for a given year, the maximum monthly lease rate for parking spaces for BMR Units for that given year shall be $100.

Project Owners choosing the unbundled parking option must provide proof that they have affirmatively marketed their non-BMR units to alert potential renters to the fact that all units in the Project are rented  both with and without parking and at two respective monthly lease rates.  Parking spaces not leased by BMR Renters may be made available to non-BMR renters once every space required is offered to a pending BMR Renter in the case of newly marketed BMR Units.  In the case of BMR Rental Units upon re-rental, the new BMR rental should be offered the opportunity to lease a space that was leased by the previous tenant.

**Methodology for Establishing Maximum Monthly Rent Levels upon Re-rental of BMR Rental Units**

Rental rates for Qualified Renter Households shall not exceed the applicable amounts published in accordance with the provisions of Section II (C) of this Manual.

**Permissible Rent Increases for BMR Rental Units**

The Project Owner shall adjust (up or down) the Maximum Monthly Rent allowed for each BMR Renter on each anniversary of a BMR Renter's occupancy in an amount that does not exceed the amount determined by MOH based on the percent of median income established in Use Restrictions.  These rents shall be made available on the MOH website at [www.sf-moh.org](www.sf-moh.org).  The Project Owner must follow all applicable federal, state and local laws when introducing the Maximum Monthly Rent adjustment.

At no time shall an annual increase exceed the actual allowable increase for that year.  In cases where the Maximum Monthly Rent level has decreased, the tenant's rent must be decreased.  In cases where the annual adjustments have not been applied year to year, the Project Owner may not take advantage of any increases that were not applied until the BMR Unit is vacant and re-rented.

BMR Renters should be aware of the fact that annual rent changes are not based on the San Francisco Rent Board and that rents may exceed the rate of inflation.

**Source of Annual Rent Levels for BMR Rental Units**

The qualifying Household Maximum Income Limits and Maximum Monthly Rent for BMR Units shall be updated annually as soon as January 1 of each year and will be available on the MOH website at www.sf-moh.org.

**Rent Subsidies**

Tenants of BMR Units must be permitted to use certified long-term government and non-profit rent subsidies including but not limited to the Section 8 Rental Voucher Program.  Any imposed rent-to-income standard must be based on the amount the BMR Renter pays toward the rent under such subsidy.

**Additional Fees Required of Renters**

Project Owners shall inform MOH of any additional required fees that will be applied to BMR Renters. Such fees will be allowed only if applied to all renters in the Project do not increase the Maximum Monthly Rent under the Program.

**D.   PERMISSIBLE REASONS FOR PROJECT OWNERS TO DENY BMR RENTER APPLICANTS**

Project Owners may deny BMR rental applicants based on the set of criteria described below.  However, MOH must review and approve such criteria before it is applied to the applicant Household.

The Project must adhere to all applicable federal, state and local standards for rental selection criteria.

**Inability to Pay Rent**

The Project Owner may require a rent-to-income standard for BMR Renters.  However, the Project must not require any Household to earn more than 2.5 times the rent each month in gross Household income and must also make allowances for a BMR applicant to prove demonstrated ability to pay rent in an amount lower than the 2.5 ratio. If a rent subsidy is used per Section III (C)), the tenant's rent to income requirement will then be based on the amount of rent the BMR Renter pays after the rent subsidy is applied.

**Credit**

The Project Owner may require each adult Household member age 18 and older to clear a credit check as long as that credit check is normal and customary and applied evenly to all tenants in the building.

**Eviction History**

The Project Owner may require each adult Household member age 18 and older to clear an eviction history review as long as that review is normal and customary and applied evenly to all tenants in the building.

**Criminal History**

The Project Owner may require each Household member to clear a criminal history review as long as that review is normal and customary and applied evenly to all tenants in the building.

**Maximum Occupancy Standard**

MOH does not establish a maximum household size for BMR Units.  However, the Project Owner may apply a maximum occupancy standard to a Household occupying a BMR Unit as long as that standard is derived from the San Francisco Housing Code Section 503(b) and as long as that review is normal and customary and applied evenly to all tenants in the building.

**E.  PERMISSIBLE REASONS FOR PROJECT OWNERS TO EVICT OR FAIL TO RENEW THE LEASE OF A BMR RENTER HOUSEHOLDS**

A Project Owner may choose not to renew the lease of a BMR Renter Household for the following reasons only:

  (1)  Non-payment of rent, meaning that the BMR Renter has failed to pay the rent to which the landlord is lawfully entitled under the written agreement between the tenant and landlord;
  (2)  Illegal use of the BMR Unit, meaning that the tenant is using or permitting a BMR Rental Unit to be used for any illegal purpose;
  (3)  Nuisance, meaning that the tenant is committing or permitting to exist a nuisance in, or is causing substantial damage to, the rental unit, or is creating a substantial interference with the comfort, safety or enjoyment of the landlord or tenants in the building, and the nature of such nuisance, damage or interference is specifically stated by the landlord in the writing
  (4)  Breach of Lease; and
  (5)  Conversion of a BMR Rental Unit to a BMR Ownership Unit as defined in Section V (I) of this Manual.

The Project Owner must not renew the lease of a BMR Renter if the BMR Renter is not in conformance with Program Rules, as follows:

If a BMR Renter is violating the requirements in this Manual, including but not limited to exceeding the income maximum for recertification as explained in Section III (G) of this Manual, not meeting the minimum Household size requirement or not occupying the BMR Unit as the Household's primary residence.  MOH must review and approve any decisions not to renew the lease of a BMR Renter Household in the case of the BMR Renter violating the requirements in this Manual before the Project Owner can take such action.

**F.  LEASE AGREEMENT PROCESS**

The Project Owner shall allow a BMR Renter no fewer than 7 calendar days from the date of the Program approval letter or Project approval of the renter, whichever occurs later and which date must be made clear to the renter at the time of final approval, to enter into a lease for an available BMR Unit and that lease shall commence no sooner than 10 calendar days from the signing unless the BMR Renter prefers to begin the lease period sooner.

**G.  RESTRICTIONS ON BMR RENTAL UNITS AND RENTERS**

**Term of Restriction**

All BMR Rental Units are restricted in their re-rental rate and other applicable restrictions for the Life of the Project unless otherwise noted in Use Restrictions for the Project.

**Occupancy Requirement**

All members of the BMR Household must occupy the BMR Unit as their primary residence, as defined by living in the BMR Unit at least 10 out of 12 months of the calendar year, and must occupy the BMR Unit within 60 days of the completion of the lease commencement date.

**Rental Prohibition**

BMR Renters may not sublease the entire BMR Unit nor rent a room within the BMR Unit or part of the BMR Unit at any time.

**Maintenance**

BMR Renters and Project Owners shall not destroy or damage the BMR Unit, allow the BMR Unit to deteriorate, or commit waste on the BMR Unit.  Renters and Owners of BMR Rental Units shall maintain the BMR Unit in compliance with all applicable laws, ordinances and regulations and in a good and clean condition and all appliances shall be in good and working order.

**Lease Changes**

BMR Renters may not add or subtract any person from the lease for a BMR Rental Unit without consent from the Project Owner and from MOH.  Should the Project Owner and MOH consent to the addition or subtraction of a qualified Household member in BMR Rental Unit, the new Household must submit a new application for the BMR Unit and meet the current eligibility standards for a BMR Rental Unit.

**Transferring Units**

Current BMR Renters may apply for other current new or re-rental BMR Rental Units but have no preference in the process, but for those outlined for all applicants in Section III (B) of this Manual, nor is a Project Owner required to make a vacant BMR Unit available for another current BMR Renter in the building.

**Annual Recertification**

BMR Renters must provide annual Household income documentation to the Project Owner upon request and other information MOH may reasonably require to monitor compliance with the BMR Unit's Use Restrictions to certify continued qualification under the Program.  Failure to provide such information could result in a Project Owner's inability to renew the lease of a BMR Renter.  The recertification process is explained in more detail in Section III (I) of this Manual.

**Permissible Increase in Income**

Upon annual recertification, existing BMR Renters whose income exceeds 200% the original income target as stated in Use Restrictions for the BMR Unit will no longer be considered Qualified Renter Households under the Program and are no longer qualified to occupy a BMR Unit. The Project Owner must bring the BMR Unit into compliance with the Program no sooner than the end of the current lease term of the tenant Household.

*Example of 200% of Original Income Target:*

Maximum AMI allowed in Use Restrictions = 55% of AMI
200% of maximum AMI allowed in Use Restrictions = 110% of AMI

## H.  DOCUMENTATION AND ENFORCEMENT OF RESTRICTIONS FOR BMR RENTAL UNITS

All leases must be 12-month leases.

MOH shall require specific lease language to be included in the lease, including an acknowledgement of the restrictions on the BMR Rental Unit and any monitoring procedures, including but not limited to this Procedures Manual. The material terms of the lease shall not change from year to year but for the Maximum Monthly Rent level.

All adult Household members must appear on the lease for the BMR Unit with following exception:

(1) legal dependents of leaseholders as claimed on the most recent federal income tax return or legal minor children of leaseholders. Spouses or state Domestic Partners are not considered dependents; and
(2) Household members younger than age 24 who are the child of a leaseholder who will reside in the BMR Unit as their primary residence, regardless of being named as a dependent on the federal tax form of a leaseholder.

Should the Project require all adults to be on the lease for the BMR Unit, these exceptions will not apply.

## I.  MONITORING OF BMR RENTAL UNITS

BMR Rental Units shall be monitored on an annual basis to determine the continued eligibility of the BMR Renter Household. BMR Renter Households, Project Owner(s) or those charged with the management of affordable BMR Rental Units satisfying the requirements of their Use Restrictions are required to submit an annual monitoring and enforcement report on a form provided by MOH and submitted on a date and at a location determined by MOH. The report shall provide information regarding rents, Household and income characteristics of tenants of designated BMR Units, services provided as part of the housing service such as security, parking, utilities, and any other information MOH may reasonably require for monitoring compliance with the BMR Unit's Use Restrictions.

In addition, Project Owners shall be required to recertify BMR Renters for continuing Program qualification within 365 days of the annual renewal of each BMR Renter lease. Non-renewal of the lease

for a BMR Renter shall require at least a ninety (90) day notice to the BMR Renter of the lease non-renewal.  Project Owners shall require existing BMR Renters to complete a new BMR application as provided by MOH at www.sf-moh.org and review such application under the application review guidelines also available at www.sf-moh.org.

Upon recertification, existing BMR Renters must meet the qualification standards for BMR Renters as contained in Section III (A), including but not limited to continuing to be income qualified per Section III (G) of this Manual, and adhering to the minimum Household size and occupancy requirements set forth in Section III (A) of this Manual.  BMR Renters must also be in compliance of the Restrictions on BMR Units and Renters as contained in Section III (G) of this Manual.

BMR Renters must provide annual Household income documentation to the Project Owner upon request and other information MOH may reasonably require to monitor compliance with the BMR Unit's Use Restrictions to certify continued qualification under the Program.  Failure to provide such information could result in a Project Owner's inability to renew the lease of a BMR Renter.

**J.    CONVERSION OF RENTAL UNIT TO OWNERSHIP UNIT**

BMR Renters should be aware of the fact that a private rental building subject to this Program may choose to convert all of the BMR Units in the Project to ownership units and therefore may convert their BMR Rental Units to restricted BMR Ownership Units.  See Section V (I) of this Manual for information on this process.

**IV.    INCOME REVIEW PROCEDURES FOR BMR OWNERSHIP AND RENTAL UNITS**

**A.  Sources of Income**

Income maximums are based on "gross" income derived from all sources as detailed in Internal Revenue Code (26 USC Section 61), whether or not exempt from federal income tax.  Such income includes, but is not limited to, the following:

Compensation for services, including fees, commissions, and similar items;
Income from assets;
Gross income derived from business;
Gains derived from dealings in property;
Interest;
Rents;
Royalties;
Dividends;
Alimony and separate maintenance payments;
Annuities;
Income from life insurance and endowment contracts;
Pensions;
Income from discharge of indebtedness;
Distribution share of partnership gross income;
Income in respect of a decedent;
Income from an interest in an estate or trust; and
Public benefits including but not limited to CalWorks, SSI, Disability income.

**B.  Determining Baseline Household Income**

MOH projects future income based on the gross income on each applicant's past three statements from each source of income.  MOH must review income documentation for all Household members 18 years and older, regardless of dependency status.

**Calculating Income from Paystubs**

For employed applicants, annual income is derived by dividing the year-to-date gross income by the current pay period count and then by annualizing an estimated pay period amount by the total pay period count over one year.

> *Example of Calculating Income with Paystubs:*
> Year-to-date (YTD) income as stated on the most recent paystub for the calendar year = $20,000
> Current pay period on most recent pay stub = 10
> Estimated pay period amount = $2,000 ($20,000 divided by 10)
> Total number of pay periods in one year for the applicant = 24
> Annualized pay = $48,000 ($2,000 x 24)

*Tips and Bonuses*

When calculating income based on paystubs, tips and commission will be annualized.  Bonuses will be annualized unless the applicant can provide documentation from the employer that the bonus was a one-time occurrence.  In this case, the bonus amount will be removed from the annualization of the income and added in one time to the total annual income that is determined.

*Seasonal Workers*

MOH will not annualize current income for seasonal workers who provide a Verification of Employment from their employer(s) verifying that the work does not occur year-round.

**Calculating Income from Government Income**

For applicants receiving government income of any source, the income is derived by multiplying a regular monthly statement by 12 months or by referring to an annual award letter.

**Calculating Income from Self-employed Income**

All self-employed applicants must submit a notarized Self-Employed affidavit provided by MOH.  If self-employed for 2 or more years of federal income tax returns, MOH will average net income on the 2 years of tax returns.  If self-employed less than 2 years of federal tax forms, MOH will annualize the submitted Profit & Loss statement.

**Calculating Income from Cash Income**

In the case of an applicant who is paid in cash for employment, MOH will require a Verification of Employment from the applicant's employer to confirm annual income and IRS form 4506-T to verify that no taxes were paid.

**Unemployed Applicants**

Unemployed applicants who are receiving no income at all should submit an Unemployed Affidavit as provided by MOH in place of income statements.  Applicants receiving unemployment benefits do not need to complete the Unemployed Affidavit as unemployment benefits are considered income.

**Verification of Employment**

An official Verification of Employment that is signed by an applicant's employer shall be used as the final proof of an applicant's income, if needed.

**Income from Commercial Property or Land Owned**

The net income from any commercial property or land owned by any applicant shall be counted toward the annual Household income.

### C.   Asset Test

MOH will apply an asset test to all applicants, including all custodial accounts held for minors. Household assets up to $60,000 will not be counted toward Household income.  10% of all assets above $60,000 will be added to the total Household income.

Assets include all liquid asset accounts, including but not limited to savings, checking accounts, Certificates of Deposit, stocks, and gifts.  MOH will not count qualified retirement accounts toward an applicant's income.  Such retirement accounts are limited to accounts that are intended for retirement and that would incur a penalty if withdrawn before a specified retirement age per each account.  Such accounts include but are not limited to 401K and 403B accounts.  MOH will also not count 529 college savings toward an applicant's income.

*Example of Addition of the Asset Test to Baseline Household Income:*

>Household of 4 earns $50,000 a year
>
>Total Household assets = $140,000
>
>First $60,000 of assets is excused: $140,000 - $60,000 = $80,000 remaining
>
>10% of remaining $80,000 is added to income: $80,000 x 10% = $8,000
>
>Total amount added to income: $8,000
>
>New total Household income: $50,000 + 8,000 = $58,000

### D.   Asset Test Exemption for Seniors

For any senior aged 62 and older who is the Head of Household, MOH shall discount $127,000 from total assets prior to performing the typical imputed income calculations.

For married seniors where one person is the Head of Household and the other has been nonworking, MOH shall discount $190,000 (rather than 2x the single rate) from total assets prior to performing the typical imputed income calculations.

Any actual IRA or other retirement funds will be deducted from these amounts first.  For example, if an applicant has $10,000 in an IRA, and $170,000 in non-IRA assets, MOH will reduce the waiver amount by $10,000, from $127,000 to $117,000.

The asset deduction amount will be adjusted each year based on the then-current running total as published at www.sf-moh.org.

**V. PROCEDURES FOR PROJECT SPONSORS AND PROPERTY MANAGERS: GENERAL COMPLIANCE PROCEDURES**

**A. Approval Process**

To comply with Planning Code Section 415 *et seq.*, Project Sponsors will work with the Planning Department and with their assigned Planner to choose the fee or to qualify for an alternative to the Affordable Housing Fee under the Program. Project Sponsors may review information about their options at www.sf-moh.org or contact the Planning Department at 415-558-6377.

Project Sponsors must sign an Affidavit of Compliance with the Inclusionary Housing Program with the Planning Department stating their intention to pay the Affordable Housing Fee or to qualify for the on-site, off-site or land dedication alternatives before receiving entitlement from the Planning Department or, in the case of Principally Permitted Projects, before the Planning Department will approve the building permit for the Project. The assigned Planner for the Project will guide the Project Sponsor through this process and apply the current Conditions of Approval to the Project as set forth by the Planning Code and the Planning Department. The current Affidavit of Compliance is found on the Planning Department's website at: http://www.sf planning.org/Modules/ShowDocument.aspx?documentid=8422 or by calling the Planning Department at 415-558-6377. Project Sponsors shall consult with the Planning Department and MOH to explore the off-site and land dedication options before seeking Project approval from the Planning Department.

Once a Project has received Planning Department approval in the form of an entitlement or building permit approval, the Project Sponsors shall record a Notice of Special Restrictions (NSR) that includes the Conditions of Approval under the Program, and the location of any on-site or off-site BMR Units in the case of such Projects, and transmit a copy of the recorded NSR to the Planning Department and MOH.

Following Planning Department approval of a Project subject to the Program, the Planning Department must transmit a copy of such approval plus the Affidavit of Compliance with the Inclusionary Housing Program to MOH. The Planning Department shall also enter the Project's Program requirements in a database shared with DBI, which will then ensure that the Project does not receive its First Construction Document or First Certificate of Occupancy, depending on the method of compliance, unless the Project is in conformity with the Program. If the Project Sponsor intends to pay the Affordable Housing Fee, a fee determination letter must be secured from the Mayor's Office of Housing prior to Planning Department Approval of a Building Permit Application. The Planner will then enter the Affordable Housing Fee amount in the shared database.

Further sections of this Manual provide details on the exercise of each option.

**B. COMPLIANCE THROUGH PAYMENT OF THE AFFORDABLE HOUSING FEE**

Project Sponsors who pay the Affordable Housing Fee ("Fee") to satisfy the Program requirements shall be charged on a per-unit size basis under a fee schedule that shall be updated annually on January 1 of each year. The Fee shall be based on the percentage requirements set forth in Planning Code Section 415. The Fee requirement shall be calculated by using the direct fractional result of the total number of

units in a Project multiplied by the percentage requirement, rather than rounding up the resulting figure.

The Fee is established as the amount of the affordability gap as defined in Section 415.5 of the Planning Code.

Commencing on January 1, 2013, no later than January 1 of each year, MOH shall adjust the Fee.  The Fee shall be adjusted based on the change in the Construction Cost Index as published by Engineering News Record.

The Project Sponsor shall request a Fee determination from MOH by completing a form supplied by MOH and available at www.sf-moh.org.  Among other items, this form shall include:

Project Sponsor contact information;
The name and address of the Project;
The number of total units by unit size;
A copy of the recorded NSR for the Project; and
An estimate of the Fee amount due.

MOH shall provide a Fee determination letter within ten (10) business days of the receipt of the request form.  The letter shall be sent to the Project Sponsor and shared with the Planning Department. The Planning Department shall enter the amount due into a database shared with DBI, who will then issue a report outlining preliminary estimates of all development impact and in-lieu fees owed for a development project and require payment of this fee before the issuance of a First Construction Document.  Payments for development impact and in-lieu fees must be made at the Permit Center, DBI, 1660 Mission, 6th floor, San Francisco, CA 94103. Questions about paying the Affordable Housing Fee after MOH has issued a fee determination letter should be directed to DBI at 558-6131.

In cases in which the Project Sponsor chooses to pay the Fee once the Fee has been established by MOH but a new fee schedule has since been established since MOH's determination of the Fee amount, DBI will alert the Project Sponsor of the schedule update and the Project Sponsor will then seek an updated Fee due amount from MOH.  If the Fee schedule update has occurred within 30 days of the date of the issuance of the MOH fee determination letter, the Project Sponsor may choose to pay the Fee under the prior schedule if the payment is made within such 30-day period.

Prior to issuance by DBI of the First Construction Document for the Project Sponsor, the Project Sponsor must have paid in full the sum required to DBI, or the required portion of the fee due in accordance with any fee deferral allowances permitted under Section 403 of the Planning Code.

## C.   COMPLIANCE THROUGH NEW CONSTRUCTION ON-SITE

When qualifying for the on-site alternative per Sections 415.3 and 415.6 of the Planning Code, the Project Sponsor may provide the number and type of BMR Units satisfying the applicable Use Restrictions through the construction of said units on the site of the Principal Project.

The Project Sponsor shall construct and, when applicable, manage the BMR Units.  Per Planning Code Section 415.8 (a) (2), BMR Units shall not remain vacant for a period exceeding sixty (60) days without

the written consent of MOH.

**Number of Units Required**

The number of BMR Units required under the on-site alternative of the Program is established by Section 415.6 of the Planning Code or by other related Planning Code sections.

**Pricing and Maximum Income Levels**

Per Section 415.8 (a) (4), the Maximum Income Levels specified in the Use Restrictions for the Project shall be the required income percentages for the Life of the Project, with the exception set forth in Section II (F) and V (G) of this Manual and excepting the fact that the qualifying income level for BMR Ownership Units only shall be 10% higher than the required income level used for pricing BMR Ownership Units, as explained in Section II (C) of this Manual.

See Section II (C) of this Manual for information on the pricing of BMR Ownership Units, including a description of the parking policy for such units.  See Section III (C) of this Manual for information on the pricing of BMR Rental Units, including a description of the parking policy for such units.

**Term of Restriction**

Per Planning Code Section 415.8 (a) (1), all BMR Units constructed pursuant to Planning Code Sections 415.6 (on-site alternative) and 415.7 (off-site alternative) must remain Affordable to Qualifying Households for the Life of the Project.  In some circumstances, the term of the restriction is established by sections of the Planning Code in effect at the time of Project approval or by the specific Notice of Special Restrictions recorded against the Project.

**Timing of Construction and Delivery of On-site Units**

Per Planning Code Section 415.6 (b), on-site BMR Units must be constructed, completed, ready for occupancy and marketed no later than the non-BMR Housing Units in the Principal Project.

**Design, Size and Location of On-site Units**

Per Planning Code Section 415.6 (c), all on-site BMR Units constructed must be provided as BMR Ownership Units unless the Project Sponsor meets the eligibility requirement of Section 415.5 (g). In general, BMR Units constructed under this Section 415.6 shall be comparable in number of bedrooms, exterior appearance and overall quality of construction to non-BMR Units in the Principal Project.  A Notice of Special Restrictions shall be recorded prior to issuance of the First Construction Document and shall specify the number, location and sizes for all BMR Units required under this Section 415.6.  The interior features in affordable units should be generally the same as those of the non-BMR Housing Units in the Principal Project, but need not be the same make, model or type of such item as long as they are of good and new quality and are consistent with then-current standards for new housing.  The square footage of affordable units do not need to be the same as or equivalent to those in the non-BMR Housing Units in the Principal Project, so long as it is consistent with then-current standards for new housing.  Where applicable, parking shall be offered to the BMR Units subject to the terms and conditions of the unbundled parking policy for BMR Units as specified in this Manual and amended from

time to time.  On-site BMR Units shall be Ownership BMR Units unless the project applicant meets the eligibility requirement of Section 415.5(g).

**Development Subsidies**

Per Planning Code Section 415.6 (e), BMR Units constructed under Section 415.6 as part of an on-site Project shall not have received development subsidies from any Federal, State or local program established for the purpose of providing affordable housing, and shall not be counted to satisfy any affordable housing requirement. Other units in the same on-site project may have received such subsidies.

Per Planning Code Section 415.6 (f), notwithstanding the provisions of Section 415.6 (e), a Project may use California Debt Limit Allocation Committee (CDLAC) tax-exempt bond financing and four percent (4%) tax credits under the Tax Credit Allocation Committee (TCAC) to help fund its obligations under this ordinance as long as the project provides 20 percent (20%) of the Principal Project units as affordable at 50 percent (50%) of AMI for on-site housing.  The income table to be used for such Projects when the units are priced at 50 percent (50%) of AMI is the income table used by MOH for the Inclusionary Housing Program as defined in Section I of this Manual, not that used by TCAC or CDLAC.  Except as provided in this subsection, all BMR Units provided under this section must meet all of the requirements of Planning Code Section 415 *et seq.* and this Manual for on-site housing.

**Marketing**

See Section V (G) of this Manual for information on the marketing of initial sale BMR Units.

**Monitoring**

See Section V (J) of this Manual for information on the monitoring of BMR Ownership Units and BMR Rental Units.

**Requirement to Record Restrictions**

Per Planning Code Section 415.6 (c), a Notice of Special Restrictions shall be recorded prior to issuance of the First Construction Document and shall specify the number, location and sizes for all BMR Units required under Planning Code Section 415.6.

**D.  COMPLIANCE THROUGH NEW CONSTRUCTION OFF-SITE**

When qualifying for the off-site alternative per Sections 415.3 and 415.7 of the Planning Code, the Project Sponsor may provide the number and type of BMR Units satisfying the Use Restrictions through the construction of said units off-site from the Principal Project.

The Project Sponsor shall construct and, when applicable, manage the BMR Units.  Such BMR Units shall not remain vacant for more than sixty (60) days at any time from the date of final completion.  Off-site Projects shall maintain insurance from the Project's architect, contractor and the Project Sponsor.

**Approval Process**

Project Sponsors choosing the off-site option shall adhere to all requirements contained in Planning Code Section 415.7 and shall adhere to the following procedures.

If the Project Sponsor is eligible and selects pursuant to Section 415.5 (f) to provide off-site BMR Units to satisfy the requirements of Section 415.1 *et seq.*, the Project Sponsor shall notify the Planning Department and MOH of its intent as early as possible. The Planning Department and MOH shall provide an evaluation of the Project's compliance with the requirements of Section 415.5 (f) and 415.7 prior to approval by the Planning Commission or Planning Department.

The Planning Department through its designated Planner shall require the Project Sponsor to indicate the intent to satisfy the Inclusionary Housing Program requirement partially or completely through off-site BMR units on the Affidavit for Compliance with the Inclusionary Housing Program. On an additional, standardized off-site form, the Planner shall (1) define the BMR Unit percent requirement of the Project under Planning Code Section 415.7; (2) confirm that the off-site proposal meets the required BMR Unit percent requirement under Planning Code Section 415.7; (3) confirm that the off-site proposal is within one mile of the Principal Project; (4) confirm that the off-site proposal includes ownership units per Planning Code Section 417.7 (d) and, if not, that the off-site proposal qualifies as a rental project per Planning Code Section 415.5 (g); and (5) confirm that the off-site housing meets the Quality Standards for Off-site Affordable Housing Units per Section V (D) of this Manual. The Project Sponsor should deliver all site information at least 120 days prior to the scheduled Planning Commission approval hearing.

The Planner will then share the standardized off-site form with MOH. MOH will also review the off-site proposal to confirm its compliance with Section 415 *et seq.*

The Project Sponsor shall record a Notice of Special Restrictions on both the Principal Project and the off-site Project, noting the Use Restrictions of each.

**Number of Units Required**

The number of BMR Units required under the off-site option of the Program is established by Section 415.7 (a) of the Planning Code.

**Pricing and Maximum Income Levels**

Per Section 415.8 (a) (4), the Maximum Income Levels specified in the Use Restrictions for the Project shall be the required income percentages for the Life of the Project, with the exception of allowances set forth in this Manual.

Per Section 415.7 (a) d) of the Planning Code, all off-site units constructed under this Section must be provided as BMR Ownership Units for the Life of the Project, unless the Project meets the eligibility requirement of Section 415.5 (g). Per Planning Code Section 417 (d), off-site BMR Ownership Units must be affordable to Qualifying Households earning no more than 70 percent (70%) of AMI and off-site BMR

Rental Units must be affordable to Qualifying Households earning no more than 55 percent (55%) of AMI.

See Section II (C) of this Manual for an explanation of the pricing mechanism for BMR Ownership Units, including a description of the parking policy for BMR Units.  See Section III (C) of this Manual for an explanation of the pricing mechanism for BMR Rental Units, including a description of the parking policy for BMR Units.

**Term of Restriction**

Per Planning Code Section 415 (8) (a) (1), all BMR Units constructed pursuant to Planning Code Sections 415.6 and 415.7 must remain Affordable to Qualifying Households for the Life of the Project.

**Timing of Construction and Delivery of Off-site Units**

Per Planning Code Section 415.7 (b), off-site BMR Units must be constructed, completed, ready for occupancy and marketed no later than the market rate units in the Principal Project.  In no case shall the Principal Project be issued a First Certificate of Occupancy until the off-site project has received its First Certificate of Occupancy.

**Geographic Location of Off-site BMR Units**

Per Planning Code Section 415.7 (c), the Project Sponsor must ensure that off-site BMR Units are located within one mile of the Principal Project.

**Quality Standards for Off-Site BMR Units**

All BMR Units constructed off-site under the provisions of Section 415.7 shall be of good quality and generally equivalent to current market rate housing standards commonplace in San Francisco as determined by the Zoning Administrator in accordance with official Planning Department policy.  Off-site BMR Units shall be comparable in number of bedrooms, number of bathrooms, exterior appearance and overall quality of construction to market rate units in the Principal Project, and shall meet at a minimum, or exceed, the following standards:

*Individual Unit Sizes*

Per Planning Code 417 (d), the total square footage of the off-site affordable units constructed under Section 415.7 shall be no less than the calculation of the total square footage of the on-site non-BMR Housing Units in the Principal Project multiplied by the relevant on-site percentage requirement for the project specified in Section 415.7. In addition, average individual BMR Unit square footages shall be no less than 70% of the average Principal Project unit square footage for corresponding unit types classified by number of bedrooms, and in no case shall individual unit square footages be less than the following for each unit type:

Studios:          350 square feet
1-Bedrooms:    550 square feet
2-Bedrooms:    800 square feet

3-Bedrooms:     1,000 square feet
4-Bedrooms:     1,250 square feet

Exceptions to these square footage minimums may be made at the Zoning Administrator's discretion where the Principal Projects average unit size by corresponding unit type classification is less than these minimums.  When using such discretion, the Zoning Administrator shall take into account any anticipated occupant for a particular development.

The average off-site BMR Unit size for a given unit type may be permitted to be less than 70% of the average size of the corresponding unit type of the Principal Project at the discretion of the Zoning Administrator on a case-by-case basis, provided there is a corresponding increase in unit numbers and all other provisions of this section are met.  No reduction in the required total minimum BMR Unit square footage per Section 415.7(d) of the Planning Code shall be permitted.

*Design of Off-site BMR Units*

*Room sizes*

No required bedroom shall be smaller than 120 square feet, and at least one bedroom in every BMR Unit, except for studios, shall be a minimum of 144 square feet.  The minimum horizontal dimension for any bedroom, excluding alcoves not included in the minimum square foot calculation, shall be 10 feet.

Primary rooms in studios shall be no less than 165 square feet excluding any contiguous kitchen area.  The minimum horizontal dimension for any such primary room, excluding alcoves not included in the minimum square foot calculation, shall be 11 feet.

No living room shall be smaller than 144 square feet, with a minimum dimension excluding alcoves not included in the minimum square foot calculation, of 11 feet.

At least one bathroom shall meet ADA size requirements, and all other full bathrooms required by this section must be at least 40 square feet in size.

Smaller room size minimums may be permitted at the discretion of the Zoning Administrator on a case-by-case basis, if such smaller room sizes are typical of the principal Project and are consistent with current City building and housing codes.

*Interior Heights*

Prevailing floor-to-ceiling heights in each BMR Unit shall be no less than 8'-6".  Lower ceiling heights in bathrooms, hallways, or small portions of other rooms may be permitted to allow for central heat and air ductwork where necessary, but in no case shall any ceiling height in such areas be less than 8'-0".

*Kitchen and Bathroom Amenities*

At a minimum, all kitchens shall have a full size four-burner cook top and full size oven, with

built-in exhaust hood/microwave oven unit (or an equivalent thereof), full size kitchen sink with in-drain electric disposal, full size dishwasher, full size refrigerator/freezer, good quality upper and lower level cabinets with doors, quality counter top surfaces, and a suitable good quality floor surface.  While appliances and finishes need not match or be equivalent to those in the Principal Project, they should be new and of good quality in terms of performance, durability and appearance.  At the discretion of the Zoning Administrator, appliance sizes may be scaled down for studio units if such downsizing is typical of the Principal Project.  For the purpose of preserving interior materials or character of older buildings or providing aesthetic compatibility therein, fully restored vintage appliances and finishes may be used as long as they are of good quality, durability, and in good working condition.

Bathrooms shall consist of a shower stall, toilet and lavatory. At least one bathroom in each unit shall have both a shower stall and standard size tub or a combination tub-shower unit.

*Closets*

Each Housing Unit shall have a coat closet and a linen closet, plus a closet for each bedroom. Minimum dimensions for coat closet shall be 4'X 2'. Minimum closet dimensions for required linen closet shall be 36"X 18".  Minimum closet size for the first/master bedroom shall be 16 square feet with a minimum depth of two feet.  Minimum closet size for each additional bedroom shall be 12 square feet with a minimum depth of two feet.

*Laundry facilities*

Off-site BMR Projects shall provide laundry facilities comparable to the Principal Project.  Each BMR Unit shall contain laundry facilities if such facilities are provided in the Principal Project. Each floor shall contain a laundry facility if such facilities are in the Principal Project, with one full-size washer and one-full size dryer for every four units per floor.  There shall be a common laundry room for the entire building if such a facility is provided in the Principal Project with one washer and one dryer unit for every eight units.  Individual laundry facilities within units shall consist of both a washer and dryer unit.  Studios, one- and two-bedroom units may utilize stacker units; three bedroom units and larger shall have full size laundry machine units.  Laundry machines shall be new and of good quality and durability.

*Finish qualities*

Finish qualities throughout Housing Units and common areas including: doors; windows; wall and floor materials and finishes; bathroom finishes and fixtures; trim; hardware; lighting and other electric features, need not match or be equivalent to that of the Principal Project, but should be new and of good quality in terms of performance, functionality, durability and appearance and should reflect current residential interior styles, except in cases where vintage styles are appropriate to the interior finish design of the building, or where it is desired to preserve historic features or finishes.

*Parking*

Parking provided for off-site BMR Units shall be comparable to the parking provided at the

Principal Project in terms of the ratio of parking spaces to Housing Units.  Should development budgets or zoning restrictions not allow such a parking arrangement, the rent or sales price of the BMR Units will be reduced to reflect the absence of the required parking spaces according to the Unbundled Parking Policy described in Sections II (C) and III (C) of this Manual.

*Zoning Administrator Discretion*

Smaller room size minimums may be permitted at the discretion of the Zoning Administrator on a case-by-case basis, if such smaller room sizes are typical of the Principal Project and are consistent with current City building and housing codes.

The standards in this section may be reduced at the discretion of the Zoning Administrator on a case-by-case basis provided the intent of this section -- that all BMR Units shall be of good quality and generally equivalent to current market rate housing standards commonplace in San Francisco -- is generally being met as determined by the Zoning Administrator.  Absent timely amendments to this section, requirements may be added or eliminated at the discretion of the Zoning Administrator to allow for changes in market standards or in technology.  In adding or eliminating such requirements, the Zoning Administrator shall take into account the likely occupancy of the off-site BMR Units in consultation with MOH.

**Development Subsidies**

Per Planning Code Section 415.7 (f), individual BMR Units constructed as part of a larger off-site project under Section 415.7 shall not receive development subsidies from any Federal, State or local program established for the purpose of providing affordable housing, and shall not be counted to satisfy any affordable housing requirement for the off-site development.  Other units in the same off-site project may receive such subsidies.

Per Planning Code Section 415.7 (g), notwithstanding the provisions of Section 415.7(f) above, a project may use California Debt Limit Allocation Committee (CDLAC) tax-exempt bond financing and four percent (4%) credits under the Tax Credit Allocation Committee (TCAC) to help fund its obligations under this ordinance as long as the project provides twenty five percent (25%) of the units as affordable at 50 percent (50%) of AMI for off-site housing.  The income table to be used for such projects when the units are priced at 50 percent (50%) of AMI is the income table used by MOH for the Inclusionary Housing Program, not that used by TCAC or CDLAC.  Except as provided in this subsection, all BMR Units provided under this section must meet all of the requirements of Planning Code Section 415 *et seq.*  and this Manual for off-site housing.

**Marketing**

See Section V (G) of this Manual for information on the marketing of initial sale BMR Units.

**Monitoring**

See Section V (J) of this Manual for information on the monitoring of BMR Ownership Units and BMR Rental Units.

**Requirement to Record Restrictions**

Per Planning Code Section 415.6 (c), a Notice of Special Restrictions shall be recorded prior to issuance of the First Construction Document and shall specify the number, location and sizes for all BMR Units required under Planning Code Section 415.7.

### E.   COMPLIANCE THROUGH LAND DEDICATION IN EASTERN NEIGHBORHOODS

Project Sponsors choosing the land dedication option under Section 419.5 of the Planning Code shall adhere to all requirements contained in such section and shall adhere to the following procedures.

**Initial Planning Department Review of Project**

Prior to any project approvals from the Planning Department or Planning Commission, the Planning Department through its designated Planner shall require the Project Sponsor to indicate the intent to satisfy the Inclusionary Housing Program requirement partially or completely through land dedication on the Affidavit for Compliance with the Inclusionary Housing Program.

On an additional standardized form provided by MOH, the Planner shall:

>(1) define the tier and percent requirement of the Project under Section 419;

>(2) identify whether the Principal Project for which the land dedication is provided applies to a single site or to a collective of sites within a 1-mile radius;

>(3) confirm that the land dedication requirement meets the required percent of total developable area of the Principal Project [which excludes land already substantially developed, subsequent non-developable uses required in connection with the project approval (ie. Open spaces, streets, alleys, walkways, or other public infrastructure), easements and other parts of the land that are not developable];

>(3) confirm that the percentage of land being dedicated to fully or partially fulfill the Project Sponsor's requirement under the Program accommodates at least the same percent of total potential units to be constructed on the Principal Project;

>(4) calculate the total number of BMR Units that would have been owed if they were provided as on-site BMR Units on the Principal Project;

>(5) state whether the dedicated land is in the form of air rights; and

>(6) note if the Section 419.5 rental incentive applies.

The Planner will then submit the standardized land dedication form to MOH.

**MOH Review and Recommendation**

The Project Sponsor must deliver to MOH all site information at least 120 days prior to the scheduled approval hearing by the Planning Commission.  MOH will issue a denial or conditional approval letter prior to issuance of project approvals from the Planning Commission or Planning Department and after MOH has completed its due diligence review of complete information submitted by the Project Sponsor.

In order to determine whether to issue a letter verifying acceptance, MOH will review the proposed land dedication to determine whether it satisfies the following requirements of Section 419.5, among others:

(1)   The dedicated site will result in a total amount of inclusionary units not less than forty (40) units.  MOH may conditionally approve and accept dedicated sites which result in no less than twenty-five (25) units at its discretion;

(2)   The dedicated site will result in a total amount of units that is equivalent or greater than the minimum percentage of the units that would have been provided on-site at the Principal Project, as required by Table 419.5, had the BMR Units been provided on-site.  MOH may also accept dedicated sites that represent the equivalent of or greater than the required percentage of units for all units that could be provided on a collective of sites within a one-mile radius, provided the total amount of inclusionary units provided on the dedicated site is equivalent to or greater than the total requirements for all Principal Projects participating in the collective, according to the requirements of Table 419.5;

(3)   The dedicated site is suitable from the perspective of size, configuration, physical characteristics, physical and environmental constraints, access, location, adjacent use, and other relevant planning criteria. The site must allow development of affordable housing that is sound, safe and acceptable;

(4)   The dedicated site includes or will include infrastructure necessary to serve the units, including sewer, utilities, water, light, street access and sidewalks;

(5)   The developer must apply for and pay for environmental review under CEQA of the land dedication and complete any applicable CEQA review prior or simultaneous to approval of the Principal Project;

(6)   The value of the dedicated land is equal to or greater than the value of the Principal Project multiplied by the applicable required land dedication percentage.  Value shall be determined by Fair Market Appraisals of the Principal Project and the proposed land dedication submitted by the Project Sponsor and subject to review and approval by MOH.

**Required Materials**

In order for MOH to perform this review of the proposed land dedication site, the Project Sponsor must provide the following due diligence documents to MOH with respect to the proposed site:

(1)   Preliminary Title Report dated within 30 days of submittal;

(2)   Recent Land/Site Surveys;

(3)  Geotechnical Report;

(4)  Phase I Report;

(5)  Phase II Report if hazardous materials are suspected in the Phase I Report;

(6)  Cost estimate for mitigation of any hazardous materials;

(7)  Land Use Memo that assesses the conformance of the proposed affordable housing project at the land dedication site with existing zoning, occupancy and use restrictions;

(8)  Fair Market Value Appraisal  to be completed to Uniform Standards of Professional Appraisal Practice standards by qualified appraisers holding a California Certified General Appraisal License (issued by the Office of Real Estate Appraisers), preferably with a Member of the Appraisal Institute member designation (issued by the Appraisal Institute), and with experience valuing similar properties in the Bay Area;

(9)  Infrastructure Study assessing the availability and capacity of infrastructure (sewer, utilities, water, light, street access and sidewalk) available to support the proposed affordable housing project.  If adequate infrastructure is not provided, a third-party cost estimate of providing such infrastructure must be provided;

(10) Density Studies compliant with site's underlying zoning, including one version that assumes Principal Project stated unit mix and size standards and one version that assumes 30% of units are 3-bedroom units;

(11) Cost study for each version of the density study in order to estimate how much it would cost to develop affordable housing according to each density study, taking into account federal prevailing wage labor rates;

(12) Schedule for delivery of land, including estimated dates for First Construction Document, demolition, lot division, etc;

(13) Intent of developer to deliver vacant site.

Developable units as assumed for the preceding studies should be comparable in size to the Principal Project unit sizes and at no time smaller than the following unit sizes:

- Studios = 350
- 1-BR = 550 square feet
- 2-BR = 800 square feet
- 3-BR = 1,000 square feet
- 4-BR = 1,250 square feet

Developable projects as assumed for the preceding studies must be able to accommodate the same parking ratio as that being provided by the Principal Project.

**Approval Letter and Conditions**

If MOH determines that the site is acceptable in accordance with Code Section 419, MOH will issue a formal approval letter.  If MOH's acceptance of the site is dependent on certain conditions being satisfied prior to the conveyance of the site, MOH shall identify such conditions in the letter.  At a minimum, MOH's acceptance of the site shall always be conditioned on a finding of consistency with the

General Plan and approval of the conveyance by the Board of Supervisors and Mayor.  Other conditions may include, but shall not be limited to:

(1) If the proposed land dedication site is found to have any hazardous materials or other environmental damage that requires remediation prior to development of Housing Units, MOH's acceptance of the site shall also be conditioned on the Project Sponsor clearing the site of such hazardous materials to the satisfaction of MOH in its sole discretion prior to conveyance to City.  Alternatively, if approved by MOH, any required environmental remediation may be able to be mitigated after conveyance within a mitigation cost standard that is determined by MOH and borne by the Project Sponsor.  If MOH agrees to allow environmental remediation work to be done after conveyance, MOH's acceptance of the site shall also be conditioned on the Project Sponsor placing sufficient funds (as determined by MOH) to pay for such remediation in an escrow account concurrently with the conveyance, which funds shall be released to MOH when the environmental remediation costs are incurred.

(2) If mitigation measures relevant to the land dedication are required as part of the Principal Project's environmental clearance, MOH's acceptance of the site shall also be conditioned, when appropriate, on the Project Sponsor completing such measures for the dedicated site concurrently with the Principal Site.   If applicable, the Project Sponsor shall be obligated under the Conditions of Approval to satisfy this condition post-conveyance.

(3) Removal of exceptions to title deemed unacceptable to MOH shall be in its sole discretion.

(4) MOH shall not be required to identify all conditions in the letter; failure to reference any conditions in the letter shall not preclude the City from imposing such reasonable conditions after the letter is issued as may be deemed appropriate by MOH in light of any new information discovered after the letter is issued.  Notwithstanding the foregoing, no new conditions may be added after the Agreement (as defined below) has been approved by the Board of Supervisors and Mayor and executed by MOH.

Should MOH issue a formal conditional approval letter, the Project Sponsor will seek entitlement for the Principal Project.  Should the Project become entitled, the Board of Supervisors must then approve the land dedication per the standard City land conveyance process by grant deed, unless another method is approved.  If approved by the Planning Commission, the Board of Supervisors, and the Mayor, the Project Sponsor must convey the land before issuance of First Construction Document for the Principal Project, with all conditions set forth in the Agreement (as defined below) and the MOH conditional approval letter having been met.   In certain circumstances, the City may provide for a later conveyance if adequate security is provided to the City by the Project Sponsor.

If MOH issues an acceptance letter, MOH and Project Sponsor will enter into a purchase and sale agreement in a form prepared by MOH (the "Agreement").  The Agreement will state that the sale of the

land dedication site will be for $1, and will be subject to all of the conditions precedent as identified by MOH. Upon execution of the Agreement by Project Sponsor, MOH shall present the Agreement and the proposed conveyance to the Board of Supervisors for approval. Upon approval of the Agreement and approval of the conveyance by the Board of Supervisors and the Mayor, and upon satisfaction or waiver of all of the conditions precedent, the Project Sponsor shall convey the land to MOH. Subject to the terms of the Agreement, in the event that any conditions have not been satisfied or waived by the issuance of the First Construction Document for the Project (or such later date as agreed to by the Planning Commission in the Principal Project's condition of approval), regardless of reason, the Project Sponsor shall not be able to use land dedication to satisfy its Inclusionary Housing Program Requirements and must satisfy the requirements of the Program through another means.

### F.   COMPLIANCE THROUGH MIDDLE INCOME ALTERNATIVE IN EASTERN NEIGHBORHOODS

MOH shall develop procedures for this compliance option with the next update of this Manual.

### G.   MARKETING PROCEDURES FOR INITIAL SALE AND RENTAL OF BMR UNITS

**General Requirements for Marketing of all Initial Sales and Rentals of BMR Units**

The Project Sponsor shall use good faith and affirmative efforts to attract potential Qualifying Owner and Qualifying Renter Households from all Minority Communities and Low-income, Median-income and Moderate-income communities through the marketing and advertising of the BMR Units. Toward that goal, the Project Sponsor shall prepare and provide to MOH a copy of the Marketing Plan for the sale or rental of the BMR Units prior to accepting applications or statements of interest for the purchase or lease of the BMR Units. No marketing or advertising material shall be distributed or published without the prior written approval of the Marketing Plan by MOH and all such materials shall be consistent with the approved Marketing Plan. Approval or disapproval of the Marketing Plan shall be made within ten (10) business days of receipt of a complete marketing plan. In instances where the Marketing Plan has been disapproved; MOH will provide recommendations to remedy any deficiencies.

To ensure access and outreach to Minority Communities and Low-income, Median-income and Moderate-income communities, the Project Sponsor must hire as part of the marketing and outreach strategy a Marketing Agent certified by MOH as having demonstrated capacity in reaching identified targeted populations. The targeted populations will be identified by MOH based on an analysis of the demographic characteristics Low-income, Median-income and Moderate-income communities of San Francisco, and applicants to the BMR program. The Project Sponsor must also work with the MOH-approved First-time Homebuyer Education Providers to market their BMR Units. Such outreach will be prescribed by MOH in a Marketing Plan template provided by MOH.

The Project Sponsor shall submit the Marketing Plan to MOH at least thirty (30) calendar days prior to the anticipated commencement of the Project's marketing and outreach and at least one hundred and twenty days (120) prior to the anticipated close of escrow for BMR Ownership Units and lease origination dates for BMR Rental Units.

**Content of Marketing Plan**

MOH shall prescribe the form of the Marketing Plan and shall provide the format to the Project Sponsor for completion and submittal.  Unless determined by MOH to be inapplicable to a particular Project, the Marketing Plan shall include:

The name, address, email address, and phone number of the Project Sponsor;

The name, address, email address, and phone number of the sales or rental agent(s);

An attached copy of all planning approvals, the NSR and approved floor plans associated with the Principal Project and any applicable off-site Project;

The name of the City Planner assigned to the Project;

A description of the total number of units in the Principal Project or applicable off-site Project;

A description of the total number of Market Rate units in the Project;

A description of the total number of BMR Units in the Project;

The Home Association Dues (HOA Dues) for each BMR Unit;

All amenities included in the sale or rental of the BMR Unit;

Parking available to all residential tenants in the Project;

BMR Buyer or BMR Renter qualifications;

Workshop and open house dates;

A media plan;

A strategy for marketing to residents of the immediate neighborhood;

A comprehensive strategy for reaching out to Low-income, Median-income, moderate-income and Minority Communities in San Francisco;

Dates and strategy for the application process;

Dates and strategy for the lottery selection process;

Dates and strategy for the process of working with lottery winners;

Marketing materials which clearly define Program eligibility and which specify documentation and monitoring procedures;

Notices that BMR Buyers are subject to special Use Restrictions, including an acknowledgement of these restrictions in the case of both BMR Ownership and BMR Rental Units and a sample packet of the City's

escrow closing documents that each BMR Buyer will be expected to execute upon purchase in the case of a BMR Ownership Units;

Listing of BMR Ownership Units with the San Francisco Multiple Listing Service (MLS);

A list of community housing organizations that will receive written notification regarding the availability of the BMR Units prior to commencement of advertising or marketing of such units;

A list of community housing organizations that the Project Sponsor or the Project Sponsor's marketing representative must work with in order to meet language or cultural needs of minority communities.

**Conduct of Marketing Plan**

No marketing of the BMR Unit(s) shall begin until the Project Sponsor has received written approval of the Marketing Plan following confirmation from MOH of the number, type, location, and price or rent of the BMR Units and permissible income limits of purchasers or tenants, pursuant to II (C) and III (C) of this Manual.

Projects Sponsors shall submit to MOH a complete Marketing Plan in a template provided by MOH. MOH shall have ten (10) business days to review and approve the Plan. The submitted Marketing Plan should not commence any sooner than thirty (30) days from the date of the submission to MOH, as reflected in all dates set forth in the plan.

All available BMR Ownership Units must be advertised by the Project Sponsor and listed on the MOH website of available BMR Units for at least forty-five (45) days prior to the application deadline for the BMR Unit(s). All available BMR Rental Units must be advertised by the Project Sponsor and listed on the MOH website of available BMR Units for at least twenty-eight (28) days prior to an application deadline for the BMR Unit(s).

BMR Units must be advertised in at least five (5) local newspapers that reach Minority and Low-, Median and Moderate-income Communities in San Francisco for a continuous period of at least the first three (3) weeks of the required marketing period and at least one local newspaper of general San Francisco circulation for at least two weekend days prior to the established application deadlines for the BMR Units.

Project Sponsors must hold at least three (3) open houses to show the BMR Units, with at least one open house date on a weekday evening and one open house date on a weekend. BMR Buyers or BMR Renters should be afforded the opportunity to view the BMR Units post-lottery in the same fashion as non-BMR buyers or renters in the Project.

Project Sponsors offering three or more BMR Units may be required to hold an information session open to the public in which the Project Sponsor presents the Project and explains the BMR program. Project Sponsors offering larger quantities of BMR Units may be required, at MOH's discretion, to hold additional information sessions. Information sessions for BMR Units shall be held in a public, accessible location that is arranged and paid for by the Project Sponsor.

As a part of the Marketing Plan submission, the Project Sponsor must provide a flyer for the BMR Units

that must include specific information set forth in the marketing plan template and may choose to use a template flyer provided by MOH if preferred.

Project Sponsors shall pay for a mailing to Certificate of Preference holders to announce new BMR Unit offerings. The mailing shall be coordinated by MOH and MOH shall send the Project Sponsor a bill for such mailing in the amount of 10 cents a page for copying the flyer plus the price of mailing the flyer to each of the Certificate of Preference holders at the then current standard first class mail rate.

Project Sponsors shall make a Program application available to the public on their own website and in person at a designated location at the least. At the end of the required marketing period, applicants shall submit the Program application directly to the Project Sponsor by a mandated day and time. Applicants submitting an application shall be issued a lottery ticket by the Project Sponsor. A twin ticket shall be held by the Project Sponsor to be entered into the lottery if the application is deemed by MOH to be complete. The Project Sponsor, with oversight from MOH, shall evaluate the application and determine within fifteen (15) business days if the applicant meets the eligibility for a BMR Renter or BMR Owner as described in Sections II and III of this Manual.

The application deadline shall be followed by a public lottery for all new BMR Units, as described in Sections II (B) and III (B) of this Manual. The Project Sponsor shall submit to MOH within 24 hours of the application deadline a list of all lottery applicants on a spreadsheet provided by MOH. The Project Sponsor may be allowed a longer period of time to submit the applicant list in the case of larger Projects with approval from MOH. This list shall be used as the final applicant list for use in the lottery.

The Project Sponsor shall alert sales or rental staff to the BMR Units and provide such staff with a copy of this Manual and the special Use Restrictions applicable to the BMR Units.

The sales or rental programs and procedures shall not have the effect of excluding or discriminating against any person on the basis of race, religion, national origin, sex, sexual orientation, gender identity, health status, source of income such as disability insurance, social security, TANF, or any other basis prohibited by federal, state or local law.

The Equal Housing Opportunity symbol shall be displayed in a visible location at any sales of rental office, and shall be incorporated in all advertisements and printed materials.

**Application Review Process**

Following the publication of the lottery results, BMR applications shall be reviewed by Project Sponsors by applying the application review guidelines as described in Section V (G) of this Manual and at www.sfgov.org and presented to MOH for review before the issuance of an approval or disqualification letter to the applicants. The Project Sponsor shall verify the Household eligibility (as approved by MOH) within fifteen (15) working days of the receipt of a complete application. Should an applicant be approved by MOH and is otherwise approved, that applicant will either enter into a lease for the BMR Unit or work with an approved lender to secure a loan. In the case of BMR Ownership Units, the Project Sponsor shall submit the BMR Buyer application to MOH for approval at least sixty (60) days prior to the anticipated close of escrow. In the case of BMR Rental Units, the Project Sponsor shall submit the BMR Renter application to MOH for approval at least fifteen (15) days prior to the anticipated signing of the lease.

**Inability to Find a Buyer or Renter for an Initial Sale or Initial Rental BMR Unit**

In cases where, despite the Project Sponsor's good faith efforts, no eligible BMR Owner or BMR Renter has contracted to purchase or rent a BMR Unit within six (6) months after the lottery for the BMR Units, the Project Sponsor shall inform MOH, which may then increase the permissible income levels for prospective BMR Buyers or BMR Renters of that BMR Unit up to a maximum twenty (20) percent over the income percentage limit specified in Use Restrictions (but only 10% above the actual Maximum Income Level for the BMR Unit for BMR Ownership Units that are priced under this Manual), but not to exceed 120% AMI at any time, on a one-time basis only, but shall not increase any current or future permissible sales or rental price of that BMR Unit as indicated in Use Restrictions or this Manual. Project Sponsors shall inform all BMR Buyers of the one-time nature of the qualifying income increase.

## H.  MARKETING PROCEDURES FOR RESALE AND RERENTAL OF BMR UNITS

**Marketing Procedures for Resale of BMR Units**

Section II (F) of this Manual contains requirements for the marketing of BMR Ownership Units upon resale.

**Marketing Procedures for BMR Rental Units upon Rerental**

*Maximum Monthly Rent of BMR Rental Units upon Rerental*

The Project Sponsor shall notify MOH of a vacancy of a BMR Unit prior to offering the BMR Rental Units for rent and prior to marketing the unit according to the marketing procedures set forth below.

Rental rates for qualifying Households shall not exceed the applicable Maximum Monthly Rent published in accordance with the provisions of Section III (C) of this Manual.

*Marketing Procedures for BMR Rental Units upon Rerental*

Marketing of BMR Rental Units upon re-rental shall be in compliance with all applicable federal, state and local laws related to fair housing rules. Project Owners may be asked to certify that the BMR Units have not been marketed in such a manner as to be discriminatory.

The rental programs and procedures shall not have the effect of excluding or discriminating against any person on the basis of race, religion, national origin, sex, sexual orientation, health status, source of income such as disability insurance, social security, TANF, or any other basis prohibited by federal, state or local law.

Upon re-rental, BMR Rental Unit managers must follow the process established by MOH for re-renting BMR Units. This process includes the following:

The Project Sponsor shall inform MOH at least thirty (30) days prior to the intended lease origination date of a new BMR Renter of the availability of any such BMR Rental Unit before beginning any general marketing;

Units must be listed on the MOH website list of available BMR Units for at least a seven (7) business day period in a form provided by MOH;

Applicants must complete a MOH BMR rental application and return the application and all supporting materials to the Project Owner by the application deadline;

All applications shall be entered into a lottery for the BMR Unit as described in Section III (B) unless the Project is specifically permitted by MOH to maintain a waitlist of applicants.

**I.    CONVERSION OF BMR RENTAL UNITS TO OWNERSHIP UNITS**

When authorized by Use Restrictions placed on a Principal Project, a BMR Rental Unit may be permitted to be converted for owner occupancy only upon satisfaction of all of the following additional conditions:

If the BMR Unit is subject to Use Restrictions specifying that the BMR Unit be a rental unit, conversion shall be subject to the approval of the Planning Commission;

The conversion from rental to condominium ownership of the BMR Unit shall be subject to any applicable City procedures, standards, fees and regulations in effect at the time of application;

The BMR Unit must be in good physical condition at the time of sale as verified by an inspection;

The Project Sponsor shall prepare and submit a Marketing Plan and conduct sales of the BMR Units in conformity with the Requirements of this Manual in force at the time of marketing and sale;

Existing tenants shall be offered a right of first refusal to purchase the BMR Unit, which right of first refusal shall afford the tenant at least six (6) months or the balance of the existing lease period, whichever is longer, from the time of official notice to exercise the right to purchase or to vacate the unit;

Should the current BMR Renter decide to purchase the BMR Unit, such unit shall be priced at the level of affordability dictated for the current BMR Rental Unit as stated in Use Restrictions or at the actual income level of the current BMR Renter, whichever is higher;

In the case of a BMR Unit whose current BMR Renter exercises the right of first refusal, the BMR Renter must be eligible under the BMR Buyer Program and the gross annual Household income of the BMR Renter at the time of application should not exceed 120% of AMI or at the actual income level of the BMR renter, whichever is higher;

Should the current BMR Renter decide not to purchase the BMR Unit, the unit shall be priced at the level of affordability dictated for the unit as stated in the Use Restrictions for the Project had the BMR Unit initially been sold rather than rented;

Should the current BMR Renter decide not to purchase the BMR Unit, the Project Owner shall provide a relocation allowance to the current BMR Renter in an amount equal to current relocation allowances required under the San Francisco Rent Ordinance;

In the case of a BMR Unit whose current BMR Renter does not exercise the right of first refusal, the prospective purchaser must meet all of the requirements of a BMR Buyer described in Section II (A) of this Manual;

Upon conversion, the BMR Unit(s) shall record a new Notice of Special Restrictions identifying the BMR Unit as a restricted BMR Ownership Unit under the current version of Section 415 of the Planning Code;

Once converted, BMR Units shall be subject to all restrictions applicable to the marketing, sale and resale of BMR Ownership Units as set forth in this Manual, including resale restrictions as set forth in Section II (F) of this Manual.

**J.    MONITORING AND REPORTING PROCEDURE**

**Monitoring and Reporting Procedures for BMR Ownership Units**

BMR Ownership Units shall be monitored according to the requirements set forth in Section II (H) of this Manual.

**Monitoring and Reporting Procedures for BMR Rental Units**

BMR Rental Units shall be monitored according to the requirements set forth in Section III (I) of this Manual.

**K.    STATISTICAL INFORMATION FOR BMR UNITS**

MOH may at any time require the Project Sponsor to collect information from the owners or tenants of all BMR Units in the Project regarding their ethnicity, gender, age, and such other information as may be requested to allow MOH to verify that there have been no discriminatory practices in the selection of such tenants or owners.  The collection of such information shall be conducted in a manner and using a form acceptable to MOH, ensuring that the information is being collected after the BMR Renter or BMR Owner selection process is complete, and is used solely for statistical reasons and not as the basis for making any decision regarding the qualification of a tenant or owner for occupancy of a BMR Unit.

**L.    DOCUMENT RETENTION POLICY**

Project Sponsors of BMR Units shall retain initial application forms and Household income documentation for the greater of (1) five (5) years from the date of a BMR Renter or BMR Owner's occupancy of a BMR Unit, or (2) the duration of the tenure of the BMR Owner or BMR Renter occupying the BMR Unit.  This data may be requested by MOH, along with an administrative fee if any is authorized at the time of the request.

**M.  CONFLICT OF INTEREST**

The Project Sponsor may not sell or rent a BMR Unit to the Project architect, attorney, prime contractor,

or to anyone of its or their employees, directors, officers or agents, or to any of their family members, as determined by MOH.

**N.   PENALTIES**

Failure to comply with the requirements of Planning Code Section 415, any Use Restrictions for the Project, or the Procedures Manual may result in an enforcement action by the City including but not limited to the imposition of penalties under the Planning Code.

**O.   PUBLIC RECORDS**

Applicants, owners, and project sponsors should be aware that any information provided to the City and County of San Francisco will be used, disseminated, and retained as needed in conducting the City's official business and may be subject to disclosure in accordance with the California Public Records Act and the San Francisco Sunshine Ordinance.

# EXHIBIT 4

DO NOT DESTROY THIS NOTE: WHEN PAID, THIS NOTE AND DEED OF TRUST SECURING THE SAME MUST BE
SURRENDERED TO CITY FOR CANCELLATION BEFORE RECONVEYANCE WILL BE MADE.

## PROMISSORY NOTE SECURED BY DEED OF TRUST
### Inclusionary Housing Program

<u>$328,366</u> (Principal Amount)    San Francisco, California    Date: 10/20/15

    FOR VALUE RECEIVED, the undersigned, <u>Kelly AD Johnston</u> (Maker) hereby promises to pay to the
CITY AND COUNTY OF SAN FRANCISCO, a municipal corporation (Holder), the principal sum of <u>Three
Hundred Twenty Eight Thousand Three Hundred Sixty Six and 00/100</u> Dollars (<u>$328,366</u>).

1.    <u>Purchase of Dwelling Unit at Restricted Purchase Price</u>
    Maker desires to purchase a unit located at <u>400 Grove Street, Unit 101, San Francisco, CA 94102</u>
("BMR unit"). The BMR unit shall include one parking space, designated as # P-3 (the "parking space"). The
purchase price of the BMR unit, including the parking space, has been established pursuant to the following
documents (collectively, the "Restriction"):

        (1) <u>Planning Commission Motion No. 18795</u>, adopted on <u>January 31, 2013</u>;
        (2) Interest on the principal amount at the rate of 0% per annum.
        (3) A "Notice of Special Restrictions Under the City Planning Code" ("NSR") recorded in the official
            records of the San Francisco County on <u>May 06, 2013</u> as <u>Document 2013-J652026</u>;
        (4) City and County of San Francisco Inclusionary Housing Monitoring and Procedures Manual
            ("Procedures Manual"), effective May 10, 2013.

2.  <u>Calculation of Principal Amount of Note</u>.

The original principal amount of this note is equal to <u>Three Hundred Twenty Eight Thousand Three
Hundred Sixty Six and 00/100</u> Dollars (<u>$328,366</u>). This amount is equal to the appraised Fair Market Value of
the BMR Unit without regard to the Restriction (<u>$650,000</u>) less the restricted purchase price of the BMR Unit
(<u>$321,634</u>), as required by the Restriction.

3.    <u>Interest</u>.  No interest shall accrue on the principal balance of this note.

4.    <u>Event of Default</u>.

    a.    Maker's failure to comply with any provision contained in the Restriction shall constitute an
Event of Default under this Note; provided that if such failure concerns a rental or sublease of the BMR Unit in
violation of the Restriction, such failure shall not constitute an Event of Default unless Maker fails to cure such
default within thirty (30) days after the receipt of written notice from Holder.  Holder's ability to cure such
defaults (i.e., through the termination of a tenancy which violates the Restriction) is subject to all applicable
local, state and/or federal laws to the contrary.

    b.    Upon the occurrence of an Event of Default, following the expiration of any applicable notice
and cure periods described in Subparagraph 5(a), the entire principal balance of this Note, together with all
accrued interest, shall be immediately due and payable.  In addition, Holder may pursue all rights and
remedies available to Holder at law or in equity.

5.    <u>Forgiveness</u>.  Upon a sale of the BMR unit for a resale price that is established pursuant to the
documents referenced in Paragraph 1, above, the entire principal balance of this Note, together with
all accrued and unpaid interest thereon, shall be forgiven, this Note shall be canceled and returned to
Maker and the Deed of Trust shall be reconveyed only upon the happening of each of the following
events:

    a.    During the period which Maker owns the BMR Unit, Maker shall have complied in all respects
with the terms of the Restriction;

    b.    Any sale, rental or sublease of the BMR Unit must be in compliance with the terms of the
Restriction, including but not limited to the requirement that, upon any resale of the BMR Unit, the City may
require prospective purchaser to execute and deliver to the Holder a note, deed of trust and grant of right of

first refusal in substantially the form of this Note, Deed of Trust and Grant of Right of First Refusal with respect to purchase of Property executed by maker concurrently herewith; except that the principal amount of such Note shall reflect the difference between the resale price and fair market value of the BMR Unit at the time of such resale.

      c.      If the conditions in this Section 5 are not satisfied, the entire principal balance and accrued interest on this Note shall be due and payable as a condition to such sale.

      d.      The resale price and resale transaction of the BMR unit must include the parking space at no additional charge.

6.      <u>Security</u>.      Repayment of this Note is secured by a deed of trust (the "Deed of Trust"), which Deed of Trust shall be recorded in the official records of San Francisco County, California, as a lien on the BMR Unit, subject only to those exceptions to title approved in writing by Holder.

7.      <u>Terms of Payment</u>.

      a.      All payments under this Note shall be paid in currency of the United States of America, which at the time of payment is lawful for the payment of public and private debts.

      b.      All payments shall be made payable to Holder and mailed or delivered in person to Holder's office at 1 South Van Ness Avenue, Fifth Floor, San Francisco, CA 94103, or to such other place as Holder of this Note may from time to time designate.

      c.      Notwithstanding any other provisions of this Note, or any instrument securing the obligations of Maker under this note, if, for any reason whatsoever, the payment of any sums by Maker pursuant to the terms of this Note would result in the payment of interest which would exceed the amount that Holder may legally charge under the laws of the State of California, then amount by which payment exceeds the lawful interest rate shall automatically be deducted from the principal balance owing on this Note, so that in no event shall Maker be obligated under the terms of this Note to pay any interest which would exceed the lawful rate.

8.      <u>Waivers</u>.

      a.      Maker expressly agrees that the term of this Note or the date of any payment due hereunder may be extended from time to time with Holder's consent, and that Holder may accept further security or release any security for this Note, all without in any way affecting the liability of Maker.

      b.      No extension of time for payment of this Note or any installment hereof made by agreement by Holder with any person now or hereafter liable for the payment of this Note shall operate to release, discharge, modify, change or affect the original liability of Maker under this Note, either in whole or in part.

      c.      The obligations of Maker under this Note shall be absolute and Maker waives any and all rights to offset, deduct or withhold any payments or charges due under this Note for any reason whatsoever.

9.      <u>Miscellaneous Provisions</u>.

      a.      All notices and consents required under this Note or the Deed of Trust shall be made in writing and shall be deemed communicated by personal delivery or by United States Mail, postage prepaid, as of the earlier of actual receipt of seven days from mailing, addressed as follows:

      To Maker:      <u>Kelly AD Johnston</u>
                      <u>400 Grove Street, Unit 101</u>
                      <u>San Francisco, CA 94102</u>

      To Holder:      Mayor's Office of Housing and Community Development
                      1 South Van Ness Avenue, Fifth Floor
                      San Francisco, CA 94103
                      Attn: Inclusionary Program

      b.      In event of litigation arising from the enforcement of or a default under this Note or the Deed of Trust, the non-prevailing party promises to pay all reasonable costs and expenses, including reasonable attorney's fees, incurred by the prevailing party in such litigation.

c.    This Note may be amended only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

d.    This Note shall be governed by and construed in accordance with the laws of the State of California.

e.    Time is of the essence for the performance of all obligations of Maker hereunder.

10.    **Termination.**

Notwithstanding the foregoing paragraph, upon foreclosure on the Property by a third party lender or other transfer of the property in lieu of foreclosure or upon an assignment to HUD of a mortgage which was made to secure Borrower's purchase of the Property, the lien of the Deed of Trust shall be extinguished if the foreclosure or other transfer recognizes any contractual or legal rights of the City and the Maker to take actions that would avoid the lien of the Deed of Trust to be extinguished.  However, this Note, the Deed of Trust and Maker's obligations hereunder shall be revived according to their original terms if, following any foreclosure or transfer in lieu of foreclosure, the owner of record before the foreclosure or transfer or assignment, or any entity that includes the former owner or those with whom the former owner has or had family or business ties, obtains an ownership interest in the Property.

**Buyer(s)**

Signature: _Kelly AD Johnston_____
        Kelly AD Johnston

(Please add additional lines if necessary)

*(THIS DOCUMENT MUST BE NOTARIZED)*

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of San Francisco

On October 20, 2015, before me, ___DAVID LAU___, Notary Public,
(here insert name and title of the officer)

personally appeared Kelly AD Johnston ___,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Signature                                        (Seal)

DAVID LAU
Commission # 2098616
Notary Public - California
San Francisco County
My Comm. Expires Feb 1, 2019

Notary Acknowledgment (Effective 1/1/2015)

SCA0002735.doc / Updated: 10.29.14

Page 1

Printed: 05.07.15 @ 03:10 PM by MY

CA-CT-FWPN-02180.052355-FWPN-3551500266

# EXHIBIT 5

3

4044F0101

Free Recording Requested
Pursuant to Government
Code Section 27383

**RECORDING REQUESTED BY:**
City and County of San Francisco
Mayor's Office of Housing

20159K14941100011
San Francisco Assessor-Recorder
Carmen Chu, Assessor-Recorder
DOC 2015-K149411-00
Acct 2001-Chicago Title Company Concord
Monday, OCT 26, 2015 12:31:38
Ttl Pd    $0.00       Nbr-0005252247
odm/RE/2-11

**WHEN RECORDED MAIL TO:**
Mayor's Office of Housing of the
City and County of San Francisco
1 South Van Ness Avenue, Fifth Floor
San Francisco, California 94103
Attention: Inclusionary Program

Block 0793 Lot 107    Space Above This Line for Recorder's Use

400 Grove #101

### DEED OF TRUST AND ASSIGNMENT OF RENTS

This Deed of Trust, made this day ___Oct. 20. 2015___, 2015 between, **Kelly AD Johnston** herein called TRUSTOR, whose address is **400 Grove Street, Unit 101, San Francisco, CA 94102; Chicago Title Company**, herein called TRUSTEE; and THE CITY AND COUNTY OF SAN FRANCISCO, a municipal corporation, herein called BENEFICIARY, witnesseth: that Trustor IRREVOCABLY GRANTS, TRANSFERS AND ASSIGNS TO TRUSTEE IN TRUST, WITH POWER OF SALE, that real property situated in the City and County of San Francisco, State of California, described in Exhibit A attached hereto and made a part thereof.

TOGETHER WITH the rents, issues and profits thereof, SUBJECT, HOWEVER, to the right, power and authority given to and conferred upon Beneficiary by paragraph (10) of the provisions incorporated herein by reference to collect and apply such rents, issues and profits.

For the Purpose of Securing: 1. The promissory note executed by Trustor in favor of Beneficiary, each dated of even date herewith, and performance of agreement of Trustor incorporated by reference or contained herein. 2. Payment of the indebtedness evidenced by the aforesaid promissory note in the principal amount not to exceed **Three Hundred Twenty Eight Thousand Three Hundred Sixty Six and 00/100 Dollars ($328,366)**. Payment of such further sums as the then record owner of said property hereafter may borrow from Beneficiary, when evidenced by another note (or notes) reciting it is so secured.

To protect the Security of This Deed of Trust, Trustor Agrees: By the execution and delivery of this Deed of Trust and the note secured hereby, that provisions (1) to (14), inclusive, of the fictitious deed of trust recorded in the office of the Recorder of the City and County of San Francisco on October 23, 1961 in Book A-332 of Official Records, at page 905, hereby are adopted and incorporated herein and made a part hereof as fully as though set forth herein at length; that he will observe and perform said provisions; and that the references to property, obligations, and parties in said provisions shall be construed to refer to the property, obligations, and parties set forth in this Deed of Trust.

In the event of default by the Trustor under this Deed of Trust, or if the herein described property or any part thereof, or any interest therein is sold, agreed to be sold, conveyed, alienated or refinanced by the Trustor, or by the operation of law or otherwise, without the written consent of the Beneficiary hereof, all obligations secured by this instrument irrespective of the maturity dates expressed therein, at the option of the Beneficiary

4044Fo101

✱ Free Recording Requested
Pursuant to Government
Code Section 27383

RECORDING REQUESTED BY:
City and County of San Francisco
Mayor's Office of Housing

WHEN RECORDED MAIL TO:
Mayor's Office of Housing of the
City and County of San Francisco
1 South Van Ness Avenue, Fifth Floor
San Francisco, California 94103
Attention: Inclusionary Program

---

*Block 0793 Lot 107*     *Space Above This Line for Recorder's Use*
400 Grove #101
St.

## DEED OF TRUST AND ASSIGNMENT OF RENTS

This Deed of Trust, made this day __Oct·20·2015__, 2015 between, **Kelly AD Johnston** herein called TRUSTOR, whose address is **400 Grove Street, Unit 101, San Francisco, CA 94102**; **Chicago Title Company**, herein called TRUSTEE; and THE CITY AND COUNTY OF SAN FRANCISCO, a municipal corporation, herein called BENEFICIARY, witnesseth:  that Trustor IRREVOCABLY GRANTS, TRANSFERS AND ASSIGNS TO TRUSTEE IN TRUST, WITH POWER OF SALE, that real property situated in the City and County of San Francisco, State of California, described in Exhibit A attached hereto and made a part thereof.

TOGETHER WITH the rents, issues and profits thereof, SUBJECT, HOWEVER, to the right, power and authority given to and conferred upon Beneficiary by paragraph (10) of the provisions incorporated herein by reference to collect and apply such rents, issues and profits.

For the Purpose of Securing:  1.  The promissory note executed by Trustor in favor of Beneficiary, each dated of even date herewith, and performance of agreement of Trustor incorporated by reference or contained herein.   2.   Payment of the indebtedness evidenced by the aforesaid promissory note in the principal amount not to exceed **Three Hundred Twenty Eight Thousand Three Hundred Sixty Six and 00/100 Dollars ($328,366)**.  Payment of such further sums as the then record owner of said property hereafter may borrow from Beneficiary, when evidenced by another note (or notes) reciting it is so secured.

To protect the Security of This Deed of Trust, Trustor Agrees:  By the execution and delivery of this Deed of Trust and the note secured hereby, that provisions (1) to (14), inclusive, of the fictitious deed of trust recorded in the office of the Recorder of the City and County of San Francisco on October 23, 1961 in Book A-332 of Official Records, at page 905, hereby are adopted and incorporated herein and made a part hereof as fully as though set forth herein at length; that he will observe and perform said provisions; and that the references to property, obligations, and parties in said provisions shall be construed to refer to the property, obligations, and parties set forth in this Deed of Trust.

In the event of default by the Trustor under this Deed of Trust, or if the herein described property or any part thereof, or any interest therein is sold, agreed to be sold, conveyed, alienated or refinanced by the Trustor, or by the operation of law or otherwise, without the written consent of the Beneficiary hereof, all obligations secured by this instrument irrespective of the maturity dates expressed therein, at the option of the Beneficiary

hereof and without demand or notice shall immediately become due and payable. The undersigned Trustor requests that a copy of any Notice of Default and of any Notice of Sale hereunder be mailed to him at his address herein before set forth.

TRUSTOR(S):

**Buyer(s)**

Signature: _Kelly AD Johnston_

**Kelly AD Johnston**

(Please add additional lines if necessary)

**THIS DOCUMENT MUST BE NOTARIZED**

A notary public or other officer completing this certificate
verifies only the identity of the individual who signed the
document to which this certificate is attached, and not the
truthfulness, accuracy, or validity of that document.

State of _____ CALIFORNIA _____

County of _____ SAN FRANCISCO _____

On _____ 10/20/16 _____ before me, _____ DAVID LAU _____, Notary Public,
(here insert name and title of the officer)

personally appeared _____ KELLY AND JOHNSON _____
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is
true and correct.

WITNESS my hand and official seal.

_____                                    (Seal)
Signature

DAVID LAU
Commission # 2098616
Notary Public - California
San Francisco County
My Comm. Expires Feb 1, 2019

**ATTACH EXHIBIT A**
**LEGAL DESCRIPTION OF PROPERTY**

# EXHIBIT A

Order No.:    4044F0101

For APN/Parcel ID(s):  Block 0793, Lot 107

REAL PROPERTY SITUATED IN THE CITY AND COUNTY OF SAN FRANCISCO, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

**PARCEL ONE:**

CONDOMINIUM UNIT 101 (LOT NO. 107) OF PARCEL A OF FINAL MAP 7986, FILED JANUARY 7, 2015 IN BOOK 126 OF CONDOMINIUM MAPS, PAGES 85, 86 AND 87, OFFICIAL RECORDS OF SAN FRANCISCO COUNTY RECORDS ("OFFICIAL RECORDS"), AS SUCH UNIT IS SHOWN ON THE CONDOMINIUM PLAN ("PLAN"), ATTACHED AS AN EXHIBIT TO THE DECLARATION OF RESTRICTIONS AND CONDOMINIUM PLAN FOR 400 GROVE STREET ("DECLARATION"), RECORDED MARCH 18,  2015, SERIES NO. 2015-K034558, OFFICIAL RECORDS, AND ANY AMENDMENTS AND/ORANNEXATIONS RECORDED PURSUANT THERETO.

**PARCEL TWO:**

AN UNDIVIDED 2.565% INTEREST AS TENANT IN COMMON IN AND TO THE COMMON AREA LYING WITHIN SAID PARCEL A OF FINAL MAP 7986, AS SHOWN ON THE PLAN AND DEFINED IN THE DECLARATION, EXCEPTING AND RESERVING THEREFROM THE FOLLOWING:

A.      ALL CONDOMINIUM UNITS SHOWN ON THE PLAN AND DESCRIBED IN THE DECLARATION.

B.      EXCLUSIVE USE COMMON AREAS FOR POSSESSION, USE AND ENJOYMENT OF THOSE AREAS DESIGNATED ON THE PLAN AND DEFINED IN THE DECLARATION.

C.      NON-EXCLUSIVE EASEMENT FOR USE, ENJOYMENT, INGRESS, EGRESS AND SUPPORT IN AND TO THE COMMON AREA AS SHOWN ON THE PLAN AND DESCRIBED IN THE DECLARATION.

D.      ALL EASEMENTS AS DEFINED IN THE DECLARATION.

**PARCEL THREE:**

NON-EXCLUSIVE EASEMENTS FOR USE, ENJOYMENT, INGRESS, EGRESS AND SUPPORT IN AND TO THE COMMON AREA, AS SHOWN ON THE PLAN AND DESCRIBED IN THE DECLARATION, FOR THE BENEFIT OF PARCEL ONE HEREINABOVE.

**PARCEL FOUR:**

EXCLUSIVE USE EASEMENTS, AS SHOWN ON THE PLAN AND DESCRIBED IN THE DECLARATION, APPURTENANT TO PARCEL ONE HEREINABOVE FOR THE POSSESSION, USE AND ENJOYMENT OF:

A.      PARKING P-3

Assessor Parcel Numbers:

**EXHIBIT A**
(continued)

LOT 103, BLOCK 0793 (PORTION-CURRENT TAX YEAR)
LOT 107, BLOCK 0793 (FUTURE TAX YEAR)

ATTACH EXHIBIT B
PHOTCOPY OF BORROWER EXECUTED PROMISSORY NOTE

# EXHIBIT B

Gregory J. Wood (200780)
WOOD LITIGATION, APC
235 Montgomery Street, Suite 415
San Francisco, California 94104
Telephone: (415) 247-7900
gwood@woodlitigation.com

Attorney for Defendant and Cross-Complainant,
KELLY ANN DOMINGUEZ JOHNSTON

IN THE SUPERIOR COURT OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, a Municipal Corporation; and the PEOPLE OF THE STATE OF CALIFORNIA, by and through David Chiu, City Attorney for the City and County of San Francisco,<br><br>    Plaintiffs,<br><br>    v.<br><br>KELLY ANN DOMINGUEZ JOHNSTON, an individual, and DOE ONE through DOE TEN,<br><br>    Defendants. | Case No.: CGC-24-614712<br><br>**KELLY ANN DOMINGUEZ JOHNSTON'S CROSS-COMPLAINT** |
| KELLY ANN DOMINGUEZ JOHNSTON, an individual,<br><br>    Cross-Complainant,<br><br>    v.<br><br>MAYOR'S OFFICE OF HOUSING AND COMMUNITY DEVELOPMENT, a City and County of San Francisco organization, and ROES ONE through ROES TEN,<br><br>    Cross-Defendants. | Complaint Filed:    May 16, 2024<br>Trial Date:          TBD |

Defendant and Cross-Complainant KELLY ANN DOMINGUEZ JOHNSTON ("Cross-Complainant") alleges:

## INTRODUCTION

Cross-Complainant is the victim of a failed government program and failed government investigation. The program that failed Cross-Complainant is the Below Market Rate housing program operated by Cross-Defendants. The BMR program promises low-income renters a chance to get ahead by buying into the lucrative San Francisco housing market. That is not, however, how it turns out. At least, that is not how it turned out for Cross-Complainant.

In Cross-Complainant's case, Cross-Complainant bought one of Cross-Defendants' BMR units only to learn that she could never sell it. Cross-Defendants set the price and restricted buyers' return on investment so that there was no market for her unit. Cross-Complainant has lost money month after month on her BMR unit, and she continues to lose. Buying that BMR unit was the worst financial decision of her life, and that was apparently just the beginning.

Adding insult to Cross-Complainant's injury, the government decided to make the situation ten times worse for Cross-Complainant by erroneously determining, pursuant to a so-called investigation, that Cross-Complainant violated BMR rental regulations. Cross-Defendants claimed Cross-Complainant rented her unit out at market rates and threatened Cross-Complainant with outrageously high fines and penalties.

The evidence will show, Cross-Complainant has not received $1 from any tenant or the rental of the unit, and the BMR program and investigation are a sham. The constitution of this state and that of the federal government afford protections against government action such as those being carried out by Cross-Defendants at Cross-Complainant's expense. By and through this Cross-Complaint, Cross-Complainant begs the Court to extend those protections to her, and asks to be compensated for the government's wrongful acts to date. Cross-Complainant is the victim, not the perpetrator, and she intends to prove as much at trial.

/ /

/ /

/ /

**THE PARTIES**

1.      Cross-Complainant Kelly Ann Dominguez Johnston is an individual living in the City and County of San Francisco.

2.      Cross-Defendant The Mayor's Office of Housing and Community Development is a government agency within the City and County of San Francisco.

3.      The true names and capacities of ROES 1 through 50, inclusive, are unknown to Cross-Complainant who sues such cross-defendants by use of such fictitious names. Cross-Complainant will amend this complaint to add the true names when they are ascertained. Cross-Complainant is informed and believe, and thereon alleges, that each of the fictitiously named cross-defendants is legally responsible for the occurrences herein alleged, and that Cross-Complainant's damages as herein alleged were proximately caused by their conduct. The named Cross-Defendant and ROE cross-defendants are collectively referred to herein as "Cross-Defendants."

4.      Cross-Complainant is informed and believe and thereon alleges, that at all times herein mentioned, Cross-Defendants, and each of them, were the agents and/or employees of each of the remaining Cross-Defendants, and in doing the things herein alleged, were acting within the course and scope of said agency and/or employment, in that the actions of each of the Cross-Defendants as herein alleged were authorized, approved, and/or ratified by each of the other Cross-Defendants as principals and/or employers.

**GENERAL ALLEGATIONS**

5.      As alleged in the City and County of San Francisco (the "City")'s Complaint, Cross-Complainant purchased the condominium unit located at 400 Grove Street, Unit 100, (the "Property") as a below market rate condominium unit in October 2015.

6.      What the City conspicuously leaves out of its Complaint is that Cross-Complainant tried to sell the unit and the City made it impossible. In September 2020, Cross-Complainant contacted a real estate agent, signed a listing agreement and ordered the usual pre-sale disclosures that one orders when they intend to sell their home.

/ /

**KELLY ANN DOMINGUEZ JOHNSTON'S CROSS-COMPLAINT, CASE NO. CGC-24-614712**

7.    Under the BMR program, however, owners of BMR units cannot just put the BMR property on the market. Cross-Defendants set the listing price and restrict buyers' return on investment, and through those powers control whether the property sells. Accordingly, Cross-Complaint and her agent contacted Cross-Defendants to engage in the process of setting the listing price for Cross-Complainant's Property.

8.    Engaging with the City is never fast and it was not in this instance. Communications with Cross-Defendants continued through October 2020. Finally, sometime in late November or early December 2020, the listing went live at Cross-Defendants' dictated price.

9.    On or about December 19, 2020, there was a lottery that yielded seven applicants for the Property. Because of Cross-Defendants' price and restrictions on buyers' return on investment, by January 7, 2021, all seven applicants had withdrawn their applications.

10.    In February 2021, the unit was finally made available to all BMR candidates, not just the December lottery candidates, again at Cross-Defendants' dictated price. Because of Cross-Defendants' price and restrictions on buyers' return on investment, there was, again, no interest in the unit from the larger BMR marketplace. No one, not even low-income residents of the City, wanted anything to do with this property. Even those desperate to get into the housing market saw this unit for what it is: a trap.

11.    In July 2021, Cross-Defendants reduced the price and the unit still did not sell. By August 2021, Cross-Complainant gave up, took the Property off the market and continued paying the mortgage. Cross-Complainant has lost money every month since.

12.    A compassionate government agency in Cross-Defendants' position would have realized Cross-Complainant's life was forever ruined by Cross-Defendants' failed program and left her well enough alone. Cross-Defendants took a different approach, investigated and erroneously determined that Cross-Complainant violated BMR rental regulations by illegally renting the unit.

13.    In fact, Cross-Complainant has never received rental income from the Property, from 2018 or any other time. Cross-Complainant is informed and believes that her soon-to-be former husband let someone live in the unit, and that person paid her husband rent. Cross-

4

**KELLY ANN DOMINGUEZ JOHNSTON'S CROSS-COMPLAINT, CASE NO. CGC-24-614712**

Complaint never received $1 from renting the Property. These details apparently do not matter to Cross-Defendants though, hence the current lawsuit.

14.    In sum, Cross-Complaint is the victim, not the perpetrator. She is the victim of a failed government program, which was supposed to help her get ahead economically and has, instead, set her back forever.

15.    Cross-Complainant is also the victim of a failed government investigation, which has erroneously concluded she illegally rented the unit when she has never received $1 in rent.

16.    Why the City Attorney's office has decided to dedicate its limited resources to ruining the life of this economically disadvantaged woman of color will be the subject of further discovery.

## FIRST CAUSE OF ACTION

### (Inverse Condemnation/Regulatory Taking)

### (Cal. Const. Art. I, § 9/42 U.S.C. § 1983)

17.    Cross-Complainant re-alleges and incorporates herein the allegations contained in paragraphs 1 through 16, *supra*.

18.    Because Cross-Defendants set the price on resale of BMR units and restrict buyers' return on investments, Cross-Defendants have total control over whether the BMR units sell or not.

19.    In Cross-Complainant's case, Cross-Defendants set the price and restricted buyers' return on investment so that the unit would not sell and left Cross-Complainant with no options but to keep paying the mortgage on a property she did not want.

20.    Cross-Defendants followed the above wrongful actions with tasking the City Attorney's office to investigate alleged violations of BMR renting rules, which resulted in erroneous conclusions and the threat of outrageously high fines and penalties if Cross-Complainant did not sell her unit and hand over all proceeds from the sale.

21.    Cross-Complainant alleges, by making false promises to lure her into the program, setting the price of the BMR unit and restricting buyers' return on investment so it Cross-Complainant's unit would not sell, erroneously concluding Cross-Complainant violated

rules and threatening outrageously high fines and penalties, Cross-Defendants violated Cross-Complainant's rights as set forth in the California Constitution and United States Constitution, specifically rights against the government taking property without just compensation.

22.    As a result of Cross-Defendants' actions, Cross-Complainant has been harmed.

23.    Cross-Defendants' actions are a substantial factor in causing Cross-Complainant's harm.

## SECOND CAUSE OF ACTION

### (Procedural Due Process)

### (Cal. Const. Art. I, § 9/42 U.S.C. § 1983)

24.    Cross-Complainant re-alleges and incorporates herein the allegations contained in paragraphs 1 through 21, *supra*.

25.    Cross-Defendants intentionally and/or knowingly deprived Cross-Complainant of her procedural due process rights in the multiple ways described above, including but not limited to by making false promises about the benefits of buying into the BMR program, putting the BMR unit on the market at a price, and restricting buyers' return on investment, such that the unit would not sell, and drawing erroneous conclusions and threatening outrageously high fines and penalties.

26.    As a result of Cross-Defendants' actions, Cross-Complainant has been harmed.

27.    Cross-Defendants' actions are a substantial factor in causing Cross-Complainant's harm.

## THIRD CAUSE OF ACTION

### (Substantive Due Process)

### (Cal. Const. Art. I, § 9/42 U.S.C. § 1983)

28.    Cross-Complainant re-alleges and incorporates herein the allegations contained in paragraphs 1 through 21, *supra*.

29.    Cross-Defendants intentionally and/or knowingly deprived Cross-Complainant of her substantive due process rights in the multiple ways described above, including but not limited to by making false promises about the benefits of buying into the BMR program, putting

**KELLY ANN DOMINGUEZ JOHNSTON'S CROSS-COMPLAINT, CASE NO. CGC-24-614712**

the BMR unit on the market at a price, and restricting buyers' return on investment, such that the unit would not sell, and drawing erroneous conclusions and threatening outrageously high fines and penalties.

30.    As a result of Cross-Defendants' actions, Cross-Complainant has been harmed.

31.    Cross-Defendants' actions are a substantial factor in causing Cross-Complainant's harm.

## FOURTH CAUSE OF ACTION

### (Equal Protection)

### (Cal. Const. Art. I, § 9/42 U.S.C. § 1983)

32.    Petitioners re-allege and incorporate herein the allegations contained in paragraphs 1 through 21, *supra*.

33.    Cross-Defendant intentionally and/or knowingly deprived Cross-Complainant of equal protection in the multiple ways described above, including but not limited to by making false promises about the benefits of buying into the BMR program, putting the BMR unit on the market at a price, and restricting buyers' return on investment, such that the unit would not sell, and drawing erroneous conclusions and threatening outrageously high fines and penalties.

34.    As a result of Cross-Defendants' actions, Cross-Complainant has been harmed.

35.    Cross-Defendants' actions are a substantial factor in causing Cross-Complainant's harm.

## PRAYER

Wherefore, Cross-Complainant prays for judgment against Cross-Defendants as follows:

1.    For an injunction shutting the BMR program down and releasing all BMR properties from the restrictions they are currently under, so Cross-Defendants cannot more BMR owners the same harm Cross-Defendants have caused Cross-Complainant;

2.    For equitable relief in the form of a declaration releasing Cross-Complainant's unit from the restrictions imposed by the BMR program;

3.    For damages in an amount according to proof;

4.    For costs of suit and attorney's fees pursuant to the California Code, including but

7

not limited to Civil Procedure § 1021.5 and California Government Code § 800;

      5.    For such other relief as the Court deems proper.

Respectfully submitted,
WOOD LITIGATION, APC

Dated: March 21, 2025            By: _____

Gregory J. Wood
Attorneys for Defendant and Cross-Complainant KELLY ANN DOMINGUEZ JOHNSTON

**KELLY ANN DOMINGUEZ JOHNSTON'S CROSS-COMPLAINT, CASE NO. CGC-24-614712**

**PROOF OF SERVICE**

I, Cristina D. Herrera, declare that: At the time of service, I was over 18 years of age and not a party to this action. My business address is 235 Montgomery Street, Suite 415, San Francisco, CA 94104. On March 21, 2025, I served the following documents:

**KELLY ANN DOMINGUEZ JOHNSTON'S CROSS-COMPLAINT**

on the following interested parties:

David Chiu, Esq.                                              *Counsel for Plaintiffs*
Yvonne R. Meré, Esq.                        *City and County of San Francisco and*
Wade Chow, Esq.                                *People of the State of California*
Hunter W. Sims III, Esq.
Deputy City Attorneys
Fox Plaza
1390 Market Street, Seventh Floor
San Francisco, California 94102-5406
Telephone: (415) 554-4259 (Sims)
E-Mail: hunter.sims@sfcityatty.org

The documents were served by the following means:

|   |   |
|---|---|
| ☐ | **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons at the addresses above and deposited the sealed envelope with the United States Postal Service, with the postage fully prepaid. |
| ☐ | **By overnight delivery.** I enclosed the documents in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses above. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier. |
| **X** | **By e-service.** I caused the documents described above to be transmitted to an approved vendor for e-service on March 21, 2025 on the persons listed above. No error was reported in the transmission of the documents. |
| ☐ | **By electronic mail.** I caused the documents to be sent to the persons at the electronic service addressed listed in above. |
| ☐ | **By messenger service.** I caused the above stated documents to be hand served on the person(s) listed above by providing them to a professional messenger service for service of process. |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed March 21, 2025.

_____
Cristina D. Herrera

2

**PROOF OF SERVICE, CASE NO. CGC-24-614712**

# CERTIFICATE OF SERVICE

I, CHRISTINE HOANG, hereby certify that I electronically filed the following document with the Clerk of the Court for the United States District Court for the Northern District of California, San Francisco Division by using the appellate CM/ECF system on September 8, 2025.

**DECLARATION OF HUNTER W. SIMS III IN SUPPORT OF PLAINTIFFS AND CROSS-DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Executed September 8, 2025, at San Francisco, California.


_____*/s/  CHRISTINE HOANG*_____
CHRISTINE HOANG